REDMOND & NAZAR, L.L.P.
245 North Waco, Suite 402
Wichita, Kansas 67202
316-262-8361

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| QuVIS, Inc. | ) | Case No. 09-10706 |
| | ) | Chapter 11 |
| _____Debtor-in-Possession_____ | ) | |

## DISCLOSURE STATEMENT DATED NOVEMBER 6, 2009

## I. INTRODUCTORY STATEMENT

On March 20, 2009, Douglas A. Friesen, Marilyn R. Friesen Greenbush, and Douglas C. Cusick filed an involuntary petition against the Debtor (hereinafter "QuVIS, Inc.," "the Company," or the "Debtor) under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Kansas ("Court"). On May 18, 2009, the Debtor consented to an Order for Relief of Bankruptcy under Chapter 11. On November 6, 2009, the Debtor filed its Plan of Reorganization ("Plan").

Pursuant to the terms of the Bankruptcy Code, acceptance of the Plan by holders of claims or interests may not be solicited unless, at the time of or before such solicitation, there is transmitted to the holder, a copy or summary of the Plan and a written disclosure statement approved by the Court as containing adequate information. The Debtor has prepared this disclosure statement to disclose that information which, in its opinion, is necessary to make an informed evaluation of the Plan. Defined terms not defined herein shall have meaning given to them in the Plan. This disclosure statement, including the summary of the Plan contained herein, has been presented to and approved by the Court. The Court's approval does not constitute a judgment by the Court as to the

desirability of the Plan, but only that the disclosure statement contains information sufficient to enable a typical creditor to make an informed judgment about the Plan.

Provided that at least one class of impaired claims vote in favor of the Plan, if any class or classes of creditors whose claims are impaired fails to accept the Plan, it may still be confirmed under the "cramdown" provisions of §1129(b) of the United States Bankruptcy Code.  These provisions require that the Plan be fair and equitable as to the objecting class.  As to a class of unsecured creditors, this means that the class must be paid in full before any junior class of claims or interests receive anything of value under the Plan.  This principle is sometimes referred to as the "Absolute Priority Rule"[1].  As to secured creditors, the fair and equitable rule requires that they receive the indubitable equivalent of their claim or that they retain their lien on and receive deferred cash payments equal to the value of their interest in property of the estate.  The Debtor believes that the Plan meets these requirements and hereby requests confirmation under §1129(b) if one or more classes fail to accept the Plan.

In order to vote on a Plan, a creditor or holder must have filed a proof of claim or interest prior to the expiration of the "Claim Bar Date" established, unless the claim is scheduled by the Debtor and it is not stated in the schedules as disputed, unliquidated or contingent.  An order establishing a Claim Bar Date was entered by the Court on July 24, 2009, establishing a Claim Bar Date on October 23, 2009.  Any creditor scheduled as undisputed, liquidated, and not contingent,

---

[1] *Collier on Bankruptcy* (15th Ed.) at ¶1129.04[4][a][I] summarizes the "Absolute Priority Rule" as follows:
   "a plan of reorganization may not allocate any property whatsoever to any junior class on account of the member's interest or claim in a debtor unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their allowed claim, or the debtor's reorganization value, whichever is less."

is to the extent scheduled, deemed to have filed a claim. In order for the Plan to be accepted by

creditors, a majority in number and two-thirds (2/3) majority in amount of claims filed, allowed (for

voting purposes) and voting in each impaired class of creditors must vote to accept the Plan. In

order for the Plan to be accepted by interest holders, a two-thirds (2/3) majority in amount of interest

allowed (for voting purposes) and voting in each impaired class of interests must vote to accept the

Plan. If the Debtors are unable to obtain the requisite acceptances, they may be able to obtain

confirmation of the Plan, despite the non-acceptance of one or more classes pursuant to 11 U.S.C.

§1129(b) as discussed more fully above.

The Debtor is a Kansas Corporation. THE DEBTOR'S BOARD OF DIRECTORS

BELIEVE THAT THE PLAN OF REORGANIZATION PROPOSED HEREIN BY THE DEBTOR

IS IN THE BEST INTERESTS OF ALL CREDITORS AND HOLDERS OF EQUITY

INTERESTS. AS SUCH, THE DEBTOR STRONGLY URGES ALL CREDITORS AND

HOLDERS OF EQUITY INTERESTS TO VOTE IN FAVOR OF THE PLAN BY NO LATER

THAN 5:00 P.M., CENTRAL TIME, ON _____, WHICH IS THE VOTING

DEADLINE SET BY THE BANKRUPTCY COURT

A creditor or interest holder may vote on the Plan by filling out and mailing the enclosed

ballot which the Court has provided. The ballots must be returned by _____, 2009; no

vote received after such time will be counted nor included in the tally in any manner. Whether a

creditor or interest holder votes on the Plan or not, such claim holder will be bound by the terms of

the Plan if the Plan is confirmed. You are, therefore, urged to complete, date, sign, and promptly

mail the ballot to Edward J. Nazar, Redmond & Nazar, L.L.P., 245 North Waco, Suite 402, Wichita,

Kansas 67202-1117.

NO REPRESENTATIONS OTHER THAN AS SET FORTH IN THIS DISCLOSURE
STATEMENT CONCERNING THE DEBTOR OR THE PLAN IS AUTHORIZED BY THE
DEBTOR.   ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR
ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT
SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH
ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO
COUNSEL FOR HORIZON WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE
COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED IN THIS STATEMENT AND THE ATTACHED
SCHEDULES HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.   DUE TO THE
COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO
WARRANT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY,
ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE
AS OF THE DATE OF THIS DOCUMENT UNLESS ANOTHER DATE IS SPECIFIED HEREIN
AND THE DELIVERY OF THIS DOCUMENT DOES NOT IMPLY THAT THERE HAVE BEEN
NO CHANGES IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL
AND DETAILED REVIEW OF THE PLAN BY EACH HOLDER OF A CLAIM OR EQUITY

INTEREST.  THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.  THE PLAN IS THE OPERATIVE CONTROLLING LEGAL DOCUMENT.  AS SUCH, IF THERE IS ANY INCONSISTENCY BETWEEN THE TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE PLAN, THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL.

REDMOND & NAZAR, L.L.P. ("R&N") COMMENCED REPRESENTATION OF THE DEBTOR PRIOR TO THE PETITION DATE AS ITS BANKRUPTCY COUNSEL.  ALL COUNSEL TO THE DEBTOR HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. R&N HAD NO INVOLVEMENT WITH THE DEBTOR OR ITS MEMBERS PRIOR TO ITS ENGAGEMENT FOR THE FILING OF THIS BANKRUPTCY AND ANY PRE-PETITION CONSULTATION.

FORWARD-LOOKING STATEMENTS: THIS DISCLOSURE STATEMENT INCLUDES FORWARD-LOOKING STATEMENTS BASED LARGELY ON THE CURRENT EXPECTATION OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR'S OR THE REORGANIZED DEBTOR'S BUSINESSES. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS,

UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER THE CAPTION "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NEITHER THE DEBTOR NOR THE REORGANIZED DEBTOR NOR THEIR COUNSEL UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

## II. HISTORY OF DEBTOR

QuVIS is a Kansas corporation formed in 1994 under the name Real Video, Inc. The company was founded by Kenbe Goertzen ("Goertzen"), previously the director of Newtek engineering; Charles Steinkuhler, previously the principal Newtek hardware engineer; and Larry Strober, a previous Newtek sales and marketing consultant. At the time QuVIS was formed, Newtek's distribution network and customers were asking for a number of new complementary products which Newtek had decided not to produce. QuVIS was formed to produce those products.

At inception, QuVIS began extensive research of compression schemes as a solution to provide guaranteed high fidelity, high resolution motion images in a real-time symmetrical encode/decode process. Among other things, this research revealed that traditional DCT-based algorithms are not adequately efficient or scalable for high resolution environments. QuVIS developed its own proprietary algorithms, becoming a recognized pioneer in wavelet-based motion

imaging technology as a result.  By placing priority on quality, not bit rate, its Quality Priority Encoding, or QPE™, algorithm is not only increasingly efficient with increasing image size, but also eliminates virtually all artifacts.

Towards the end of 1995, the enabling technology was completed, and information was provided to Fenwick & West, an Intellectual Property law firm in San Fransisco, for patents to be prepared and submitted.  QuVIS eventually changed patent counsel to Bromberg & Sunstein to finish the patent process.  A chief executive officer ("CEO") was retained to arrange funding and management of the operating company who would design and produce the product based on the QPE algorithm.  An initial equity investment from a small number of individual investors provided funding for the newly formed QuVIS.

During 1996 and 1997, a U7 Kansas stock registration and offering occurred, which was a substantial success and raised capital for QuVIS. However, the new capital brought increased overhead with the addition of administrative, sales, production, and engineering personnel and the addition of multiple physical facilities.  Upon the CEO's resignation in 1997, funds raised by the U7 were gone.

Still needing to fully complete the initial product design, and needing additional capital to complete that process, Goertzen took over operations.  Sales-and-production staff and facilities were reduced.  Orders were canceled, reduced, or deliveries pushed back.   After QuVIS rebounded financially, Becky Lester ("Lester") was hired to help manage the company.

At this time, a joint digital-cinema-system development between Disney, Texas Instruments, and QuVIS became the company's focus, causing QuVIS to depart from the original product

concepts.  Development moved rapidly in 1998 and 1999, and by the middle of 1999, QuVIS had

used the enabling technology developed by the original founding members in a digital-cinema player

and recorder, and Texas Instruments had developed their new Digital Light Processing projector

technology.  This led to the movie content being displayed to and evaluated by Disney.  Disney

initiated  a 35 location digital-cinema pilot program starting towards the end of 1999, using QuVIS

and Texas Instruments equipment.  The first movie displayed commercially was Pixar's "Toy Story

II".

Disney and Pixar attempted to convince the studio industry to begin converting to digital

cinema at that time, but this change meet with resistance.  Instead, a MPEG interop method of

supporting Digital Cinema was defined by a consortium including a number of QuVIS competitors,

and that approach had the strong support of at least one of the movie studios  (Universal) and Texas

Instruments.  When these MPEG interop Digital Cinema systems began to appear commercially,

Texas Instruments purchased units, and provided them free of charge to any QuVIS customer.

By 1999, Lester had taken over most of QuVIS operations, and by the end of 2001 Lester

was in charge of all of operations and Goertzen became the Chief Technical Officer.  QuVIS's

algorithms were refined, and the architecture for the QuVIS Digital Mastering Codec (QDMC) and

the QuVIS Digital Mastering Reformatter (QDMR) were defined, and the QDMC was implemented

as an Application Specific Integrated Circuit (ASIC).

With the MPEG interlop, and Texas Instrument procedure, QuVIS decided it would de-

emphasize digital cinema and return to equipment supporting post production.  The refocus allowed

QuVIS engineering to bring a QuBIT ST product to a high level of refinement, and a number of

significant customers used this system extensively.  The QuBIT ST was followed up by the initial development of the next generation of products which included the Acuity for very high end post production work, the Encore for mainstream post product work, and the Ovation for display playback applications.  A description of these products and their capabilities can be found in Article III of this disclosure statement.

By 2002, a few of  the QuVIS investors were effectively supporting the company as it attempted to engineer its way out of a dependence on digital cinema. Those investors had a very significant amount of funds at risk, and wanted a more secure vehicle for their investments than common stock.  This lead to the establishment of the secured note (the "Secured Note") which is attached hereto as **Exhibit 1.**

The Secured Note allowed investment up to approximately $30 million of principal.  Each investment made would contribute to the overall investment figure , much like water filling a glass, and once all investments reached $30 million, no more investment could take place because the metaphorical glass was full.

The Secured Note required unanimous consent of the Noteholders for any change in the Secured Note other than the maturity date.  The Noteholders held as security all assets of the company, except recievables.  There was an anti-dilution provision effectively preventing down rounds of equity sales.   There was a turnover provision among the Noteholders to prevent an individual Noteholder from acting unilaterally for their individual benefit.

Although the Secured Note made it relatively easy to finance QuVIS, it did place a number of restrictions on the company which later became significant.  For example, QuVIS was dependent

on the Secured Note for funding.  Conventional loans and equity sale were effectively precluded by the Secured Note.  Moreover, QuVIS carried the Secured Note as debt on its balance sheet, making the company's financial situation look much more questionable than if the investment was reflected as stock.  What ended up being the most critical of all, however, was that modification, conversion or subordination of the Secured Note could be blocked by a single Noteholder.

When the studios began to reinvest in digital cinema in 2004,  it provided another potential opportunity for QuVIS and its wavelet-based technology to enter into the digital-cinema market. Internal debates began within QuVIS about whether it would be better to continue to push post-production equipment that had been started and was showing some success, or table post-production equipment to work on digital-cinema servers.  It was eventually decided QuVIS was going to move in the digital-cinema direction.

Larry Jacobson ("Jacobson") was hired to manage the digital-cinema effort.  Focus on post-production products was reduced, and efforts were turned to JPEG2000 support and a digital-cinema Server.

Digital cinema again looked hopeful by the end of 2005.  The movie studios had obtained an exception to the anti-trust laws to allow them to collaborate on a digital-cinema initiative to develop a new standard.  All studios had agreed on an initial standard, and the industry was again mobilizing to make the digital-cinema transition.  Sony America ("Sony") had paid QuVIS to develop support for Sony's new 4-K resolution projector, which QuVIS had done.  Sony provided QuVIS with a memorandum of understanding that Sony would purchase 60 units from QuVIS for the 300-screen Technicolor trial that several of the studios had approved.  Technicolor also

expressed interest in an additional 60 units of 2-K resolution players from QuVIS. QuVIS had the new JPEG-2000 based formats working in the lab, and was working on the first generation production version for early 2006. In addition, there were several digital-cinema business plans underway which intended to convert a significant portion of theaters to digital presentation over the next two years.

This trend drove an influx of additional investment in the Secured Note. From 2001 to the later part of 2005, approximately $15 million had been invested in the Secured Note. In late 2005 and early 2006, about $13 million was invested in the QuVIS digital-cinema plan.

In early 2006; however, Dolby, DoRaMe, and NEC agreed to give Technicolor 60 units each, which made it more difficult to discuss sales to Technicolor. Sony realized it was not technically ready for a digital-cinema trial, so Sony delayed its rollout. Technicolor started delaying its test as it realized the poor readiness level of many products. Only one of the various business plans was funded in 2006 and started installing units.

Unfortunately for QuVIS, that company, Access IT, had purchased a digital-cinema program, so it began rollout with that equipment. Access IT rapidly encountered so many difficulties in implemention the overall distribution and control systems that they decided not to incorporate any other vendor equipment until they solved the initial problems, even though the studio contracts required multiple vendor support. In 2006, it became apparent that no other plans were moving.

By May 2006, the QuVIS Board of Directors (the "Board") was concerned that the company was going to run out of funds before a significant digital-cinema rollout occurred. The Board requested a dramatic reduction in expenses to assure more staying power. By July 2006, Goertzen

was asked by the Board to take over operations again and cut expenses.  Elective expenses were stopped, and plans for staff reduction began.  QuVIS began to trim back, and by November 2006, staff had been reduced from 65 to 35 people, and overhead had been reduced from about $800,000 per month to about $300,000 per month.   Despite this effort, at the beginning of 2007, QuVIS was broke with trade and payroll tax debt, and a product line highly dependent on digital cinema.

The Board recommended to raise money to cover the overhead and expense of once again invigorating the post-production products, on an emergency basis.  The Acuity and  Encore conversion to JPEG2000 had not been polished, and the Encore could not run Acuity software, limiting its marketability.   A one-year plan was drawn up with an estimated expense of  $6 million dollars to fund overhead and the required development.

The problem was the Secured Note was effectively full, cutting off additional investments. The Secured Note would have to be expanded, subordinated, or converted to preferred stock to allow any new investment of this magnitude.  QuVIS first tried to obtain approval for a senior secured note for $6 million, but that was rejected by a minority of Note holders.  Black Oak (as known as MTV Capital Ltd.) one of the substantial Note holders, proposed QuVIS arrange a "prepackaged" bankruptcy, to get rid of debt, common stockholders, and all Noteholders that could not respond to a 50% call on their current position.  Since Black Oak was one of the few Note holders likely to be in a position to respond to such a call, that plan effectively handed the company to Black Oak.  The Board decided that if there was any chance at all of preserving the other stakeholders positions, it should be attempted before such an extreme approach was taken.  QuVIS made an attempt to

complete the required Acuity and Encore development, but progress was very slow.  Digital cinema continued to consume time, money, and talent.

With efforts for investment stalled, Black Oak sued QuVIS, Lester, and the Board claiming that it had been compelled to invest $5 million dollars in QuVIS, based upon Lester's statement to the effect that QuVIS was likely to have a cash-flow positive month.

With the Secured Note capped, and no subordination in site, QuVIS began to factor its receivables - the only financing mechanism not excluded under the Secured Note.  Production pools were also set up, funded or secured by Board members, in order to purchase parts in order to build product.  Factoring the recievables was expensive, placing an additional financial burden on QuVIS.

By the beginning of 2008, progress had been made in many areas, and QuVIS estimated only approximately $3 million was then needed to finance the required restructuring.  Once again a subordination, or conversion of the Secured Note was attempted, to no avail.  It also became apparent that the Acuity and Encore developments would not be completed in time to be helpful, so the Board asked for additional ideas to monetize technology.  Goertzen contacted Apple and determined that Apple believed there was a market for software to provide a Digital Cinema Package (DCP) format for content produced by Apple's "Final Cut Pro."

A program was implemented to provide such a product, and a wholly owned subsidiary - QuVIS Software, Inc. - was formed in the middle of 2008 to commercialize that and similar software products derived from the QuVIS technology.  Equity in QuVIS Software was sold by QuVIS to fund the effort.  Seacoast Capital offered to invest $1 million in QuVIS Software if others would

invest $1 million.  Unfortunately, only $375,000 was raised.  The initial product was announced in mid September, with good technical reviews, but disappointing sales.

Late in September 2008, Seacoast Capital began making a concerted effort to help address the Secured Note dilemma.  Proposals were distributed among the Note holders outlining conversion ratios, and the proposed dilution by new money.  Plans included provisions for common stock holders, debt holders, and Note holders, and did not require mandatory participation in new money.  A minority of the Note holders continued to persist in rejecting all plans.

The Noteholders were aware that QuVIS was in financial crisis due to the Secured Note, and that QuVIS would not be able to continue to operate without some modification to the Secured Note.  However, there was general agreement among the Noteholders that QuVIS had a significantly higher value if operations continued in some form, than if it was shut down.

The Board decided to promote Michael Paulson ("Paulson"), Vice President of Engineering, to Chief Operating Officer ("COO").  As a first priority, Paulson was tasked with getting income and expenses in line.  QuVIS had very limited resources, and engineering development was proceeding slowly, so it was considered likely that staff reductions were essential.

Black Oak continued to advance their lawsuit against the company throughout 2008.  Depositions were taken mid year, final documentation was prepared, and a settlement conference was scheduled for mid-November.  In the settlement conference, QuVIS agreed to pay Black Oak $400,000 to dismiss the case.  This amount was the money the Board members had available to provide to QuVIS as new money to prime the process of recapitalization of QuVIS if the Secured Note could be resolved.

Throughout this 2007 and 2008 period, QuVIS continued to factor its receivables to provide cash flow for the company.  JFM Partnership ("JFM") had historically factored most of QuVIS's receivables.  In late September 2008, JFM rapidly changed its procedures and policies towards QuVIS, including JFM claiming rights to all receivables, even receivables not factored, based upon conversion provisions in the factoring agreement between the parties.  During this period, JFM collected over $700,000 of receivables.

JFM's change in factoring policy caused QuVIS to have no funds and no immediate prospect for funds.  The employees were informed on the first of October 2008 that QuVIS could no longer reliably pay payroll, and that the condition would continue until there was a resolution to the Secured Note.  Still, all Noteholders seemed to agree that the company was more valuable with continued operations, and that it would not be in any Noteholder's interest to shut the company down.

On December 1, 2008, Goertzen dismissed all employees.  The employees were informed that the Secured Note and new-money issues were still being worked on, but timing was completely uncertain.

Through December 2008, Goertzen was the only person still working, full time, and without pay, to maintain company continuity and to try to retain some value for the Noteholders.  Goertzen worked to maintain dealer and customer product service and support, and assure long-term customers that QuVIS would continue to address their orders, and production requirements.  Goertzen was able to get about $600,000 of the orders in place at the first of December 2008 reaffirmed.

As of January 2009, QuVIS was completely broke and maintained skeleton operations to service major customer orders.  No one was in a position to make investments into QuVIS, with the Secured Note still unresolved, so the Board asked Goertzen to continue to operate on a as-needed basis to continue contact with critical customers.  Operations continued in that fashion and on March 20, 2009, an involuntary bankruptcy petition was filed.

### III. THE DEBTOR'S TECHNOLOGY AND OPPORTUNITY

A.     *The Technology*

QuVIS's servers address a broad range of high-resolution video acquisition and display markets, including digital cinema.   The four most relevant products, upgraded in 2007 for the JPEG2000 standards, are Acuity, Cinema Player, Encore and Ovation.   The design of the QuVIS Acuity, QuVIS Cinema Player, QuVIS Encore and QuVIS Ovation incorporates the QuVIS QDMC ASIC as a key component required for QPE video signal encoding, decoding and system cost engineering.

*The QuVIS Acuity™* provides a single flexible, real-time mastering platform for the production and post-production industries. Designed to fit seamlessly into a high-resolution production workflow, the QuVIS Acuity offers a powerful virtual tape architecture that allows it to function in existing equipment suites with zero to minimal customizations.

The QuVIS Acuity real-time mastering supports 4K (4096 x 2160), 2K (2048 x 1080), High Definition (HD), and Standard Definition (SD) video formats in the most comprehensive variety of encoding levels, color sampling, frame rates, color spaces, and



scanning options available today. The QuVIS Acuity offers patented and widely accepted

wavelet-based image encoding method, QPE. The JPEG2000 wavelet encode/decode standards

have combined with the Quality Priority Encoding to provide products that use less bandwidth

and the highest quality images. This combination of JPEG and QPE offer the optimal choice for

reducing online storage requirements while guaranteeing the highest image quality possible.

*The QuVIS Encore ™* is a resolution-independent digital

record and playback server that offers many of the same features 

available on the QuVIS Acuity, but in a smaller profile. The

compact packaging of the QuVIS Encore enables it to be

installed in space-challenged environments like broadcast trucks, aircraft, rental and staging

applications, and production stages.  The Encore has recently been upgraded to include real-

time record of JPEG2000 2K, 3D, and academic 4K.  The Encore is a first in real-time record of

these formats.

Like the QuVIS Acuity, the QuVIS Encore is designed to operate within digital workflow

environments and even be a drop-in replacement for existing DDR (digital disk recorder) or older

VTR (video tape recorder) equipment.   Competitively priced, the QuVIS Encore is flexible,

scalable and uniquely positioned to outperform any other server in its class.

*The QuVIS Ovation ™* is a low-cost digital playback server designed to meet a wide variety

of high-resolution display needs. Based upon the QuVIS Cinema Player design, the QuVIS Ovation

provides additional video output options required to connect to a wider range of display devices

used for multi-screen displays, trade shows, museums, theme parks and entertainment venues.

Reliable and robust, the QuVIS Ovation is a general purpose

QPE 2D and 3D playback server that supports more than 50

video formats from NTSC and PAL up through HD, 2K and



beyond. The QuVIS Ovation may be configured to playback more than 10 hours of 1080i or

720p HD video from internal storage and offers expanded external storage capabilities. Patented

QPE assures unsurpassed image quality while 16 channels of digital audio support digital

surround sound and multiple language tracks.

The QuVIS Ovation offers standard integration with third party control devices while

local utilities allow for the creation of sophisticated playlists. GPI triggers provide the ability to

command to lights, curtains, screens and other equipment. Real-time 3D support at a variety of

resolutions is available incorporating frame accurate synchronous playback that ensures

flawless performances for 360 degree, domed cinema and other multiple screen presentations.

***The QuVIS Cinema Player ™*** was specifically designed for the Digital Cinema market.

The QuVIS Cinema Player has been displaying flawless images to the silver screen using QPE

since 2004. In 2005, the QuVIS Cinema Player was updated to

support JPEG2000 playback as mandated by the digital cinema

industry. Since its rollout, the QuVIS Cinema Player has been

used worldwide to exhibit Hollywood 2D and 3D digital film releases, as well as local and

regional independent feature content.

The QuVIS Cinema Player is fully compliant with all current industry requirements (including SMPTE standards and DCI recommendations) and continues to offer value-add features and options including playback support of QPE independent content, 16 channels of Digital or Analog format free audio, local USB 2.0 and network-based ingest of content, 1.0 TB or more of internal RAID storage, 2D and 3D single server playback, local show playlist authoring, forensic watermarking, secure link encryption, secure logging, secure reporting, intrusion detection and electronic protection, automation programming, server-based timed-text and graphic overlay subtitle rendering, digital rights management support, and many more.

*QuVIS Wraptor*™ is a software plug-in for Apple® Compressor that adds the ability to create a professional-quality, DCI JPEG2000-encoded, AES-encrypted, MXF-wrapped, and distribution-ready Digital Cinema Package (DCP) directly from a Final Cut Studio® project. Wraptor™ dramatically reduces the cost of entry for content producers that must submit their composition in the Digital Cinema distribution format to film festivals, industry award events, Digital Cinema advertising, and other digital exhibition venues of alternative content.

Corporate users of Final Cut Studio, such as motion picture studios and commercial post houses, also benefit from Wraptor's low cost-of-entry by reducing the need for specialized DCP mastering equipment or third-party DCP services. With Wraptor™ and Final Cut Studio the production costs for lower-budget projects like movie shorts, movie trailers, movie teasers, advertisements, public service announcements, training videos, and most types of alternative content can be kept under control and under budget. High-quality archiving using the secure DCP

In the United States Bankruptcy Court for the District of Kansas
IN RE:   QuVIS, Inc.
        Bankruptcy Case No. 09-10706-11
        Disclosure Statement
Page 20

architecture is achievable using Final Cut Studio and Wraptor™.

    *B.*    *The Market*

    The market for QuVIS's high-fidelity, high-resolution motion-imaging technology extends from enabling consumer devices and applications to other specialty professional markets such as motion picture production and exhibition, medical imaging, military imaging, image archiving and video surveillance.

    ***Digital Cinema Market.*** While Digital Cinema by itself represents only $2.5 billion of an estimated $700 billion total digital imaging market, it is the area in which the industry standards are set.  QuVIS has been a technology solutions provider to the industry working closely with movie studios and post-production houses for over a decade. By itself, the Digital Cinema rollout represented an investment estimated at approximately $12 billion. QuVIS was well positioned and expected its participation in this upgrade would generate more than $40 million in revenue for the Company by the end of 2008.

    Perhaps the most significant and formidable challenge to digital cinema was and remains the financing of the infrastructure upgrade necessary to receive, manage and project digital content. In most digital cinema schemes, this upgrade requires each theater to install one digital switch or central server as well as one dedicated media server and digital projector for each screen. The 2006 cost of the conversion was approximately $80,000 per screen.  The total cost of digital cinema deployment was nearly $12 billion worldwide and $3.5 billion in North America. The two essential elements of the financial mechanics are the emergence of business entities to facilitate the

structured financing of the required upgrades and the acceptance of "virtual print fees" as the means to service the debt component, provide a return to equity investors and pay management fees to the facilitator. The facilitator brings together the studio, distributor, exhibitor and investors.

While stalled for the moment, the efficiencies and cost savings the industry will receive make the conversion to Digital Cinema inevitable.  There are many benefits resulting from the movie industry's migration to digital cinema: preservation, consistent presentation, additional flexibility for distributors and exhibitors and of course, presentation quality. Perhaps, the most meaningful driver behind the migration to digital cinema is the expected savings, which will be significant. The savings begin with the elimination of the cost of developing and distributing celluloid film which averages $2,000 per print according to Nash Information Services, LLC. The MPAA's tracking of the costs of the seven major studios and their subsidiaries in 2003 suggests that the industry spent more than $631 million on prints in North America alone. With the addition of independent films and foreign releases, Screen Digest estimates that well more than $1 billion is spent annually worldwide on celluloid film processing and shipping. The potential to reduce this recurring expense remains a powerful catalyst for change among the studios.

The logistics of distributing movies on celluloid film not only costs more than $1 billion a year, but also does not allow for any meaningful flexibility to adjust title availability to meet box office demand. In the traditional celluloid film based distribution model, flexibility is limited by the necessity to determine the number of prints to be produced in advance of any meaningful box office results. The process of developing bulk printed film, rebuilding it into shipping reels,

packaging the reels into canisters and delivery of the physical medium is time-consuming and cumbersome. Further, as audience and box office receipts for hit movies are front-end loaded, the traditional process does not provide the ability to increase the number of prints for broader initial distribution. Conversely, Digital Cinema provides onsite ability to adjust title distribution in order to optimize ticket sales and gives the theaters immediate flexibility without the necessity of obtaining additional reels of film.  Other areas of revenue enhancement expected to result from the implementation of digital cinema include: i) secure tracking of movie content to playback as a more precise audit trail to existing hand ledgers; ii) increased rate cards for "trackable" advertising that will be delivered to a highly relevant audience; and, iii) the ability to use theaters as venues for enhanced content and other non-movie content, including 3D and ultimately simulcasts of live events.

   ***Specialty Professional Markets.*** In theory, any application that utilizes signal processing is potentially enhanced by QuVIS's fundamental intellectual property. However, the greatest efficiencies occur in content types with the highest data requirements – the most obvious being high fidelity, high resolution, motion images. For example, a current state-of-the-art CT scanner produces a full body image requiring one-half of a gigabyte of storage.  The enormous size of the CT image is difficult and expensive to archive and impractical to transmit electronically among disparate radiologists and physicians. Next generation CT scanners will soon be producing image resolutions which require 64 times the storage and processing time. A terabyte of storage, which seemed like a tremendous amount of storage just a few years ago, can archive only thirty images

of this size. Such images are extremely expensive to archive and time consuming to process, communicate and analyze.

However, by encoding these enormous images using QuVIS wavelet compression their size can be greatly reduced while maintaining the fidelity and resolution required for this critical application.

A QuVIS image recorder is capable of encoding a high resolution image much faster than conventional methods. The resulting size, although still large, would be on the order of 1/100 of the original data set, thus enabling much more practical and cost effective archive and transmission of the data.   QuVIS digital image processing would provide radiologists with the ability to effectively process.nd speed.

QuVIS has identified the following professional markets as those which represent large and attractive arenas for application of its intellectual property: medical imaging, military imaging, image archiving and video surveillance. The Freedonia Group estimates the US medical imaging market (which includes CT, MRI, X-ray, nuclear medicine, ultrasound, radiographic fluoroscopy, PET, etc.) at more than $16 billion annually.  The US Department of Defense spent $70 billion on IT in 2006, a significant part which was surveillance and reconnaissance. In the aggregate, these segments comprise a digital imaging opportunity that is expected to reach $700 billion by 2010.

***Consumer Market.*** The global consumer device and digital content distribution services markets are growing rapidly. The global consumer market for digital media hardware devices, including DVD players, DVD recorders, high definition TVs, mobile handsets, digital still cameras,

digital camcorders and digital audio players was expected to exceed $275 billion in 2008. The market for video content distribution, which is comprised of cable and satellite subscription and DVD and VHS retail sales, was $95.3 billion in 2006. Together, these statistics point to a consumer digital media market opportunity exceeding $370 billion. OEMs serving this segment are increasingly incorporating best-of-breed, branded technologies to enable CE devices, power solutions, and enhance their market positions within the category. Dolby Laboratories, with its audio specific IP, is a longstanding example of an enabling technology that also contributes significant brand equity to the devices and applications in which it is embedded. This type of IP is generally licensed to OEMs on volume-based royalty arrangements. The Company believes that there is a significant opportunity in applying a similar embedded technology approach to CE devices used for digital video capture, enhancement and playback.

*Software Markets*. QuVIS started porting its digital cinema production tools into the Apple "Final Cut" environment in 2008.  The first product was "Wraptor" a software tool designed to place content produced using Final Cut, into the correct color space, compression standard, and file formats to produce a Digital Cinema Package (DCP).  The initial product sold for $699, with QuVIS receiving about $600 per copy after various fees.  The product initially sold about one copy per day, with little promotion.  A more established third party software company in this market would like to take over marketing and maintenance of this product, because it would complement their own software product lineup.  They would like to raise the price to $1399, with QuVIS receiving about $1000, per copy.  They believe they can obtain sales levels in the range of one to five units per day.

QuVIS has several other software components for digital cinema authoring, which can be ported to support this application and broaden their software product offering.

These extensions to the Wraptor product include:

> Package Validation and report generation
>
> Package Ingest and preview
>
> 3D (stereoscopic) package wrapping
>
> 3D (stereoscopic) Ingest and preview
>
> 2D and 3D Subtitles
>
> Color correction
>
> Encryption

There is also interest in porting some of the time consuming software processes, such as transcoding, compression, resizing, effects, and filtering to various accelerator platforms, which may include using low cost graphics cards developed for the game industry for image processing acceleration, as well as possible custom FPGA based accelerators.

***Licensing and Design Opportunities.*** A critical review of the company's current and potential patents, software, firmware, and hardware designs will be undertaken. Those assets which are considered appropriate to monetize will be further refined and documented, so that they can be cost effectively licensed or applied to a "rapid application development" environment, to take advantage of a "project funded development" type business model.

## IV. LIQUIDATION ANALYSIS

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, if each Class of impaired Claims does not vote unanimously to accept the Plan, then the "best interests of creditors test" requires the Bankruptcy Court to find that the Plan provides to each holder of a Claim or Equity Interest in each impaired Class a recovery on account of such holder's Claim or Equity Interest that has a value at least equal to the value of the distribution that each such holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

If the Debtor's Chapter 11 case was converted to a Chapter 7 liquidation proceeding, then the Debtor's business operations would immediately cease and the Debtor's assets liquidated by a Chapter 7 trustee.  In connection therewith, the Debtor believes that the liquidation value of the assets is substantially less than the amount of the Secured Claims encumbering such assets or under a 11 U.S.C. § 363 sale.  See the Liquidation Analysis attached hereto as **Exhibit 2**.  At this point, QuVIS has no unsecured assets in which to liquidate in favor of unsecured creditors.  All of QuVIS's asset are secured by the Secured Note identified in the Debtor's Plan of Reorganization or by the tax liens of the I.R.S.

Further, if this Chapter 11 case was converted to Chapter 7 liquidation proceedings, then there would be additional administrative expenses for one or more Chapter 7 trustees and any professionals employed by the Chapter 7 trustee(s) to administer and liquidate the assets.  In such event, the Debtor asserts that holders of Unsecured Claims and Equity Interests would receive only the value of these assets in the event of a liquidation in Chapter 7.  As a result of these circumstances, the Debtor firmly believes that the Plan provides a significantly higher return to

holders of Unsecured Claims against and Equity Interests in the Debtor.

## V.  FINANCIAL INFORMATION

Attached hereto as **Exhibit 3** as "Historical Financials" are selected reports relating to the past financial performance of the Debtor.  Below is five-year historical cash-flow of the Debtor ending in December 31, 2008.

*QuVIS Financial Five Year Historical (Year Ending Dec 31)*

|                | 2005 | 2006 | 2007 | 2008 |
|----------------|------|------|------|------|
| Revenue        | $7,020,000 | $6,181,000 | $2,774,000 | $3,288,000 |
| Gross Profit   | $3,573,000 | $2,823,000 | $1,285,000 | $2,131,000 |
| Total Expenses | $6,662,000 | $8,836,000 | $5,209,000 | $4,618,000 |
| EBITDA*        | ($3,089,000) | ($6,013,000) | ($3,924,000) | ($2,487,000) |

(* Earnings before Interest, Taxes, Depreciation, and Amoritization)

The following five-year projection reflects reduced overhead resulting from the benefits derived from completion of the engineering development and the improved margins of the software and component markets.

|                | 2010 | 2011 | 2012 | 2013 | 2014 |
|----------------|------|------|------|------|------|
| Revenue        | $1,256,000 | $2,026,000 | $3,630,000 | $5,570,000 | $10,750,000 |
| Gross Profit   | $872,000 | $1,508,000 | $2,701,000 | $4,103,000 | $7,695,000 |
| Total Expenses | $610,000 | $964,000 | $970,000 | $1,099,000 | $1,125,000 |

| EBITDA | $278,000 | $565,000 | $1,757,000 | $3,035,000 | $6,606,000 |
|---|---|---|---|---|---|

A complete financial analysis is presented in **Exhibit 4**.

## VI.  SUMMARY OF CLAIMS

A  proof of claim deadline was established in this case.  All proofs of claim are due to be filed by October 23, 2009 under orders of the Court entered on July 24, 2009 (Docket #93).

1.      Administrative Expenses

The Debtor has incurred, and will continue to incur, substantial administrative expenses as a result of professional fees and expenses.  The Debtor retained the law firm of Redmond & Nazar, L.L.P. ("Law Firm") as its insolvency counsel to file the Chapter 11 proceeding.  Fees and expenses incurred with the Law Firm since inception of representation through September 30, 2009 total $40,936.73.  The Law Firm has obtained an order allowing the payment on a monthly basis of its fees and expenses and all the fees are current as of this plan.  The Law Firm has remaining in its trust account $11,063.73 of the original $52,000.00 retainer paid by the Debtor.  The Debtor estimates an additional sum of $15,000.00 to $20,000.00 in attorney's fees and expenses through confirmation.  In the event that no party in interest or creditor objects to the Debtor's Plan, thus requiring lengthy evidentiary hearings and discovery, the estimated fees will be significantly less, however, if significant litigation during the confirmation process takes place, this sum may rise.

The law firm of Bromberg & Sunstein, L.L.P. has been employed as special counsel for the Estate regarding patent and trademark matters and has current outstanding fees in the amount

In the United States Bankruptcy Court for the District of Kansas
IN RE: QuVIS, Inc.
      Bankruptcy Case No. 09-10706-11
      Disclosure Statement
Page 29

of 62.50.  The Debtor also anticipates approximately $5,000.00 in additional fees and expenses owed

to Bromberg & Sunstien, L.L.P.  The Debtor will pay Bromberg & Sunstein, L.L.P. in full for all

post-petition fees and expenses incurred.

      The accounting firm of Summer, Spencer & Callison, CPA, P.A. has been employed by the

Estate pursuant to court order and has supplied the Debtor with accounting expertise relative to pre-

petition operations from November 2008 through the date of filing.  Currently, Summers, Spencer

& Callison, CPA, P.A. is paid in full. The Debtor anticipates additional fees to Summers, Spencer

& Callison, CPA, P.A. for approximately $3,000.00 and the Debtor intends to pay those fees and

expenses in full.

      An administrative claim is also owed to the initial petitioning creditors in this case, Douglas

A. Friesen, Marilyn R. Friesen-Greenbush, and Douglas Cusick in the amount of $7,136.00.  This

amount includes $1,039.00 for the filing fee, $4,335.00 in attorneys fees related to the involuntary

case, and $1,762.00 in patent expense.  The Debtor does not anticipate any more administrative

expenses from the petitioning creditors as the case was converted to a voluntary case on May 18,

2009 and other-related expenses are no longer provided by statute.

      These Claims will be paid upon the Effective Date of the Plan by the Debtor in full.

      2.      <u>Priority Claims</u>

Priority creditors include the Internal Revenue Service in the amount of $254,371.11[2]; the Shawnee County Treasurer in the amount of $14,962.54; the Franchise Tax Board in the State of California in the amount of $1,708.63; and the following unpaid wage claims, but not to exceed $10,950.00 per wage claimant.

## Filed Claims

| | | | |
|---|---|---|---|
| A. | Jon M. Flickinger Jr. | Claim # 1 | $53,387 |
| B. | Charlotte J. Kimball | Claim # 2 | $33,716.20 |
| C. | Kathleen R. Urbom | Claim # 3 | $19,717.69 |
| D. | Thomas Bradley | Claim # 6 | $65,500.00 |
| E. | Curtis T. Drake | Claims # 7 | $44,420.82 |
| F. | Melissa D. Daubert | Claim # 9 | $7,672.84 |
| G. | Jay M. Horting | Claim # 11 | $10,869.06 |
| H. | Paul C. Nelson | Claim # 12 | $27,416.00 |
| I. | Gary M. Hammes | Claim # 13 | $21,953.85 |
| J. | Cary A. Shoup | Claim # 14 | $10,950.00 |
| K. | Rodney J. Epple | Claim # 15 | $20,538.30 |
| L. | Robert Turner | Claim # 16 | $10,333.34 |

---

[2] According to the IRS's proof of claim (Claim # 5), the Debtor's IRS debt is proportioned as follows: $201,437.71 is claimed secured, $45,371.11 is claims as priority, and $7,262.23 is claimed as unsecured. The Debtor proposes to pay total amount of the IRS debt in full.

In the United States Bankruptcy Court for the District of Kansas
IN RE: QuVIS, Inc.
      Bankruptcy Case No. 09-10706-11
      Disclosure Statement
Page 31

| | | | |
|---|---|---|---|
| M. | Gary W. Green | Claim # 18 | $39,448.70 |
| N. | John J. Iserman | Claim # 19 | $12,000.00 |
| O. | Robert Stratton | Claim # 24 | $59,033.36 |
| P. | Michael C. Paulson | Claim # 26 | $140,003.77 |
| Q. | Antonio A. Austin | Claim # 30 | $8,589,29 |

### Non-Filed, But Outstanding Wage Claims

A.     David Bell

B.     Jason Dale

C.     Jerry Pearson

D.     Joseph Christianson

E.     Joshua Norton

F.     Kevin Dayo

G.     Paul Flores

H.     Richard Ehret

I.     Sara Steele

Pursuant to 11 U.S.C. § 501, the first $10,950.00 of each wage claim for wages due within 180 days of the Petition Date shall be treated as a priority claim. The remaining amount shall be treated as an unsecured claim in Class (3) Three.

3.     Secured Creditors

The Secured Note consists of approximately $43 million in claims. The claims are secured

by all the assets of the Debtor, excluding accounts receivables.  Attached hereto as **Exhibit 5** is a

list of Note Holders.  The Secured Note based claims are not disputed, contingent, or unliquidated,

and accordingly are deemed filed under Section 501 of the Bankruptcy Code, and upon confirmation

of the Plan will be conclusively deemed Allowed Claims in the liquidated amounts listed in the

Bankruptcy Schedules filed by the Debtor on May 18, 2009.

3.      Unsecured Creditors

The remaining creditors of the bankruptcy estate are unsecured.  These creditors include

the following Claims within the bankruptcy estate:

| | | | |
|---|---|---|---|
| 1. | American Express Travel Related Services | Claim #4 | $  75,422.86 |
| 2. | Arrow Electronic's, Inc. | Claim #8 | $  $48,360.75 |
| 3. | Culligan of Northeast Kansas | Claim #10 | $  1,051.85 |
| 4. | Worldwide Express | Claim #17 | $  27,918.57 |
| 5. | United Parcel Service | Claim #27 | $  130.00 |
| 6. | Logan Business Machines | Claim #29 | $  365.52 |
| 7. | Kansas Turnpike Authority | Claim #32 | $  125.80 |
| 8. | Worldwide Express | Claim #35 | $  27,917.57 |
| 9. | Culligan of Northeast Kansas | Claim #42 | $  1,051.85 |
| 10. | Arrow Electronics, Inc. | Claim #43 | $  48,360.75 |
| 11. | Sanmina-SCI Corporation | Claim #46 | $  1,049,390.37 |
| 12. | Conner & Winters, LLP | Claim #68 | $  $165,753.49 |

| 13. | DBA Distribution Services, Inc. | Claim #69 | $ 7,612.87 |
| 14. | Mouser Electronics | Claim #82 | $ 4,005.17 |

In addition to these claims, there is the unsecured deficiency of Secured Noteholders as more fully set forth above, which were not specifically itemized in this article.

## VII. CURRENT STOCKHOLDERS

A list of the current stockholders is attached as **Exhibit 6**. These stockholders will receive no distribution under the Plan, regardless of whether Plan A and Plan B are adopted.

## VIII. CLASSIFICATION OF CLAIMS

The classification of claims and treatment of claims are more fully set forth in the Debtor's Reorganization Plan, however, the Debtor has attempted to classify such claims according to their specific nature. The classification of claims will follow the general narrative treatment set forth herein.

## IX. SUMMARY OF THE PLAN

The entire text of the Plan has been provided, with this Disclosure Statement, to all creditors and all interest holders known to the Debtor. The following is a brief summary of the Plan and should not be relied on for voting purposes. The Plan should be read carefully and independently of this Disclosure Statement. Creditors are further urged to consult with counsel, or with each other, in order to fully resolve any questions concerning the Plan.

The Debtor would proposes its creditors decide its direction and future. The Debtor proposes to provide in more detail below two plans: (1) Plan A consist of an infusion of capital and a

reorganization of the company; or (2) Plan B consists of a sale of assets of the company under 11

U.S.C. § 363.  Under Plan A, each creditor - either a Noteholder or Unsecured Creditor - will receive

an interest in the Reorganized debtor.    Under Plan B, creditors will be paid in the priority

established under the Bankruptcy Code and once the proceeds of the sale have been exhausted, the

remaining creditors will receive nothing.  Ultimately, the creditors will decide which direction and

plan is proposed by the Debtor for confirmation and adopted by the Court through the statutory

balloting process.

## Plan A

This plan is the offer to reorganize the Debtor.  This reorganization effort will be capitalized

by the sale of common stock to Secured Noteholders.  The maximum investment in the Reorganized

Debtor will be four (4) percent of the original principal of the Secured Notes held by the Noteholder.

Each share a common stock will have one (1) vote for each share owned.  The proposed ballot (to

be approved by the Court) will confirm the willingness of the respective Noteholder to participate

in the new investment.  The Debtor will have to raise a minimum of $600,000.00 of capital and only

upon the commitment of that amount of capital should Plan A be confirmed.

All administrative claims, including those of the accounting firm of Summers, Spencer &

Callison, CPAs, Inc. and the law firm of Bromberg & Sunstein, L.L.P. shall be paid in full.

The Debtor currently owes substantial priority debt to the Internal Revenue Service in the

amount $253,371.11.  That amount will be amortized over five (5) years but not beyond May 18,

2014.  Additionally, the Debtor owes twenty-five (25) employees outstanding wages in varying

amounts. The Debtor proposes to pay those individual either the amount owed or the statutory limit of $10,950.00 per employee, whichever is less. Those payments will be made over a five (5) year period, unless otherwise required by law.

Currently, the Debtor owes Secured Noteholders approximately $40,000,000.00 in claims. In Plan A, each Noteholder would ratably receive common stock equal to 27 percent of the Debtor's common equity in the Reorganized Debtor.

General Unsecured creditors, which constitute approximately $5,000,000.00 in claims, will ratably receive common stock equal to three (3) percent of the Debtor's common equity.

The Debtor would propose that the current stockholders receive nothing.

The reorganized Debtor's Board of Directors will initially be compromised of persons that hold or represent the six (6) largest holders of common stock. In circumstances where the initial sale of common stock is either under-scribed, the Noteholders who invested new money shall have the right to purchase additional shares of common stock up to four (4) percent of the original principal of the Secured Notes held by the Noteholder until the minimum $600,000.00 subscription amount is reached.

## **Plan B**

The purpose of this alternate plant B is to sell the most valuable assets of the Debtor free and clear of all liens and encumbrances to the highest bidder. Subject to Court approval, the following terms will govern the auction:

1.   <u>Initial Minimum Bid</u>:  A minimum cash bid of $600,000.00 will be required to participate as a bidder;

2.   <u>Minimum Overbid Requirements</u>:  A minimum overbid in $100,000.00 increments will be required;

3.   <u>Means of Payment of Overbid Amounts</u>:  The means of payment of the overbid amount shall be cash, or with respect to bids by Qualified Noteholder(s), payment may be made by exercise of credit-bid rights recognized in 11 U.S.C. § 363 and 11 U.S.C. § 1129.  Neither minimum bid nor the overbids may be paid by means of promissory note or other credit terms.

4.   <u>Joint Bids</u>: Two or more entities may present a joint bid.  A joint bid may include both a cash and credit-bid component, so long as the minimum cash term is met, and the credit-bid component is made by a Qualified Noteholder.

5.   <u>Qualified Noteholder</u>: In terms of Plan B, a Qualified Noteholder shall be any noteholder who has filed a public notice of its security interest in all or substantially all of the Debtor's assets, either by means of a UCC financing statement made with the Kansas Secretary of State, or by means of having recorded its security interest with the United States Patent and Trademark Office.

6.   <u>Qualified Cash Bidder</u>: A qualified cash bidder is any bidder that has timely submitted a written bid to the Debtor for the minimum bid amount identified above, with proof satisfactory to the Debtor and the Court that the bidder has adequate

sources of cash to make the required minimum bid payment at closing. A qualified cash bidder would also be required to provide the Debtor with a $25,000.00 cash deposit refundable only if its bid is not approved.

Upon the completion of a sale under Plan B, all administrative claims and all priority claims identified above will be paid in full.

The Noteholders will ratably receive the net cash proceeds after administrative claims and priority claims are paid, until the Secured Notes are paid in full. The general unsecured creditor will receive any residue of the sale proceeds after the application of those proceeds as stated above. The current stockholders will receive nothing.

## **Confirmation**

At the confirmation hearing on the Plan, the Debtor shall present the results of the balloting. If Plan A has been accepted by the creditors, and if Plan B has also been accepted by the creditors, and taking into account the preferences of the creditors as shown on the timely submitted ballots, the Court concludes the creditors prefer Plan A, and the Court finds that Plan A otherwise complies with the requirements of the Bankruptcy Code, then Plan will be confirmed.

If Plan B is accepted by the creditors (or if both Plans are accepted by the creditors and the Court taking into account the preferences of the creditors as shown on the timely submitted ballots, the Court concludes creditors prefer Plan B), and the Court finds that the highest bid received at least the $600,000.00 amount of the minimum bid, and Plan B otherwise complies with the requirements

of the Bankruptcy Code, then Plan B will be confirmed, and the sale free and clear of liens under

11 U.S.C. § 363 may occur.

## X.  SALE OF NEW EQUITY INTERESTS

If the Plan is confirmed, and Plan A is adopted according to its terms, the Reorganized

Debtor will be capitalized by the sale of common stock to Secured Noteholders only.  All other

creditors or non-participating Secured Noteholders will receive certain stock as described in the

Article VIII of this disclosure statement and more fully set forth in the Plan.

Participation Requirements.  The maximum investment in the Reorganized Debtor will be

four (4) percent of the original principal of the Secured Notes held by the Noteholder.  The common

stock purchased by the Noteholders  will have one (1) vote for each share owned.  The Reorganized

Debtor will have to raise a minimum of $600,000.00 of capital and only upon the commitment of

that amount of capital should Plan A be confirmed.

Investment Procedures:  The proposed ballot (to be approved by the Court) will confirm the

willingness of the respective Noteholder to participate in the new investment.  A letter of

commitment should accompany the ballot and indicate whether the Secured Noteholder wishes to

make the minimum amount of investment required or exceed that minimum amount and by how

much.

Investment Deadline:  A Secured Noteholder that desires to purchase a new equity interest

in the Reorganized Debtor shall indicate on the ballot when due, and deliver its letter of

commitment, not later than 5:00 p.m., Central Time, on the day that is two business days prior to the

Confirmation Hearing (the "Investment Deadline") by facsimile to Edward J. Nazar, Redmond & Nazar, L.L.P., 245 North Waco, Suite 402, Wichita, Kansas 67202-1117, telephone number 316-262-8361, facsimile number 316-263-0610.  Bids submitted by the Bid Deadline shall remain open and irrevocable through the Effective Date.

      <u>Remaining Noteholder and Equity Interest Holders</u>: The remaining Secured Noteholders will participate in the Reorganized QuVIS as set forth in the Plan.  The current common stockholders will not receive any stock in the Reorganized QuVIS and will receive not payment under the plan.

## XI.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Plan provides for the assumption of all executory contracts not previously assumed or rejected, should Plan A be adopted.  In the event, the Plan B is adopted, the Plan provides for the rejection of all executory contracts and unexpired leases.

## XII.  PREFERENCES, FRAUDULENT CONVEYANCES AND OTHER CLAIMS BY DEBTOR

The Debtor has reviewed its payments over a period of time covering the ninety (90) days prior to the filing of their petition for relief to non-insiders and payments to insiders over the one year period prior to the filing of their petitions for relief.  To the extent that there are any preferences or fraudulent conveyances, the Debtor reserves a period of one (1) year from and after the time of confirmation to commence such actions.  The Debtor has not completed the analysis.  To the extent that the Debtor is successful in recovery of preferences and fraudulent conveyances under Plan B, such proceeds will be used to pay:

a.      Unpaid administrative expenses;

b.      Priority claims, if any; and

c.      Allowed Unsecured Claim, including Noteholder deficiencies.

## XIII.  TAX ATTRIBUTES AND TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtor and the holders of Claims based upon the Tax Code, the Treasury Regulations promulgated thereunder, judicial authorities and current administrative rulings and practices now in effect, all of which are subject to change at any time by legislative, judicial or administrative action.  Any such change could be retroactively applied in a manner that could adversely affect the Debtor and holders of Claims.  In addition, certain aspects of the following discussion are based on proposed Treasury regulations.

The tax consequences of certain aspects of the Plan may be subject to administrative or judicial interpretations that differ from the discussion below.  The Debtor has not requested, nor does it intend to request, a tax ruling from the Internal Revenue Service (the "IRS"), nor will any opinion of counsel be obtained by the Debtor, with respect to the federal income tax consequences of the Plan.  Consequently, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS.  Further, the federal income tax consequences to the Debtor, holders of Claims and holders of Equity Interests may be affected by matters not discussed below. For example, the following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or the holders of Claims, and the discussion does not address the

In the United States Bankruptcy Court for the District of Kansas
IN RE:   QuVIS, Inc.
       Bankruptcy Case No. 09-10706-11
       Disclosure Statement
Page 41

tax consequences of the Plan to certain types of holders of Claims and holders of Equity Interests (including non-U.S. persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax ("AMT")) who may be subject to special rules not addressed herein.

**THE DISCUSSION SET FORTH BELOW IS INCLUDED FOR GENERAL INFORMATION ONLY.  THE DEBTOR AND ITS COUNSEL AND FINANCIAL ADVISORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN, WITH RESPECT TO THE DEBTOR, HOLDERS OF CLAIMS OR HOLDERS OF EQUITY INTERESTS, NOR ARE THEY RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES. THE TAX LAWS APPLICABLE TO CORPORATIONS IN BANKRUPTCY ARE EXTREMELY COMPLEX, AND THE FOLLOWING SUMMARY IS NOT EXHAUSTIVE.  HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS REGARDING TAX CONSEQUENCES OF THE PLAN, INCLUDING FEDERAL, FOREIGN, STATE AND LOCAL TAX CONSEQUENCES.**

**Federal Income Tax Consequences to the Debtor**

**General Discussion**

In general, the Debtor does not expect to incur any substantial tax liability as a result of implementation of the Plan.

## Cancellation of Indebtedness

In general, the Tax Code, with certain exceptions, provides that taxpayers that realize a "cancellation of indebtedness" (i.e., debt extinguishment in exchange for a payment having a value less than the debt extinguished) must include the amount of cancelled indebtedness in gross income to the extent that the indebtedness cancelled exceeds any consideration given for such cancellation. The Tax Code and applicable regulations further provide, however, that where the taxpayer is in a Chapter 11 case and the cancellation of indebtedness is pursuant to a plan approved by the bankruptcy court, with the exception of certain cancellations of indebtedness between affiliates filing a consolidated federal income tax return, such cancellation of indebtedness will not be included in gross income, but the taxpayer must generally reduce tax attributes in an amount equal to the cancelled indebtedness in a specified order.

The Debtor expects to realize a material amount of cancellation of indebtedness ("COD") income as a result of the Plan.  With certain exceptions, to the extent that any creditor receives from a Debtor a distribution under the Plan in an amount less than such creditor's Claim, the Debtor will realize COD income in an amount equal to such excess.  Because the Debtor is in bankruptcy, it will not be required to include COD income in taxable income (with the exception of certain inter-company debt between affiliates), but rather will be required to reduce its NOLs (and possibly certain other tax attributes, including tax basis of assets) by the amount of the COD income.  Tax attributes must be reduced in the order specified as follows: (I) NOLs, (ii) business credits, (iii) minimum tax credits, (iv) capital loss carry-overs, (v) tax basis in assets, (vi) passive activity losses

and credits, and (vii) foreign tax credit carry-overs.  In lieu of this order, however, the Debtor may elect to apply any portion of the reduction to reduce the basis of its depreciable assets first.  The consolidated return regulations require that if intercompany debt between corporations filing a consolidated federal income tax return is cancelled in a bankruptcy proceeding the obligor must report the COD income.  The creditor would be entitled to bad debt deduction.  While this treatment should generally result in no net taxable income to the consolidated group, there may be ancillary effects in connection with the transaction, such as the recapture of excess loss accounts.

As a result of the discharge and satisfaction of Claims pursuant to the Plan, the Debtor will incur significant COD and potential tax attribute reduction.  However, because any reduction in tax attributes does not occur until the first day of the taxable year following the taxable year in which the COD is incurred, the resulting COD will not impair the Debtor's ability to use its tax attributes (to the extent otherwise available) to reduce the tax liability, if any, resulting from the implementation of the Plan.

**Alternative Minimum Tax**

A company may be subject to the AMT even if its regular taxable income is entirely offset by NOL carryforwards.  For purposes of computing a taxpayer's regular federal tax liability, all of the income recognized in a taxable year may be reduced by NOL carry-overs.  For purposes of the AMT, however, (except as to taxable years ending during 2001 or 2002) only 90% of a taxpayer's alternative minimum taxable income ("AMTI") may be reduced by NOL carry-overs ("AMTNOL carry-overs"), the amount of which is determined separately from the amount of regular NOL carry-

overs.  Therefore, any alternative minimum taxable income recognized by the Debtor will be taxable at current rates established by the Internal Revenue Service and may be subject to an environmental tax under Section 59A of the Tax Code.

**Federal Income Tax Consequences to Holders of Claims**

The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder's Claim becomes an Allowed Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of accounting, and whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim.

**Claims for Accrued Interest**

Notwithstanding the general rules described above, holders of Claims who receive any consideration under the Plan in respect of Allowed Claims for accrued but not previously taxed interest must treat the amount of such consideration as ordinary income.  A holder of a Claim whose Allowed Claim for accrued and previously taxed interest is not fully satisfied generally may take an ordinary deduction for the unsatisfied portion of such Allowed Claim, even if the underlying claim is held as a capital asset.   The proper allocation, between principal and interest, of consideration to be distributed under the Plan is unclear.  The Debtor intends to take the position that such consideration is allocated to principal, to the extent thereof, before any amount is allocated to accrued but unpaid interest.  Creditors should be aware, however, that the IRS may take a different position with respect to the proper allocation.

HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS ABOUT THE PROPER ALLOCATION OF CONSIDERATION BETWEEN PRINCIPAL AND INTEREST.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XIV.  LITIGATION

Prior to its consent to relief under Chapter 11 on May 19, 2009, the Debtor was involved with the following litigation:

1.      *MTV Capital Ltd. v. QuVIS, et al.*, Case No. 07 CV 981, U.S. District Court, Western District of Oklahoma: This case involves Black Oak's claim that Lester made certain representations regarding QuVIS's cash flow protections.  This case ultimately settled for $400,000.00 with payments made by QuVIS Board members.

2.      *Greenville Cinemas, LLC v. QuVIS, Inc.*, 07 CP-23-44448, In the court of Commons Pleas, South Carolina: This case involved a QuVIS product sold second hand, which Greenville Cinemas claimed was defective.  Rather than litigate, QuVIS settled the case, but was not able to

make any payments under the settlement agreement. Default judgment was entered in South Carolina for breach of the settlement agreement, and the judgment was filed in Topeka, Kansas.

     3.     *Sanmina-SCI, et. al. v. QuVIS*, 108 CV 116716, In the Superior Court of California, Santa Clara County: This case involved the recovery of money for Sanmina claimed it was owed for the purchase and production of costs of certain inventory. Default judgment was entered, however that judgment was not filed in Kansas.

     4.     *Arrow Electronics v. QuVIS*, 08 C 7535, District Court, Shawnee County, Kansas: This case involves the recovery of money from QuVIS for the alleged failure to pay for product.

     5.     *Ann Hessman Trust v. QuVIS, Inc.*, 08 CV 1274, District Court, Shawnee County, Kansas: The Ann Hessman Trust is a secured note holder who sued QuVIS to recover the money invested in the same.

     6.     *Progress Instruments, Inc. v. QuVIS, Inc.*, Missouri Circuit Court: This case involves breach of a settlement agreement made by QuVIS after Progress filed lawsuit to recover money for work performed and product delivered.

     7.     Various wages claims were filed by current and former employees with the Kansas Department of Labor. Those claims are address as priority claims and the summary of claims in Article VI, Section 1 above.

## XV.  RISK FACTORS

Introduction

This section summarizes some of the risks associated with the Plan and the Debtors' ability to comply with the terms of the Plan. However, this analysis is not exhaustive and must be supplemented by an evaluation of the Plan and this Disclosure Statement as a whole by each holder of a Claim or Equity Interest with such holder's own advisors.

AS SUCH, HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN, ITS IMPLEMENTATION OR ITS SUCCESS.

Bankruptcy Risks

(a)     Risks Relating to Confirmation

For the Plan to be confirmed, each impaired Class of creditors and holders of Equity Interests is given the opportunity to vote to accept or reject the Plan, except for those Classes which will not receive any distribution under the Plan and which are, therefore, presumed to have rejected the Plan. There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.

If one or more of the impaired Classes vote to reject the Plan, then the Debtor may request that the Bankruptcy Court confirm the Plan by application of the "cramdown" procedures available under Section 1129(b) of the Bankruptcy Code.  There can be no assurance, however, that the Debtor will be able to use the cramdown provisions of the Bankruptcy Code to achieve Confirmation of the Plan.

If the Plan, or a plan determined not to require re-solicitation of any classes of Claims or Equity Interests by the Bankruptcy Court, were not to be confirmed, it is unclear what distribution holders of Claims and Equity Interests ultimately would receive with respect to their Claims and Equity Interests.  If an alternative plan could not be agreed to, it is likely that holders of Claims and Equity Interests would receive less than they would have received pursuant to this Plan.

Any objection to the Plan by a member of a class of Claims or Equity Interests could also either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

(b)     Other Bankruptcy Risks

If Administrative Expense Claims or Priority Claims are determined to be Allowed in amounts greatly exceeding the Debtor's estimates, then there may be inadequate cash or other property available on the Effective Date to pay certain Claims under the Plan, and the Plan would not become effective.  The Debtor believes, however, that it will have more than sufficient cash to satisfy such Claims.

In addition, the effect, if any, that the Chapter 11 Cases may have upon any continued operations of the Reorganized Debtor cannot be accurately predicted or quantified.  Although the

Debtor's reorganization and emergence from bankruptcy will eliminate some uncertainty about the Reorganized Debtor's future operations, some entities, at least initially, may be uncomfortable doing business with a company that recently emerged from Chapter 11 process.  The Chapter 11 Cases could have harmed the Reorganized Debtor's relationships with its customers, suppliers, and employees, resulting in a material adverse impact on the Reorganized Debtor's operations.

Business Risks

(a)      Reliance on Key Personnel

If the Plan is confirmed, and Plan A is adopted by the proper parties, the Debtor believes that its success depends on the services of the majority of its present senior management.  If the Reorganized Debtor loses the services of its key executives, then its business could be materially adversely affected.  The Debtor also believes that its ability to retain members of its senior management team and key personnel is critical to its future success.  In that regard, the Debtor proposes to retain and pay Kenbe Goertzen a minimum salary of $72,000.00 a year, excluding benefits.  This amount is subject to change based upon approval from the Board of the Reorganized Debtor.

Risks with Financial Projections

The fundamental premise of the Plan is the successful implementation of the Debtor's business plan as reflected in the financial projections attached hereto. The projections are inherently uncertain and are dependent upon the successful implementation of the business plan and the reliability of the other assumptions contained therein. The projections reflect numerous assumptions,

including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Reorganized Debtor and some of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement, including unanticipated changes in applicable regulations or accounting procedures, may affect the actual financial condition, results of operations and cash flows of the Reorganized Debtor in the future.

## XVI.  ALTERNATIVES TO PLAN

If the Plan is not confirmed, then one alternative would be the conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, which would require the immediate closure and cessation of the Debtor's business operations and the potential piecemeal liquidation of all assets of the Debtor and the Debtor's Estate by a Chapter 7 bankruptcy trustee. Due to the nature of the Debtor's business, the Debtor's assets have limited value unless they are used in connection with a going concern business. In addition, the forced liquidation value of Debtor's current assets is  significantly less than the ongoing business value and the value attributed by the Debtor. The Debtor's cash flow was sufficient to be able to service the debt as outlined pursuant to the cash flow attached hereto.

The second alternative to the proposed Plan is the dismissal of the Chapter 11 case. In that event, however, the Debtor readily anticipates that the I.R.S. Tax liens and the liability to wage holder will force it to cease business.  These consequences are exactly the types of activities that

the bankruptcy process is designed to avoid.  It is only through the bankruptcy process that the

Debtor's creditors can be treated in accordance with each creditor's respective rights.

A third alternative in the event the Plan is not confirmed is that the Debtor, a creditor or

another party in interest could attempt to formulate and propose a different plan of reorganization

or liquidation.  The Debtor does not believe that an alternate plan under Chapter 11 of the

Bankruptcy Code can be formulated that will provide for greater distributions to creditors and

holders of Equity Interests than provided for under the Plan.  Further, the Debtor believes that

emergence from these Chapter 11 Cases as soon as reasonably possible is necessary for the survival

and viability of the Debtor's business.  Any alternate plan would likely take significant time to

formulate and propose, would likely substantially increase the administrative expenses in the Estate

as well as jeopardize the viability of the Debtor's business, and significantly delay any distributions

to creditors and holders of Equity Interests.

Collectively, these factors clearly evidence that the Debtor's proposed Plan is superior to

a liquidation under Chapter 7 of the Bankruptcy Code, dismissal of the bankruptcy case or the filing

of an alternate plan of reorganization or liquidation.  The Debtor firmly believes that the Plan results

in a fair balancing of all parties' rights, and again urges creditors and holders of Equity Interests to

vote to accept the Plan.

## XVII.  MISCELLANEOUS PROVISIONS

The Plan also provides that it may be modified by the Debtor or corrected prior to

Confirmation Date without additional disclosure, pursuant to §1125 of the Bankruptcy Code,

In the United States Bankruptcy Court for the District of Kansas
IN RE:   QuVIS, Inc.
        Bankruptcy Case No. 09-10706-11
        Disclosure Statement
Page 52

provided that the Court finds that such modification does not adversely affect any creditor or class of creditors and is consistent with the Bankruptcy Code.  After the Confirmation Date, the Debtor may, with approval of the Court, and so long as it does not adversely affect the interests of the creditors, remedy any defect or omission, or reconsider any inconsistencies in the Plan, or in the order of confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

## XVIII.  SUBSTANTIAL CONSUMMATION OF THE PLAN

Upon issuance of the common stock as provided for in Plan A, or the conduction of a sale under 11 U.S.C. § 363 according to the terms of the Plan B, the Plan shall be deemed to be substantially consummated.

## XIX.  DISCHARGE PROVISIONS

Upon confirmation of Plan A, the Debtor will be discharged pursuant to 11 U.S.C. §1141.

## XX.  RE-VESTING OF ASSETS

On the Effective Date, any and all property of the Estate under Section 541 of the Bankruptcy Code, including recovery therefrom, shall be vested in the Reorganized Debtor, free and clear of any and all Claims, debts, liens, security interests and encumbrances of any kind or type, except those Claims, debts, liens, security interests and encumbrances specifically provided for under the Plan.  From and after the Effective Date of Plan A, the Reorganized Debtor may operate its businesses and may use, acquire and dispose of its property free and clear of any restrictions of

the Bankruptcy Code, except as otherwise provided in the Plan or Confirmation Order.   The

Reorganized Debtor shall also be able to pay any and all legal and professional fees and expenses

that accrue post confirmation without the need to seek court approval thereof.

## XXI.  RETENTION OF JURISDICTION

The Court, pursuant to the Plan will retain jurisdiction of the case in order to:

A.      To consider any modifications of the Plan pursuant to Section 1127 of the Bankruptcy Code;

B.      To hear and determine all controversies, suits and disputes, if any, which may arise in

connection with the interpretation or enforcement of the Plan, or which may be required to

insure compliance with the provisions of the Plan;

C.      To hear and determine any and all requests for compensation and/or reimbursement of

expenses, made by application to the Court;

D.      To hear and determine all of the controversies, suits and disputes, if any, that may be

pending at the time of the confirmation of the Plan, or that may arise between the Debtor and

any creditor of any class, including objection to claims and to determine the extent to which

disputed claims shall be allowed and approved, including, but not limited to the following:

(1)     The determination of valid liens and claims (and amounts) against the Debtor and its

property;

(2)     This continuing jurisdiction, staying enforcement of any claims or liens until

consummation of this Plan;

In the United States Bankruptcy Court for the District of Kansas
IN RE:   QuVIS, Inc.
       Bankruptcy Case No. 09-10706-11
       Disclosure Statement
Page 54

(3)     The entering of any necessary orders requiring lienholders, judgment holders, and mortgage holders to erase and cancel their liens and mortgages from the conveyance, mortgage or other appropriate records of any county where the real estate or other property of Debtor is located, so that there will be no encumbrances on the Debtor's properties after confirmation other than claims and liens consistent with this Plan.

E.     To allow the Debtor to enforce, after confirmation, any claims or causes of action which exist in the Debtor's favor as debtor-in-possession and which may not have previously been enforced by the Debtor;

F.     To enforce the provisions of Sections 362 and 524(a) of the Bankruptcy Code; and

G.     To insure that the intents and purposes of the Plan are fulfilled.

## XXII.  CONCLUSION

This Disclosure Statement is intended to assist each creditor in making an informed decision regarding the acceptance of Debtor's Plan of Reorganization.  If the Plan is accepted, all creditors will be bound by its terms.  You are, therefore, urged to carefully review this statement and the enclosed copy of the Plan.  If questions remain after such review, you are urged to make further inquiries as you may deem appropriate to counsel or other creditors.

[INTENTIONALLY LEFT BLANK]

QuVIS, Inc.

By: /s/ Kenbe Geortzen
Printed Name: Kenbe Geortzen
Title: President


RESPECTFULLY SUBMITTED:

REDMOND & NAZAR, L.L.P.

/s/ Nicholas R. Grillot
Edward J. Nazar, #09845
Nicholas R. Grillot, #22054
Attorney for Debtor
245 North Waco, Suite 402
Wichita, KS 67202-1117
316-262-8361