# FIRST AMENDED AND RESTATETED
## CONVERTIBLE LOAN AND SECURITY AGREEMENT

THIS FIRST AMENDED AND RESTATED CONVERTIBLE LOAN AND SECURITY AGREEMENT (this "Agreement") is dated and effective as of June 30, 2003 between each person who has executed this Agreement on the signature pages hereto (collectively, the "Lenders" and each a "Lender") and QUVIS, INC., a Kansas corporation (the "Borrower"). The Lenders and the Borrower are sometimes collectively referred to herein as the "parties" and individually as a "party."

## PREAMBLE

WHEREAS, each person whose name is set forth in Schedule 1 to this Agreement under the column captioned "Lender" and who loaned the Borrower the principal amount set forth in Schedule 1 under the column captioned "$2.99 M Note (12%)" and the sub-column captioned "Original Principal" executed the Convertible Loan and Security Agreement dated as of November 30, 2001 (the "2001 Agreement") and those persons from such column and sub-column who execute this Agreement (the "2001 Lenders") and the Borrower desire to (i) amend certain provisions of the 2001 Agreement and the notes issued to evidence the loans made pursuant to the 2001 Agreement (the "2001 Notes"), (ii) extend the outstanding principal amount of such loans and (iii), with respect to certain 2001 Lenders, loan additional amounts to the Borrower as set forth in this Agreement and the Notes (as defined in this Agreement);

WHEREAS, each person whose name is set forth in Schedule 1 to this Agreement under the column captioned "Lender" and who loaned the Borrower the principal amount set forth in Schedule 1 under the column captioned "$1.57 M Note (12%)" and the sub-column captioned "Original Principal" (the "2002 Lenders") executed the Convertible Note and Security Agreement dated as of October 1, 2002 (the "2002 Note") and the 2002 Lenders and the Borrower desire to enter into this Agreement, cancel the 2002 Note and loan additional amounts to the Borrower as set forth in this Agreement and the Notes;

WHEREAS, each person whose name is set forth in Schedule 1 to this Agreement under the column captioned "Lender" (including the persons under "Pledged but not Collected") and who has loaned or has pledged to loan the Borrower the principal amount set forth in Schedule 1 under the column captioned "Additional Funding (8%, except where commented)" and the sub-column captioned "Original Principal" (including the amounts under "Pledged but not Collected") (the "Additional Lenders") desire to enter into this Agreement and to lend to the Borrower, or have loaned the Borrower, on the terms and conditions set forth herein, additional amounts, which loan will be evidenced by the Notes; and

WHEREAS, the Borrower agrees that as security for its obligations hereunder that a security interest in the Collateral (as defined below) is to be created for the benefit of the Lenders as herein provided;

**EXHIBIT**

tabbies

_____

NOW, THEREFORE, in consideration of the mutual covenants, promises, representations and warranties set forth herein, the parties agree as follows:

# ARTICLE I

## DEFINITIONS

All capitalized terms used in this Agreement shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

"*Additional Lenders*" shall have the meaning set forth in the Preamble to this Agreement.

"*Affiliate*" shall mean, with respect to a Lender, any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Lender. "Control" shall mean the power, directly or indirectly, either to (a) vote 10% or more of the aggregate equity interests of the Person in question, or (b) direct or cause the direction of the management and policies of the Person in question, whether by contract or otherwise.

"*Borrower*" shall mean QuVIS, Inc., a Kansas corporation.

"*Business Day*" shall mean a day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the laws of the United States of America or the State of Kansas.

"*Capital Transaction*" shall mean any merger pursuant to which the Borrower shall not be the surviving entity sale of all or substantially all the assets of, the Borrower or the sale, in a single transaction or related series of transactions of a majority of the outstanding shares of Common Stock of the Borrower.

"*Collateral*" shall have the meaning set forth in Section 6.01(a).

"*Common Stock*" shall mean the Borrower's common stock, without par value.

"*Conversion Date*" shall mean the date on which the conversion of a Note to Common Stock is deemed effective, which date shall be the date on which the Borrower receives the Conversion Notice.

"*Conversion Notice*" shall mean notice of conversion in the form set forth in Exhibit B hereto.

"*Conversion Price*" shall mean the price per share of Common Stock at which Notes are converted into shares of Common Stock, determined as set forth in Section 7.01(b).

"*Default*" shall mean any of the events specified in Section 10.01, without giving effect to any requirement for the giving of notice, for the lapse of time, or both, or for the happening of any other condition, event or act.

"*Event of Default*" shall mean any of the events specified in Section 10.01, provided that any requirement for the giving of notice, the lapse of time, or both, or for the happening of any further condition, event or act has been satisfied.

"*Governmental Authority*" shall mean any government, any department, agency, division or instrumentality thereof or any court, whether federal, state, local or a political subdivision.

"*Indemnified Parties*" shall have the meaning set forth in Section 12.07(a).

"*Interest Payment Date*" shall have the meaning set forth in Section 3.01 hereof.

"*Law*" shall mean any statute, rule, regulation, order, judgment, award or decree of any Governmental Authority.

"*Lenders*" shall mean each person who has executed this Agreement on the signature pages hereto, collectively, or any successor or substitute Lender as shown on Schedule 1 hereto, as modified from time to time.

"*Lien*" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code of the State of Kansas or comparable law of any jurisdiction).

"*Loan*" shall have the meaning set forth in Section 2.01.

"*Maturity Date*" shall mean June 30, 2006.

"*Net Sales*" shall have the meaning set forth in Section 8.01 of this Agreement.

"*Noteholder*" shall mean the person who is the registered owner of a Note as recorded in the books and records of the Borrower.

"*Notes*" shall mean the first amended and restated convertible secured senior notes in the form attached as Exhibit A hereto and delivered by the Borrower to the Lenders and evidencing the borrowings hereunder.

"*Permitted Encumbrances*" shall mean the following encumbrances: (a) Liens for taxes or assessments or other governmental charges not yet due and payable; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation; (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which the Borrower is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business, so long as such Liens attach only to equipment, fixtures and/or real estate; (e) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of

business and securing liabilities; (f) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which the Borrower is a party; (g) any attachment or judgment lien not constituting an Event of Default; (h) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such real estate; and (i) presently existing or hereinafter created Liens in favor of the Lenders.

"*Person*" shall mean and include an individual, a partnership, a corporation, a trust, an unincorporated association, a joint venture or any other entity or a government or any agency or political subdivision thereof.

"*Principal Balance*" shall mean the remaining outstanding and unpaid principal balance of the Notes as reduced by any payments of principal and conversion to Common Stock.

"*Principal Payment Date*" shall have the meaning set forth in Article IV hereof.

"*Quarterly Royalty Payment Date*" shall have the meaning set forth in Section 8.03 of this Agreement.

"*Royalty*" shall have the meaning set forth in Section 8.01 of this Agreement.

"*Royalty Period*" shall have the meaning set forth in Section 8.02 of this Agreement.

"*2001 Agreement*" shall have the meaning set forth in the Preamble to this Agreement.

"*2001 Lenders*" shall have the meaning set forth in the Preamble to this Agreement.

"*2001 Notes*" shall have the meaning set forth in the Preamble to this Agreement

"*2002 Lenders*" shall have the meaning set forth in the Preamble to this Agreement.

"*2002 Note*" shall have the meaning set forth in the Preamble to this Agreement

## ARTICLE II

## THE LOAN

**Section 2.01. The Loan**. The Lenders hereby agree to make a loan (the "Loan") to the Borrower up to a total amount of Eleven Million Five Hundred Thousand Dollars ($11,500,000) in the manner, and subject to the terms and conditions set forth herein; provided, however, that the Borrower may (i) issue Notes under this Agreement in an aggregate principal amount in excess of $11.5 million, excluding the aggregate principal amounts of any Notes issued pursuant to Sections 2.01(ii) of this Agreement, through November 15, 2003 to the extent approved by the Borrower's Board of Directors and the Lenders holding Notes with a majority of the Principal Balance and (ii) issue Notes under this Agreement in an aggregate principal amount not to exceed an additional $2,992,568 with respect to Notes issued pursuant to Section 7.02(a) of this Agreement without any further action, approval or consent by the Borrower's Board of Directors or Lenders. The Borrower will not issue Notes under this Agreement after November 15, 2003,

4

without the prior written consent of the Lenders holding Notes with a majority of the Principal Balance. The amount lent to the Borrower by each of the Lenders is set forth in Schedule 1 hereto.

**Section 2.01. Funding; Delivery of Notes.** The 2001 Lenders have previously delivered to the Borrower funds in the full amount specified opposite such 2001 Lender's name in the column captioned "$2.99M Note (12%)" and the sub-column captioned "Original Principal" in Schedule 1 hereto and unpaid interest has accrued on the 2001 Notes in the full amount specified opposite such 2001 Lender's name in the column captioned "$2.99M Note (12%)" and the sub-column captioned "Accrued Interest" in Schedule 1 hereto. The 2002 Lenders have previously delivered to the Borrower funds in the full amount specified opposite such 2002 Lender's name in the column captioned "$1.57M Note (12%)" and the sub-column captioned "Original Principal" in Schedule 1 hereto and unpaid interest has accrued on the 2002 Notes in the full amount specified opposite such 2002 Lender's name in the column captioned "$2.99M Note (12%)" and the sub-column captioned "Accrued Interest" in Schedule 1 hereto. The Additional Lenders have previously delivered to the Borrower funds in the full amount specified opposite such Additional Lender's name in the column captioned "Additional Funding (8%, except where commented)" and the sub-column captioned "Original Principal" in Schedule 1 hereto, unpaid interest has accrued on such funds in the full amount specified opposite such Additional Lender's name in the column captioned "Additional Funding (8%, except where commented)" and the sub-column captioned "Accrued Interest" in Schedule 1 hereto and the Additional Lenders specified in the column captioned "Lender" and the sub-column "Pledged but not Collected" have pledged to deliver additional funds in the full amount specified opposite such Additional Lender's name in the column captioned "Additional Funding (8%, except where commented)" and the sub-column captioned "Original Principal" in Schedule 1 hereto. The Borrower will deliver Notes in the form attached as Exhibit A hereto to the Lenders each with a stated Principal Balance equal to the amount specified opposite the Lender's name in the column captioned "Total Principal and Accrued Interest" in Schedule 1 hereto, which amount is equal to the outstanding principal amount of the note previously issued to the Lender for cash previously delivered, any unpaid accrued interest on such note that the Lender has elected to exchange for the corresponding principal amount of Notes as indicated in the applicable column captioned "Rollover" in Schedule 1 hereto and additional cash previously delivered or to be delivered by the Lender to the Borrower for Notes.

**Section 2.03. Use of Proceeds.** The Borrower agrees that all amounts lent hereunder shall be applied by the Borrower exclusively for sales and marketing, research and development, manufacturing, conversion of short term debt, payment of existing debts, judgments, settlement of existing or threatened lawsuits existing now or in the future, working capital and other general corporate purposes. A portion of such amounts will be used to pay, on the date of this Agreement, the amounts shown in Schedule 1 hereto under the column captioned "Cash to Pay" to the corresponding Lenders indicated in the column captioned "Lender" for unpaid accrued interest and unpaid principal, as indicated in Schedule 1, on existing debts.

**Section 2.04. Access.** So long as no Default or Event of Default exists, the Borrower shall, during normal business hours, from time to time upon five (5) Business Days' prior notice: (a) provide each Lender and any of its officers, employees and agents access to its properties, facilities, advisors and employees (including officers) and to the Collateral, (b) permit each

5

Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from the Borrower's books and records, and (c) permit each Lender, and its officers, employees and agents, to inspect, review, evaluate and make test verifications and counts of the Collateral. If a Default or Event of Default shall have occurred and be continuing or if access is necessary to preserve or protect the Collateral as reasonably determined by any Lender, the Borrower shall provide such access to any Lender at all times and without advance notice. Furthermore, so long as any Event of Default shall have occurred and be continuing, the Borrower shall provide each Lender with access to its suppliers and customers. The Borrower shall make available to each Lender, as quickly as is possible under the circumstances, originals or copies of all books and records which the Lender may reasonably request.

## ARTICLE III

## INTEREST

**Section 3.01. Interest.** (a) The Borrower shall pay interest on the Principal Balance of each Note at the rate of 8.0% per annum. Interest on the Notes shall be computed on the basis of a year deemed to consist of 365 days and paid for the actual number of days elapsed.

(b) Interest on the principal amount of each Note will be paid in arrears in quarterly installments on the last day of each calendar quarter beginning September 30, 2003 (each such date an "Interest Payment Date") until the Note is paid in full or converted in full to Common Stock pursuant to this Agreement. Interest shall begin to accrue as of the date of the Note is issued. Interest payments are convertible to Common Stock at the election of a Lender pursuant to Article VII.

**Section 3.02. Usury**. Notwithstanding any provisions to the contrary in this Article III or elsewhere in the Note, the Borrower shall not be obligated to pay interest at a rate which exceeds the maximum rate permitted by Law. If, but for this Section 3.02, the Borrower would be deemed obligated to pay interest on the Note at a rate which exceeds the maximum rate permitted by Law, then (a) the Borrower shall not be obligated to pay interest to the extent it exceeds the interest that would be payable at the maximum rate permitted by Law; (b) any such excess interest that has been paid by the Borrower shall be refunded; and (c) the effective rate of interest shall be deemed automatically reduced to the maximum rate permitted by Law.

## ARTICLE IV

## PRINCIPAL

The Borrower shall pay the entire Principal Balance of each Note in full on the Maturity Date (the "Principal Payment Date"); provided, however, such payment shall not be due for that portion of any Note that has been converted to Common Stock on or before the Maturity Date.

## ARTICLE V

## PAYMENTS AND PREPAYMENTS

**Section 5.01. Manner of Payments**. All payments of principal and interest on the Notes will be made by Borrower either by direct wire transfer of immediately available funds to such accounts as shall be designated by the Lenders from time to time or by check, at the election of the Lender. All such payments shall be made on or before the date when due, without deduction, setoff or counterclaim by the Borrower. The Borrower hereby waives any right to deduction, setoff or counterclaim with respect to the Notes.

**Section 5.02. Due Dates Not on Business Days**. If a Principal Payment Date or Interest Payment Date is not a Business Day, then such Principal Payment Date or Interest Payment Date, as the case may be, will be deemed to be the next following Business Day and, with respect to the payment of principal, interest thereon shall be payable through the date of payment.

**Section 5.03. Prepayment**. Upon sixty (60) days written notice to the Lenders, the Borrower shall have the right to prepay all or any portion of the Principal Balance of the Notes prior to the Maturity Date, plus accrued interest through the date of prepayment, at any time without penalty. Any partial prepayment of the Principal Balance will be made to each Lender in proportion to the Principal Balance of each Lender's Note. Upon giving such notice, the Lenders who hold Notes shall still be able to exercise the right to convert all or a portion of the Principal Balance on the Notes to Common Stock pursuant to this Agreement.

**Section 5.04. Release Upon Payment.** Upon payment by the Borrower to the Lender of all principal of and interest on the Notes held by the Lender pursuant to this Agreement, the Lender will no longer be entitled to exercise or enforce any rights under the Notes hereunder, including the rights available to Lenders in an Event of Default under Section 10.01(a) and the Collateral shall be released from the security interest created therein pursuant to this Agreement without any further action by the Borrower, any Lender or any other Person. Each Lender agrees that, upon payment by the Borrower to the Lender of all principal of and interest on the Notes held by the Lender pursuant to this Agreement, the Lender shall take promptly such action as is necessary to release the Collateral from any security interest or liens created hereunder, including the filing of a UCC-3 termination statement or its equivalent.

## ARTICLE VI

## SECURITY AGREEMENT

### Section 6.01. Grant and Perfection of Security Interest.

(a)     To secure the timely payment of all principal and interest under the Notes and the performance by the Borrower of all of its commitments and obligations under this Loan and Security Agreement subject to Sections 5.04 and 7.01(e) of this Agreement, the Borrower hereby pledges and grants to the Lenders a security interest in all of the right, title and interest of the Borrower in and to all of the property, assets, interests and undertakings of the Borrower, whether now owned or hereafter acquired, existing or arising, real, personal or mixed, tangible or intangible, of every kind and description, wherever located, together with all renewals thereof, substitutions therefor and proceeds thereof and all interest, dividends, income and revenue therefrom, ***excluding all factored***

7

*accounts receivable whether now existing or in the future,* but otherwise including all accounts, all chattel paper, all contracts, all deposit accounts, all equipment, all fixtures, all goods, all instruments, all inventory, all cash of the Borrower, all patents, trademarks, trade names, copyrights and other intellectual property or intellectual property rights (the "Collateral"). This instrument shall constitute a security agreement to the extent the Collateral constitutes personal property, and the Lenders shall have all of the rights of a secured party under the Uniform Commercial Code of the State of Kansas as it may be amended from time to time.

(b) In order to perfect such security interest, Borrower shall: make such filings and take such other actions as may be required under the Uniform Commercial Code of the State of Kansas or other jurisdiction. Borrower authorizes each Lender to perform every act which such Lender considers necessary to protect and preserve the Collateral and Lenders' interest therein and, in that regard, Borrower agrees to execute such documents and to take whatever other action is reasonably requested by Lenders to perfect and continue the security interest granted hereby.

(c) Except as set forth in Schedule 6.01(c) to this Agreement, the Borrower represents and warrants to the Lenders that:

(i) The Borrower is the sole owner of each item of the Collateral upon which it purports to grant a Lien hereunder, and has good and marketable title thereto free and clear of any and all Liens other than Permitted Encumbrances.

(ii) No effective security agreement, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is on file or of record in any public office, except such as may have been filed (i) by the Borrower or the Lenders in favor of the Lenders pursuant to this Agreement, and (ii) in connection with any other Permitted Encumbrances.

(iii) This Agreement is effective to create a valid and continuing Lien on and, upon the filing of the appropriate financing statements, a perfected Lien in favor of the Lenders on the Collateral with respect to which a Lien may be perfected by filing pursuant to the Uniform Commercial Code of the State of Kansas. Such Lien is prior to all other Liens, except Permitted Encumbrances that would be prior to Liens in favor of the Lenders as a matter of law, and is enforceable as such as against any and all creditors of and purchasers from the Borrower (other than purchasers of inventory in the ordinary course of business). All action by the Borrower necessary or desirable to protect and perfect such Lien on each item of the Collateral has been or will be duly taken.

**Section 6.02. Defense of Title to Collateral.** The Borrower covenants and agrees that during the term of this Agreement, it will defend title to the Collateral against the claims, lawful

8

or unlawful, of any other parties and shall not create or allow the creation of any other lien, security interest or other encumbrance of any nature whatsoever against or with respect to the Collateral without the prior written consent of the Lenders. In the event any action or proceeding is commenced with respect to Borrower's title to the Collateral or the interest of the Lenders in the Collateral under this Agreement, the Borrower shall defend the action at Borrower's sole expense. The Lenders may be the nominal parties in such proceeding, but shall be entitled to participate in the proceeding and to be represented therein by legal counsel of their choice.

**Section 6.03. Use of Collateral and Profits and Proceeds**. Except in an Event of Default under Section 10.01(a) of this Agreement, Borrower shall retain all of its rights to, and use of, the Collateral and to the use of the profits or proceeds from the Collateral.

**Section 6.04. Waiver**. Borrower waives any right to require Lenders to proceed against another person or to exhaust the Collateral or to pursue any other remedy which Lenders may have. Borrower waives presentment, demand for performance, notice of nonperformance, protest, notice of protest and dishonor with respect to the Collateral. Borrower waives the right to require Lenders to preserve rights against prior parties to instruments or chattel paper.

**Section 6.05. Appointment of Lenders as Attorney-in-Fact**. Borrower appoints Lenders, and each of them individually, as Borrower's attorney-in-fact to do any act which Borrower is obligated by this Agreement to do, and to exercise the rights that Borrower may exercise under this Agreement, to use the Collateral as Borrower might use it and to protect and preserve Lenders' rights under this Agreement and in the Collateral. Borrower agrees to reimburse Lenders in cash for cash paid expenses which they may incur while acting as Borrower's attorney-in-fact, including the payment of compensation paid a Lender to Kenbe Goertzen, Becky Lester and other employees of the Borrower specified in writing by a Lender to the Borrower. No Lender shall have any liability whatsoever to the Borrower, any other Lender or any third party for any action taken or rights exercised pursuant to this section.

## ARTICLE VII

## CONVERSION OF NOTES AND INTEREST

**Section 7.01. Optional Conversion of Notes and Interest and Anti-Dilution.** (a) Each Lender shall have the right individually, at its own discretion, to convert all or any portion of the Principal Balance of such Lender's Note and the accrued but unpaid interest payable on such Note into fully paid and nonassessable shares of Common Stock while the Note is outstanding as follows:

    (i)     At any time while the Note is outstanding;

    (ii)    Upon the occurrence of an Event of Default under Section 10.01(a) hereof;

    (ii)    Prior to and in conjunction with the initial underwritten offering of the Borrower's common stock to the public that is registered under the Securities Act of 1933, as amended;

    (iv)    Prior to and in conjunction with any Capital Transaction; and

9

(v)     If the Borrower sells any shares of Common Stock for less than $0.50 per share, the Borrower shall provide each Lender written notice of such proposed or actual sale no later than ten (10) Business Days after such sale occurs and each Lender may elect to exercise its right to convert under this section at that price by providing written notice of such election to the Borrower in substantially the form set forth in Exhibit B hereto at any while the Note is outstanding.

(b)     The number of shares of Common Stock to be delivered to a Lender who has exercised its right to convert its Note or interest to Common Stock under this Agreement shall be determined by dividing the Principal Balance of the Note or the amount of accrued but unpaid interest to be converted, as the case may be, by the Conversion Price. The conversion price shall be $0.50; provided, however, if a Lender elects to convert his Note or interest pursuant to Section 7.01(a)(v), the conversion price shall equal the lower price at which the shares to which the notice relates were sold (the "Conversion Price").

(c)     In order to exercise such optional conversion right under this section, a Lender must give written notice thereof to the Borrower in substantially the form set forth in Exhibit B hereto at least three (3) Business Days prior to the proposed date of conversion to Borrower. By no later than the thirtieth Business Day after delivery of such notice, the Borrower will deliver certificates for the number of shares of Common Stock determined as provided in paragraph (b) above to such Lender and a Note for the remaining Principal Balance after the conversion against delivery by such Lender of its currently outstanding Note marked "Cancelled." The person in whose name the certificate or certificates for Common Stock are to be issued shall be deemed to have become a shareholder of record on the applicable Conversion Date unless the transfer books of the Borrower are closed on the date, in which event he shall be deemed to have become a shareholder of record on the next succeeding date on which the transfer books are open.

(d)     No fractional shares of Common Stock or scrip shall be issued upon conversion of any Note or interest. Instead of any fractional shares of Common Stock which would otherwise be issuable upon conversion of any Note or interest, the Borrower shall pay a cash adjustment in respect of such fractional interest in an amount equal to the Conversion Price per share for such fractional interest.

(e)     Upon delivery by a Lender of a notice that it intends to exercise its right to convert the entire Principal Balance of its Note into Common Stock under this section, the Lender will no longer be entitled to exercise or enforce any rights under the Note hereunder, including the rights available to Lenders in an Event of Default under Section 10.01(a) and the Collateral shall be released from the security interest created therein pursuant to this Agreement without any further action by the Borrower, any Lender or any other Person. Each Lender agrees that, upon conversion of the entire Principal Balance of its Note into Common Stock, the Lender shall take promptly such action as is necessary to release the Collateral from any security interest or liens created hereunder, including the filing of a UCC-3 termination statement or its equivalent.

(f)     The Borrower will pay the Lender in cash all accrued but unpaid interest to the Conversion Date, on the Principal Balance converted on the Conversion Date unless the Lender elects to convert such interest into Common Stock pursuant to this Agreement.

10

(g)     In the event any stock dividend is declared upon the Common Stock, or in the event the outstanding shares of Common Stock shall be changed into or exchanged for a different number or kind of shares of stock of the Borrower, whether by reason of split-up, reclassification or combination of shares, the number and/or class of shares for which the Notes shall be converted shall be appropriately and proportionately adjusted, and, in any such event, a corresponding adjustment shall be made changing the number of shares deliverable upon the conversion of any Note. In case the Borrower shall distribute to all holders of Common Stock evidences of its indebtedness or assets (excluding any cash dividend or distribution paid out of surplus), or a dividend on the Common Stock payable in any security (other than one convertible into or representing a right to purchase Common Stock), then in each such case lawful and adequate provisions shall be made whereby holders of Notes shall thereafter have the right to purchase and/or receive on conversion of shares of Notes in addition to the shares of Common Stock deliverable upon conversion of shares of Notes immediately prior to the declaration of such dividend, such shares of stock, securities or property as are distributable with respect to outstanding shares of Common Stock equal to the number of shares of Common Stock issuable upon conversion of shares of Notes immediately prior to such declaration. In the event the Borrower is merged, consolidated or reorganized with another corporation, appropriate provision shall be made for the continuance of outstanding exchange rights with respect to the Notes and to prevent the diminution or enlargement of such rights as compared to the total shares issuable upon exchange for the Common Stock. Any adjustment shall be determined by the Board of Directors of the Borrower on a fair and equitable basis, in accordance with customary and normal corporate procedures and the laws of the jurisdiction applicable to the Borrower.

**Section 7.02  Mandatory Conversion of Interest to Principal and Election to Receive Interest.** (a) All or any portion of interest that will accrue and will be payable on each Note with respect to which the Lender who owns the Note does not elect to receive cash pursuant to Section 7.02(b) will mandatorily and automatically convert into additional principal, interest on which will be payable pursuant to Article III of this Agreement. If a Lender does not exercise such election pursuant to Section 7.02(b), by no later than January 31 each year the Borrower will send to such Lender a new Note in substantially the form of the note at Exhibit A to this Agreement in a principal amount equal to the amount of unpaid interest on such Lender's Notes that would have accrued for the period beginning on the date on which such interest converted to principal under this section through December 31 of the immediately preceding year.

(b)     A Lender may exercise its right under this section to elect to receive in cash all or any portion of the interest that will accrue and be payable on each Note the Lender owns once annually prior to the anniversary of the date of original issuance of the Note with respect to which the Lender is exercising such right, pursuant to the terms and conditions of this section. In order to exercise the right under this section to receive cash, a Lender must give written notice thereof to the Borrower in substantially the form set forth in Exhibit C hereto at least thirty (30) days prior to the anniversary of the date of original issuance of the Note with respect to which the Lender is exercising such right. If a Lender does not provide such notice in the proper form by the time set forth in this Section 7.02(b) and pursuant to the notice provisions of this Agreement, the Lender will not have the right to exercise such election with respect to any or all

11

interest that accrues and is payable on the Notes owned by the Lender prior to the time that the Lenders may next exercise properly its election right under this Section 7.02(b)

**Section 7.03. Taxes**. The Borrower shall pay all federal and state transfer taxes and similar taxes, if any, incurred with respect to the issuance of any Common Stock upon any conversion of Notes or interest provided for herein.

**Section 7.04. Fully Paid Nature of Common Stock**. All shares of Common Stock which are issued upon the conversion of the Notes or interest shall, upon issuance, be fully paid and nonassessable and free from all taxes and liens with respect to the issuance thereof.

**Section 7.05. Amendment of Charter Documents**. If required by the charter documents of the Borrower, the laws of Kansas or otherwise, the Borrower shall cause the charter documents to be amended and all necessary filings to be made with the Secretary of State of the State of Kansas to allow the conversion of Notes or interest into Common Stock to take place in accordance with all applicable Laws.

**Section 7.06. Securities Law Matters.** (a) By executing this Agreement, each of the Lenders represents and warrants to the Borrower that the following is true and accurate as of the date of this Agreement and shall be true and accurate as of the date of the Lender elects to convert its Note to Common Shares:

(i)     The undersigned has made such independent investigation of the Borrower and has been furnished such information with respect to the Borrower as the undersigned deems necessary to evaluate the merits and risks involved with an investment in the Borrower and has had an opportunity to meet with representatives of the Borrower and to ask questions and receive answers regarding an investment in the Borrower and has asked any question the undersigned desired to ask and has received answers with respect to such questions to the full satisfaction of the undersigned.

(ii)    The undersigned is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

(iii)   The undersigned recognizes that an investment in the Borrower involves significant risks.

(iv)    The undersigned acknowledges and understands that the Notes and the Common Stock have not been registered under the Securities Act of 1933, as amended in reliance upon an exemption therefrom for nonpublic offerings and, accordingly, the Notes and Common Stock will be restricted securities. The undersigned and acknowledges and agrees that (y) he or she will not sell, transfer or otherwise dispose of the Note or any Common Stock without registration thereof under the Securities Act of 1933, as amended and applicable state securities laws, or pursuant to an exemption therefrom and (z) the Borrower is under no obligation to register the Note or Common Stock under federal or state securities laws; provided, however, the Borrower shall take reasonable actions to assist the undersigned in complying with any exemption from registration. The

undersigned further acknowledges that the Note and Common Stock will be legended to reflect these transfer restrictions.

(v)    The undersigned acknowledges the information in this paragraph. The Borrower intends to use the funds from this offering for the purposes set forth in this Agreement. Certain prior private placement offerings of the Borrower's securities may not have complied with applicable federal or state securities laws in certain states. The Securities and Exchange Commission (the "SEC") and state securities regulators could bring actions against the Borrower alleging that these offerings were in violation of these laws. The remedies sought by the SEC or state securities regulators could range from administrative actions to fines and penalties in an amount that is undeterminable currently. The likelihood of such actions or the potential exposure to the Borrower is unknown at this time. If the offerings did not comply with these laws, there are a number of potential remedies available to stockholders who purchased securities in the offerings, including, without limitation, rescission rights. The Borrower is considering, but has not yet determined, whether to offer certain of these stockholders the right to re-confirm or rescind their purchases. Currently, the Borrower believes that it does not have sufficient capital to fund a rescission offer and would need to raise additional capital to fund a rescission offer. The Borrower agrees that is shall not use any proceeds from the offering made pursuant to this Agreement to fund a rescission offer. There is no assurance that the Borrower will decide to conduct a rescission offer and if it does, whether it will be able to raise sufficient capital to fund a rescission offer. The likelihood of conducting a rescission offer, the extent of a rescission offer, the amount required to fund a rescission offer, the likelihood of stockholder actions and the potential exposure from such actions is unknown at this time.

(vi)   The Notes are being and the Common Stock will be purchased solely for the undersigned's own account for investment purposes only and not for the account of any other person and not for distribution, assignment or resale to others.

(vii)  The undersigned understands that there are restrictions on transfers of the Notes and the Common Stock under the federal and state securities laws and, accordingly, at this time there is no established market for the Notes or the Common Stock. Therefore, the undersigned understands and acknowledges that he or she must bear the economic risk of an investment in the Common Stock of the Borrower for an indefinite period of time.

## ARTICLE VIII
## ROYALTY

**Section 8.01. Royalty Rights.** (a)    Each Noteholder shall be entitled to receive, in cash out of assets of the Borrower legally available for distribution, an amount equal to: (i) the aggregate outstanding principal amount of Notes held by the Noteholder issued by the Borrower under this Agreement, including any such Notes acquired by the holder after the date of their original issuance, as indicated on the records of the Borrower, divided by the aggregate outstanding principal amount

13

of Notes multiplied by (ii) the dollar amount that is equal to five percent (5.75%), subject to adjustment for certain Noteholders pursuant to Section 8.01(b) of this Agreement, (the "Royalty Percentage") of the net sales amounts (calculated based on gross sales minus sales commissions and sales returns) received by the Corporation resulting from the sale of QDMC, QuVIS Digital Mastering CODEC ASIC design in the form of ASIC chips, cores, license fees and royalties (the "Net Sales") (the amount determined from this calculation is referred to herein as the "Royalty"). The right to receive the Royalty and the Royalty are additional consideration for the Lender to make a loan pursuant to this Agreement and are not part of the Collateral.

(b)     If the aggregate outstanding principal amount of Notes issued under this Agreement exceeds $11.5 million, the Royalty Percentage will be increased to the extent necessary to provide the Noteholders who own the first $11.5 million in aggregate principal amount of Notes issued under this Agreement with a Royalty in an amount equal the amount that the Noteholder would have received if the aggregate outstanding principal amount of Notes issued had not exceeded $11.5 million. The Royalty Percentage will be increased beginning on the date any Notes are issued in excess of the first $11.5 million in aggregate principal amount of Notes issued under this Agreement with respect to Net Sales received on and after such date through the end of the Royalty Period (as defined below). The Royalty Percentage will remain at five percent (5.75%) with respect to all Notes issued in excess of the first $11.5 million in aggregate principal amount of Notes issued under this Agreement. For example only, if at the end of any calendar quarter during the Royalty Period the aggregate outstanding principal amount of Notes held by a Noteholder is $1 million, the aggregate outstanding principal amount of Notes is $11.5 million and Net Sales for a Royalty Period (as defined below) are $1 million, the Royalty payable to the Noteholder for the Royalty Period would be $5,000 ($1 million divided by $11.5 million multiplied by 0.0575 times $1 million). If, however, at the beginning of any calendar quarter during the Royalty Period the aggregate outstanding principal amount of Notes held by a Noteholder continues to be $1 million, the aggregate outstanding principal amount of Notes increases to $20 million and Net Sales for a Royalty Period (as defined below) are $1 million, the Royalty Percentage would increase to ten percent (10%) in order for the Noteholder to receive the same $5,000 Royalty ($1 million divided by $20 million multiplied by "X" (where "X" equals the new Royalty Percentage) times $1 million equals $5,000, "X" equals 0.10).

Section 8.02.  **Royalty Period.**  The Royalty will be payable with respect to the Net Sales amounts received by the Corporation during the period (i) beginning on the date that the Borrower first receives Net Sales amounts and (ii) ending on the tenth anniversary of the date determined in Section 8.02(i) (the "Royalty Period"). The Royalty Period will continue through such tenth anniversary date regardless of whether or not any Note remains outstanding.

Section 8.03.  **Payment of Royalty.**  (a)  The Royalty shall be payable in arrears in cash on the tenth day of April, July, October and January, in each year during the Royalty Period (each such date being referred to herein as a "Quarterly Royalty Payment Date"), commencing on the first Quarterly Royalty Payment Date after the Royalty Period begins. The Royalty payable at the end of the Royalty Period shall be payable on the tenth day after the end of the Royalty Period. If any Quarterly Royalty Payment Date or the date for payment of the final Royalty payment falls on a day that is not a Business Day, the Quarterly Royalty Payment Date will be deemed to be the next following Business Day.

14

(b)     The Royalty shall be payable in full to the holder of the Note indicated on the records of the Corporation on the last day of the month immediately preceding the Quarterly Royalty Payment Date or final Royalty payment date.

(c)     Accrued Royalties that are not paid on the date due shall not bear interest. Royalties paid on the Notes in an amount less than the total amount of such Royalties at the time accrued and payable on such Notes shall be allocated pro rata on the basis of the aggregate principal amount outstanding of the Notes.

**Section 8.04.  Royalty Runs With Notes.**  None of the rights to or associated with the Royalty may be sold, pledged, hypothecated, assigned or otherwise transferred separately from the associated Note.


# ARTICLE IX
# COVENANTS

**Section 9.01.  Borrower's Covenants**.  During the term of this Agreement and prior to the conversion or payment in full of all of the Notes, the Borrower covenants and agrees, unless waived by the Lenders holding Notes with a majority of the Principal Balance:

(a)     *Existence.*  Borrower shall maintain its legal existence in good standing under the laws of the State of Kansas and in each other jurisdiction where the operation of its business requires.  The Borrower shall not amend its Articles of Incorporation or Bylaws in any manner which adversely affects the rights of the Lenders thereunder or hereunder without the prior consent of the Lenders.

(b)     *Subsidiary.*  Borrower shall own all of the issued and outstanding shares of any of its subsidiaries.

(c)     *Other Obligations.*  Borrower shall pay, as and when due, all of its other obligations, including obligations to pay taxes, except for such obligations that are being contested in good faith.  Borrower agrees to notify Lenders of any event of default or delinquency on any other obligations.

(d)     *Redemption of Common Stock.*  Borrower shall not redeem, purchase or retire any of its common stock or purchase for consideration any warrant, option or right to purchase its membership interests except as required by agreements existing on the date hereof or pursuant to the order of a Governmental Authority or a settlement agreement in connection with any threatened or pending litigation arising prior to or after the date of this Agreement.

(e)     *Additional Debt.*  The Borrower shall not incur or make any obligation to incur any additional debt which is senior or equal to the Notes in right of payment or in its claim against the assets of the Borrower without the prior written consent of the Lenders.  Borrower shall not become liable for the obligations, as guarantor or otherwise, for the debts of any other entity.

15

(f)     *Pledge of Assets.*  The Borrower shall not allow a lien, charge (floating or fixed), pledge or any other encumbrance on its assets without the prior written consent of the Lenders.

(g)     *Use of Proceeds.*  The Borrower shall not use the proceeds of the Loan for any purpose other than those stated in Section 2.03 hereof.

(h)     *Loans.*  The Borrower will make no loans to any person.

(i)     *Assignment of Key Life Insurance Policy.*  The Borrower agrees to promptly, and in any event within 30 days of the date of this Agreement, to collaterally assign the Borrower's key man life insurance policy issued by Transamerican Occidental Life, policy number 41680003, in the amount of $5 million on Kenbe Goertzen to each of the Lenders in proportion to the Principal Balance of each Lender.  Such collateral assignment to a Lender shall terminate on the earliest of the Lender's conversion of its Note to Common Stock, the payment in full of the Lender's Note plus accrued interest or the termination of this Agreement.

(k)     *Reservation of Shares.*  The Borrower shall reserve, free from preemptive rights, out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the Notes, sufficient shares to provide for the conversion of the entire amount of the Notes.  In accordance with applicable laws and regulations, the Borrower shall from time to time increase its number of authorized shares of Common Stock so as to maintain a number of such shares sufficient to permit the conversion of the entire amount of the Notes.

## ARTICLE X

## DEFAULT

**Section 10.01.  Events of Default**.

(a)     Any one or more of the following prior to the date the principal of and interest on all Notes is paid in full or all Notes are converted to Common Stock pursuant to this Agreement shall constitute an Event of Default under this Agreement, unless waived in writing by the Lenders holding Notes with a majority of the Principal Balance;

(i)     *Payment of Principal and Interest on Loan.*  Failure to pay the Principal Balance of, or interest on, any Note, as and when due as set forth herein which Borrower has not cured within thirty (30) days.

(ii)     *Payment of Royalty.*  Failure to pay any Royalty pursuant to Article VIII of this Agreement, as and when due as set forth herein, which Borrower has not cured within ninety (90) days.

(iii)     *Breach of Covenants.*  The breach by the Borrower of any of its covenants contained herein, excluding its obligations to pay any Royalty pursuant

16

to Article VIII of this Agreement, which Borrower has not cured within thirty (30) Business Days after notice thereof has been delivered to Borrower by Lenders.

(iv) *Acceleration and Payment of Other Indebtedness.* Any material obligation of the Borrower (other than the Notes) for the payment of borrowed money becomes or is declared to be due and payable or required to be prepaid (other than by a regularly scheduled prepayment) prior to the expressed maturity thereof and the Borrower has not cured the default giving rise to such an acceleration within thirty (30) Business Days.

(v) *Bankruptcy; Insolvency; Etc.* The Borrower (i) becomes insolvent, generally fails to pay, or admits in writing its inability to pay, its debts as they become due; (ii) makes an assignment for the benefit of creditors; (iii) files a petition in bankruptcy or institutes any action under federal or state law for the relief of debtors or seeks or consents to the appointment of an administrator, receiver, custodian, or similar official for his assets (or has such a petition or action filed against it and such petition or action or appointment is not dismissed or stayed within thirty (30) days).

(vi) *Judgments; Attachment; Etc.* Any one or more judgments or orders against the Borrower or any attachment or other levy against the property of the Borrower with respect to a claim or claims, involving in the aggregate liabilities (not paid or fully covered by insurance, less the amount of reasonable deductibles) in excess of $300,000, remains unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of one hundred twenty (120) days.

(vii) *Document Provision.* Any material provision of this Agreement or the Notes shall for any reason cease to be legal, valid and binding on the Borrower, or the Borrower shall so state in writing or conducts itself in a manner inconsistent with the provisions hereof.

(viii) *Security Interest.* This Agreement shall for any reason caused by Borrower and except to the extent permitted by the terms hereof cease to create a valid and perfected first priority security interest in any of the Collateral or the Borrower shall so state in writing.

(b) After the date the principal of and interest on all Notes is paid in full or all Notes are converted to Common Stock pursuant to this Agreement, the failure to pay any Royalty pursuant to Article VIII of this Agreement, as and when due as set forth herein, which Borrower has not cured within ninety (90) days shall constitute an Event of Default under this Agreement.

**Section 10.02. Rights and Remedies in the Event of Default**.

(a) Upon any Event of Default under Section 10.01(a) and subject to Section 5.04 and Section 7.01(e) of this Agreement:

(i)     the Lenders may declare all or any part of the Principal Balance of the Notes and all unpaid accrued interest thereon, immediately due and payable, and upon such declaration all such amounts shall automatically become immediately due and payable.

(ii)    the Lenders may exercise any or all rights as secured parties under this Agreement or the Notes, including, without limitation:

> (A)  the sale of the Collateral and such other rights as may be afforded to secured parties under the laws of the county which is the situs of the Collateral or under the Uniform Commercial Code of the State of Kansas; or

> (B)  to take possession of the Collateral; and

> (C)  receive any payments of dividends, cash distributions or other payments received by the Borrower in connection with the Collateral.

(iii)   Upon any Event of Default under Section 10.01(a)(v), the Principal Balance on each Note shall be increased by ten (10) percent of the Principal Balance outstanding on the date of occurrence of such Event of Default.

(iv)    All amounts received by the Lenders upon the exercise of its remedies hereunder shall be applied by Lenders, pro rata based on the outstanding principal amount of Notes issued under this Agreement. Any amounts in excess of the Principal Balance and interest thereon due to the Lenders may then be applied by the Lenders to defray the costs incurred by them in connection with the enforcement of their rights hereunder and under the Notes. Any remaining amounts shall be remitted to the Borrower.

(b)     Upon any Event of Default under Section 10.01(b), the Borrower shall enter into binding arrangements with all of its existing and future customers from whom Net Sales are received to pay the Royalty directly to the Lenders who are owed the Royalty pursuant to the terms of this Agreement.

**Section 10.03.  Remedies not Exclusive.**  Lenders, collectively or individually, shall be entitled to enforce payment and performance of all obligations of the Borrower hereunder or under the Notes and to exercise all rights and powers hereunder or under the Notes, or under any Law and the pursuit of any remedy available to Lenders against the Borrower shall not prejudice or in any manner affect a Lender's right to realize upon or enforce any other remedy or security now or hereafter available to it in such order and in such manner as such Lender may determine in its sole discretion. No such right or remedy shall be exclusive, but each shall be cumulative and shall be in addition to every other remedy provided herein or in any other agreement or by Law and each such remedy may be exercised concurrently or independently. Nothing in this Agreement shall be construed as prohibiting the Lenders, collectively or individually, from seeking a deficiency judgment against the Borrower.

18

**Section 10.04. Notice.** Any notice of intended action required to be given by the Lenders, if delivered at least five (5) Business Days prior to such proposed action (unless otherwise set forth herein), shall be effective and constitute reasonable and fair notice to the Borrower.

## ARTICLE XI

### TERM

This Agreement shall terminate with respect to each Lender on the latest of (i) the date the Lender converts its Note to Common Stock, (ii) the date the Borrower pays the Lender in full the amounts due under the Note and (iii) the date the Borrower pays the final Royalty due under this Agreement to the Lender.

## ARTICLE XII

### MISCELLANEOUS

**Section 12.01. Notices.** All notices or other communications to be given hereunder shall be given in writing and delivered by (a) certified mail, return receipt requested, (b) personal delivery, or (c) nationally recognized overnight express carrier addressed as follows:

If to the Lenders:　　　　As indicated in Schedule 12.01 to this Agreement, as may be modified from time to time.

If to the Borrower:　　　　QuVIS, Inc.
2921 Wanamaker Drive
Suite 107
Topeka, KS 66614
Telephone: 785 272-3656
Attention: Becky Lester

or to such other address furnished by any party to the other in writing at any time and from time to time for such notice purposes. Any notice served by either party on the other shall be deemed effective the fifth business day following deposit in the mail if sent by certified mail, return receipt requested, when received, if delivered personally, or the next Business Day following deposit with a nationally recognized overnight express carrier.

**Section 12.02. Amendments and Waivers; Nonexclusive Rights.** No amendment, modification or waiver of any provision of this Agreement or the Notes shall be effective unless the same shall be in writing and signed by the Borrower and each Lender or an authorized representative of each Lender; provided, however, that any such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

**Section 12.03. Survival of Agreements.** All agreements, representations, warranties and covenants made herein and in the Notes, and in any certificates delivered pursuant hereto,

19

shall survive the execution and delivery of this Agreement and the execution and delivery of the Notes.

**Section 12.04. Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and all future holders of the Notes and their respective successors and assigns, except that the Borrower may not assign, delegate or transfer any of its rights or obligations under this Agreement without the prior written consent of the Lenders.

**Section 12.05. Payment of Expenses**. If at any time or times after the date hereof the Lenders engage legal counsel for representation to enforce the rights of the Lenders against the Borrower under this Agreement upon the occurrence of an Event of Default, or in connection with amendment of this Agreement or the Note as a consequence of a Default or Event of Default, then all reasonable fees and all expenses advanced for such legal counsel and all litigation costs, including costs incurred as a consequence of any proceedings involving the Borrower under the federal Bankruptcy Code (if any), shall be payable by the Borrower to the Lenders on demand.

**Section 12.06. Severability**. If any provision of this Agreement is held invalid or which is prohibited or unenforceable for any reason, the invalidity shall not affect the validity of the remaining provisions of this Agreement, and the parties shall substitute for the invalid provision a valid provision which most closely approximates the intent and economic effect of the invalid provision.

**Section 12.07. Indemnity**.

(a)     The Borrower irrevocably and unconditionally agrees to indemnify and hold harmless the Lenders and their heirs, permitted assignees, officers, directors, partners, agents or employees (the "Indemnified Parties") from and against, and promptly to reimburse the Lenders for, any and all claims, damages, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements and amounts paid in settlement) incurred, paid or sustained by the Indemnified Parties in connection with, arising out of, based upon or otherwise involving or resulting from any threatened, pending or completed action, suit or other proceeding (including, but not limited to, proceedings relating to a violation of Law by the Borrower) against the Indemnified Parties and in any way dealing with, relating to or otherwise involving this Agreement or the Notes; provided, however, that the Borrower shall have no obligation to indemnify the Indemnified Parties hereunder with respect to any claims, damages, liabilities, losses, costs and expenses arising from the negligence, gross negligence or willful misconduct of any of the Indemnified Parties.

(b)     The Borrower shall receive notice from an Indemnified Party as soon as is practicable after such Indemnified Party has actual knowledge of or has received notice of any threatened, pending or completed action, suit, investigation or other proceeding by, against or otherwise involving the Indemnified Parties and in any way dealing with, relating to or otherwise involving this Agreement or the Note. The failure of the Indemnified Parties to give notice shall not, however, relieve the Borrower of its obligations hereunder.

**Section 12.08. Counterparts.** This Agreement may be executed by the parties hereto on any number of separate counterparts, and all such counterparts taken together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart signed by the party to be charged.

**Section 12.09. Governing Law; No Third-party Rights.** This Agreement, the Notes and the rights and obligations of the parties hereunder and thereunder shall be governed by and construed and interpreted in accordance with the laws of the United States and State of Kansas applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

**Section 12.10. Headings.** The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement or the Note. The Exhibits referred to throughout this Agreement are attached to this Agreement and are incorporated into this Agreement. Unless the context clearly indicates, words used in the singular include the plural, words in the plural include the singular and the word "including" means "including but not limited to."

**Section 12.11. Conflict of Terms.** In the event of any material conflict between the terms of this Agreement and the Notes, the terms of this Agreement shall control.

**Section 12.12. Waiver.** The failure of any party at any time to require performance by the other party of any provision of this Agreement shall not affect in any way the full right to require the performance at any subsequent time. The waiver by any party of a breach of any provision of this Agreement shall not be taken or held to be a waiver of the provision itself. Any course of performance shall not be deemed to amend or limit any provision of this Agreement.

**Section 12.13. Section References.** References to "Sections," "subsections," "Schedule" and "Exhibits" shall be to Sections, Schedules, subsections and Exhibits, respectively, of this Agreement unless otherwise specifically provided.

**Section 12.14. Relationship of Parties.** Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of borrower and lender.

**Section 12.15. Entire Agreement.** This Agreement, including the Exhibits attached hereto, set forth all of the promises, agreements, conditions and understandings between the parties respecting the subject matter hereof and supersedes all negotiations, conversations, discussions, correspondence, memorandums and agreements between the parties concerning the subject matter.

21

**Section 12.16. Assignment**.

(a)      Except as otherwise provided herein, the rights and obligations of the Borrower under this Agreement are personal and not assignable, either voluntarily or by operation of law, without the prior written consent of the other parties hereto.

(b)      This Agreement, the Notes and the rights and obligations of the Lenders hereunder or thereunder may be transferred, assigned or delegated by a Lender. As a condition to any such transfer, assignment or delegation, such transferee, assignee or delegee shall become a party to this Agreement and the Lender shall provide the Borrower an opinion of counsel reasonably acceptable by the Borrower and its counsel to the effect that such transfer, assignment or delegation is exempt from registration under federal and applicable state securities laws. The Borrower shall treat any person who acquires a Note in accordance with this Section 12.16 as the registered owner thereof for all purposes, and neither the Lender nor any subsequent holder shall be affected by notice to the contrary.

**Section 12.17. Confidentiality.** Each Lender acknowledges that the business of the Borrower is highly confidential and will involve the creation by the Borrower and its subsidiaries of trade secrets, know-how and other confidential information related to the business ("Confidential Information"). Each the Lender, therefore, agrees that without express authorization by the Borrower neither it nor any of its officers, directors or agents shall publish, disclose to any person including, without limitation, any investor in any Lender, or use any Confidential Information for purposes other than those necessary to protect its rights as a Lender under this Agreement. All business records, papers and documents kept or made by the Lenders containing Confidential Information shall be and remain the property of the Borrower and shall be surrendered to the Borrower upon the termination of this Agreement. No Lender shall not take with it, publish or disclose, without the prior written consent of the Borrower, any business records, paper, correspondence, ideas, strategies or other documents containing Confidential Information.

[signatures on next page]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

LENDERS

By: _____
Name: _____
Title: _____

BORROWER

QUVIS, INC.

By _____
Name:
Title:

## SCHEDULE 6.01(C)

Each of the 2001 Lenders has a Lien upon the Collateral pursuant to the 2001 Agreement and a UCC-1 financing statement has been filed in connection with that Lien and the 2001 Agreement. Each of the 2002 Lenders has a Lien upon the Collateral pursuant to the 2002 Note and a UCC-1 financing statement has been filed in connection with that Lien and the 2002 Note.

## QUVIS, INC.

### FIRST AMENDED AND RESTATED
### 8.0% CONVERTIBLE SENIOR SECURED NOTE
### DUE JUNE 30, 2006

$\$$_____

August ___, 2006

**THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE PROVISIONS OF A JOINDER AGREEMENT TO FIRST AMENDED AND RESTATED CONVERTIBLE LOAN AND SECURITY AGREEMENT DATED AS OF May 27, 2005, AND A FIRST AMENDED AND RESTATED CONVERTIBLE LOAN AND SECURITY AGREEMENT DATED AS OF June 30, 2003, COPIES OF WHICH ARE ON FILE AT THE OFFICES OF THE CORPORATION.**

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR QUALIFIED UNDER ANY APPLICABLE STATE SECURITIES OR BLUE SKY LAWS. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933 AND QUALIFICATION UNDER APPLICABLE STATE SECURITIES OR BLUE SKY LAWS, OR PURSUANT TO AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION REQUIREMENTS.**

For value received, the undersigned, QUVIS, INC., a Kansas corporation (the "Maker") hereby promises to pay to the order _____, or holder (the "Holder"), as provided herein at any place designated by the Holder, in lawful money of the United States of America and in immediately available funds, the principal sum of up to, and not to exceed $\$$_____ which represents the aggregate amount that has been disbursed by the Holder to the Maker pursuant to the that certain Joinder Agreement to First Amended and Restated Convertible Loan and Security Agreement dated as of the date hereof among the Maker and the Holder and that certain First Amended and Restated Convertible Loan and Security Agreement dated as of June 30, 2003 by and between the Maker and the Lenders identified therein (the "Loan Agreement") plus all interest thereon as specified in the Loan Agreement. All capitalized terms used and not otherwise defined shall have the meanings given them in the Loan Agreement.

The Maker promises to pay the Principal Balance plus interest from the date hereof on the Principal Balance at the rate and on the dates set forth in the Loan Agreement. Interest shall be computed as provided in the Loan Agreement.

This Note is secured by the Collateral described in the Loan Agreement.

This Note and accrued but unpaid interest thereon is convertible into shares of Common Stock of the Maker as described in the Loan Agreement. Accrued but unpaid interest on this

Note will be converted to principal unless the Holder properly exercises its right under the Loan Agreement to receive cash for the interest.

Upon any Event of Default under Section 10.01(a) of the Loan Agreement, the Holder may, without notice or demand, declare the then Principal Balance immediately due and payable and shall then have in any jurisdiction where enforcement hereof is sought, in addition to any other rights or remedies, the rights and remedies set forth in the Loan Agreement and the rights and remedies of a secured party.

If this Note is not paid as provided herein and in the Loan Agreement and is referred to an attorney for collection, the Maker promises to pay the reasonable fees and expenses of such attorney in addition to the full amount due hereon, whether or not litigation is commenced.

Demand for payment, protest, notice of dishonor and all other notices and demands under this Note and any and all lack of diligence in the enforcement of this Note are hereby waived by all who are or shall become parties to this Note, and the same hereby assent to each and every extension or postponement of the time of payment, at or after demand, or other indulgence, and hereby waive any and all notice thereof.

No amendment, modification or waiver of any provision of this Note, nor consent to any departure by the Maker herefrom, shall be effective unless the same shall be in a writing signed by the Holder or an authorized representative of the Holder, and then only in the specific instance and for the purpose for which given. No failure to exercise, and no delay in exercising, any right under the Loan and Security Agreement or this Note shall operate as a waiver thereof, nor shall any single or partial exercise of any right under the Loan Agreement or this Note preclude any other or further exercise thereof or the exercise of any other right. Each and every right granted hereunder or by law or in equity shall be deemed cumulative, and such remedies may be exercised from time to time concurrently or consecutively.

All notices required to be given or which may be given in connection with this Note shall be given in the manner required for notices under the Loan Agreement.

Any term of this Note that does not comply with applicable law will not be effective if that law does not expressly or impliedly permit variations by agreement. If any part of this Note cannot be enforced according to its terms, that fact will not affect the balance of this Note.

The Maker's rights and obligations under this Note are assignable or delegable with the prior written consent of the Holder as set forth in the Loan Agreement.

The rights of the Lenders under this Note may be transferred only in accordance with the provisions contained in the Loan Agreement. The Borrower shall treat any person who is a holder in due course of this Note as the registered owner hereof for all purposes and neither the Lender nor any subsequent holder shall be affected by notice to the contrary.

This Note will be governed by the laws of the United States and the State of Kansas, including the Uniform Commercial Code. The terms of any agreement securing the payment of this Note may also be governed by the law of the state where the property is located.

2

IN WITNESS WHEREOF, the Maker has executed and delivered this Note effective as of the date first set forth above.

MAKER

QUVIS, INC.

By _____
Name _____
Title _____

Case 09-10706   Doc# 158-1   Filed 11/06/09   Page 27 of 30

**EXHIBIT B**

**FORM OF OPTIONAL CONVERSION NOTICE**

TO:    QuVIS, Inc.
      [_____]
      [_____]

      The undersigned owner of the attached Note hereby gives notice that, in accordance with the terms and conditions of such Note and the First Amended and Restated Convertible Loan and Security Agreement, dated [       ], 2003 between QuVIS, Inc, the undersigned owner and other lenders from time to (the "Loan Agreement"), it hereby exercises its right to convert all or any portion of the Principal Balance of such Note and/or accrued but unpaid interest on the Note, in the amount designated below, into shares of Common Stock of QuVIS, Inc. and directs that the shares issuable and deliverable upon the conversion, and any cash for fractional shares, be issued and delivered to the registered holder of such Note unless a different name has been indicated below. If shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto. Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Loan Agreement.

      By executing this Conversion Notice, the undersigned represents and warrants to the Borrower that the following is true and accurate as of the date of this Conversion Notice and shall be true and accurate as of the date the shares of Common Stock are issued pursuant to the Loan Agreement:

(i)      The undersigned has made such independent investigation of the Borrower and has been furnished such information with respect to the Borrower as the undersigned deems necessary to evaluate the merits and risks involved with an investment in the Borrower and has had an opportunity to meet with representatives of the Borrower and to ask questions and receive answers regarding an investment in the Borrower and has asked any question the undersigned desired to ask and has received answers with respect to such questions to the full satisfaction of the undersigned.

(ii)      The undersigned is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

(iii)      The undersigned has no need for liquidity with respect to the Common Stock, is able to bear the economic risks of an investment in the Common Stock for an indefinite period and is able to afford a complete loss of such investment.

(iv)      The undersigned recognizes that an investment in the Borrower involves significant risks.

(v)      The undersigned acknowledges and understands that the Common Stock has not been registered under the Securities Act of 1933, as amended in reliance upon an

exemption therefrom for nonpublic offerings and, accordingly, the Common Stock will be restricted securities. The undersigned and acknowledges and agrees that (y) he or she will not sell, transfer or otherwise dispose of any Common Stock without registration thereof under the Securities Act of 1933, as amended and applicable state securities laws, or pursuant to an exemption therefrom and (z) the Borrower is under no obligation to register the Common Stock under federal or state securities laws; provided, however, the Borrower shall take reasonable actions to assist the undersigned in complying with any exemption from registration. The undersigned further acknowledges that the Common Stock Securities will be legended to reflect these transfer restrictions.

(vi)     The Common Stock will be purchased solely for the undersigned's own account for investment purposes only and not for the account of any other person and not for distribution, assignment or resale to others.

(vii)    The undersigned understands that there are restrictions on transfers of the Common Stock under the federal and state securities laws and, accordingly, at this time there is no established market for the Common Stock. Therefore, the undersigned understands and acknowledges that he or she must bear the economic risk of an investment in the Borrower for an indefinite period of time.


_____

Dated: _____

By _____
Name _____
Title _____

Please complete the following:

Principal amount to be converted $_____

Accrued but unpaid interest to be converted $_____

Name: _____

Address: _____

Please print name and address (including ZIP code number): _____

Social Security or other Taxpayer Identifying Number: _____

2

**EXHIBIT C**

**FORM OF NOTICE OF ELECTION TO RECEIVE INTEREST**

TO:     QuVIS, Inc.
          [_____]
          [_____]

        The undersigned hereby gives notice that, in accordance with the terms and conditions of the First Amended and Restated Convertible Loan and Security Agreement, dated [                    ], 2003 between QuVIS, Inc., the undersigned owner and other lenders from time to (the "Loan Agreement") and the Note(s) (as defined in the Loan Agreement) owned by the undersigned, the undersigned hereby exercises its right to receive all or any portion of the interest that will accrue and will be payable on the Note(s), in the amount designated below, in cash. Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Loan Agreement.

                                        _____

                        Dated:  _____

                        By _____
                        Name _____
                        Title _____

Please complete the following:

(Check one)

I elect to receive all accrued Interest payable in cash _____

I elect to receive a portion of the accrued Interest in the amount of $_____ in cash.

Name: _____

Address: _____

Please print name and address (including ZIP code number): _____

Social Security or other Taxpayer Identifying Number: _____

3