**SO ORDERED.**

**SIGNED this 23 day of November, 2009.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

**OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| QuVIS, INC. ) | Case No. 09-10706 |
| ) | Chapter 11 |
| ) | |
| Debtor-in-Possession ) | |
| _____) | |

**ORDER ON DEBTOR'S MOTION TO APPROVE
POST-PETITION SALARY OF ITS CHIEF EXECUTIVE OFFICER**

Debtor moves for approval of the payment of a stipulated salary to its chief executive officer, Kenbe Goertzen, of $6,000 per month, effective August 1, 2009.[1] The Petitioning Creditors, Douglas A. Friesen, M.D., Marilyn R. Friesen Greenbush, Ph.D., and Douglas C. Cusick object. Debtor appeared by its counsel Edward J Nazar and Nicholas Grillot. The Petitioning Creditors

---
[1] Dkt. 135.

-1-

appeared by their counsel Jeffery L. Carmichael and William B. Sorensen, Jr. The Official Unsecured Creditors Committee appeared by J. Michael Morris. Creditor JFM Limited Partnership I, debtor's accounts receivable factor, appeared by Patrick Riordan. No others appeared.

Facts

Debtor seeks to pay Goertzen $6,000 per month pending completion of this case. Prior to the filing of the involuntary petition, Goertzen was employed at a stipulated salary of $120,000 a year or $10,000 per month. He has received no regular compensation in 2009. This case began with the filing of the involuntary petition on March 20, 2009. On May 18, 2009, the Court entered a "consent order" providing that the case go forward as a voluntary chapter 11 with the debtor remaining in possession.

Throughout this period, and for at least a year prior, Kenbe Goertzen has been the debtor's CEO, president and chairman of the board of directors. Goertzen has been with this company since its inception in 1994 (one of its founders), first as a developer of technology and subsequently in the additional capacity as a managing executive of some description.[2] His pay has varied throughout this period, and has been as high as $150,000 a year. Most recently, his stipulated, but largely unpaid salary has been $120,000. In 2007, he was paid that amount, and in 2008, he received about $115,000. His salary has been paid sporadically until December 31, 2008, at which time he stopped taking compensation from the company. During 2009, he has received, according to the monthly reports, about $9,500, $7,300 of which was advances or reimbursement of expenses and $2,200 of which was a garnishment by the Kansas Support Center for spousal maintenance. Were he to have received his stipulated pre-petition salary, he would have gotten some $80,000 from March 1 to

---

[2] Goertzen also owns about 3.3% of the stock in QuVis. Dkt. 17, p. 523.

-2-

October 1, 2009.

QuVis sells software and hardware that compresses and processes video data for various digital video applications in the medical, entertainment, and military industries. Goertzen is a computer engineer who devised a number of the processes that QuVis markets. He patented those processes and assigned the patents to the company. As noted above, he has worked in various capacities for the company over its 15 year lifetime and, recently, has served as its management officer while also participating in equipment repair, software design, customer service, financial management and record-keeping, as well as other general administrative duties. He coordinates the activities of the other three current employees, who are regularly paid.

The company once had a 65-person payroll, but is now down to 3 employees plus Goertzen. Since the filing, and through September, the company has grossed about $317,000. As recently as 2008, it grossed as much as $3 million dollars annually. As is detailed in Goertzen's testimony and in the company's disclosure statement, the company has pioneered a number of video processes that have, for various reasons, not caught on commercially notwithstanding their considerable innovation and promise. The company still maintains a core of ongoing business and, according to Goertzen, its growth has been severely inhibited by financial issues and, most recently, by its status in bankruptcy. While in this mode, the company focuses on service and support of its customers, long-term orders, seeking to do business with the federal government – essentially preserving opportunities until its debt issues can be resolved.

The company's debt is structured in an unusual way. When presented with some growth opportunities in the early 2000's, QuVis issued secured notes under a credit agreement that capped its lending at $30,000,000. "Investors" acquired these notes for cash and received a security interest

in all the debtor's assets except its receivables. Under the agreement, the company cannot incur any other secured debt, except as to its receivables, without the consent of the note-holders. This prevents the dilution of the holders' interests. QuVis has attempted to secure the consent of the note holders to further advances, but has been unsuccessful to date. The debtor factored its receivables to FJM for some time, but this is a slim source of funding at best.

The Petitioning Creditors are note-holders. According to counsel, some note-holders desire the orderly liquidation of the company in bankruptcy while others seek its reorganization. The Petitioning Creditors are in the liquidation camp. The debtor's plan, as filed, proposes two alternative schemes, one being an orderly liquidation and the other a reorganization with the infusion of some capital by present investors. As contemplated, creditors and note-holders would have the opportunity to indicate their preference by ballot and the majority would determine the company's future course. The debtor filed its disclosure statement and plan on November 6, 2009 and the disclosure statement will be noticed for objection presently.

QuVis is a Kansas corporation and is managed by a Board of Directors consisting of four members. They are Vern Nelson of Chicago, Gary Baker of Topeka, Owen Leonard of New Jersey, and Kenbe Goertzen, who also resides in Topeka. According to Gary Baker's testimony, the Board meets periodically by conference call. Baker and Leonard each spend additional time conferring with Goertzen as to the company's affairs. Baker and Goertzen both testified that Leonard spends a considerable amount of time in Topeka as well.

On September 16, 2009, Baker, Nelson, and Leonard, the three other members of the Board acting as a "compensation committee," voted unanimously to approve Goerzen's ongoing salary at $6,000 a month retroactive to August, 2009. The committee noted that Goertzen had taken no salary

-4-

since June of 2008 (somewhat different than the testimony) and thanked Goertzen for his gratis services to date, promising to "commence a review of the larger issue with respect to his salary and wages and decide on the fair disposition as soon as possible."[3] In essence they cut his pay, but voted to resume paying him at a lower rate. Goertzen testified that he needs the money, not least because he has not been paid for a long time. He suggests that he has waived the company's back-pay obligation to him. He has loaned the company money, he says, and currently lives off IRA withdrawals.

Baker is a business professor at Washburn University in Topeka and testified as an expert on pay scales for similarly qualified engineers in Kansas, stating that computer engineers have a median salary of $78,000. He had no data, nor had he studied what "CEO's" are paid in Kansas, nor could he comment on how the Board arrived at the $6,000 number. Baker testified that the $6,000 figure "seemed reasonable under the circumstances" and in his opinion, was "not inappropriate." He further denied that any of the company's financial problems were attributable to Goertzen and that the Board considered the company's cash flow in its decision. Baker noted that Goertzen wears many hats with the company and referred to him as its future.

The Petitioning Creditors presented the testimony of Ron Christie, a professor in the Entrepreneurship Center at Wichita State University. Mr. Christie stated that based on his numerous consulting engagements with businesses large and small, executives are compensated in accordance with their performance, the company's performance, and the company's ability to pay. He concluded that, here, in light of the company's poor performance and lack of money, Goertzen's work is only worth about $0-$3,000 a month. He could not say how much it might cost to replace

---

[3] Dkt. 135, p. 5.

Case 09-10706    Doc# 178    Filed 11/23/09    Page 5 of 12

a computer engineer who also maintains the general administrative function. Christie also said that Goertzen's unique talents would make him critical to a reorganization going forward. He could not say with accuracy what Goertzen actually does for the company. Christie has consulted for the Wichita Investors Group, a group of Wichitans who are note-holders.

QuVis has filed monthly reports during its incumbency in chapter 11. One aspect of these reports is inaccurate. Goertzen included an inventory opening balance of $100,000 and, as the subsequent reports have been filed, this number has never changed even thought the company has had some $300,000 in sales during that time. Goertzen says a physical inventory would be required to accurately report it and he does not have the time to do that.[4] He also says that much of the company's inventory is written off as aged and consists of circuit boards that may be out of date. The Court also notes that no tax returns were filed for 2007 or 2008. The company terminated the financial officer in 2007 or 2008. Goertzen serves now in that capacity. There are unpaid IRS withholding obligations for which he would be liable as a responsible person.

In the Court's review of the monthly operating reports, it notes that QuVis has maintained cash and receivable balances since April that range from $85,000 to $39,000 in round numbers. In that time, receivables have fluctuated from a low of $4,000 in May to a high of about $49,000 in September. During that time, Goertzen received about $9,500. The Court notes, too, that had he been paid his previously-set pay of $10,000 a month during the case, the company's cash situation would be very grim. Indeed, it is doubtful that company would have a positive cash balance had that obligation been met.

---

[4] According to the statement of financial affairs, the last physical count of inventory occurred in 2007. Dkt. 17, p. 522.

-6-

Case 09-10706   Doc# 178   Filed 11/23/09   Page 6 of 12

Analysis

The Petitioning Creditors object to the amount that debtor intends to pay Goertzen, arguing that the diminished size and performance of the company do not require a $6,000 a month manager when, as counsel put it, all they need is someone to answer the phone. The Petitioning Creditors point to the inventory inaccuracy, the lack of tax returns, and the fact that this company has run through $30 million in a few years as reasons to restrict Goertzen's pay. In essence, they argue that the proposed pay is unreasonable in the circumstances of the case.

This motion presents two legal issues: (1) whether the Board and Compensation Committee exercised appropriate business judgment in setting Goertzen's post-petition salary; and (2) whether this proposal is a retention payment of the sort limited by the employee retention provisions of § 503(c)(1).

The payment of compensation to executives is clearly within the discretion of a corporation's board of directors provided that they exercise appropriate business judgment. The business judgment rule is "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *quoting Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985). Thus, "corporate decision-makers and their decisions [are shielded] from judicial second-guessing when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *In re Adelphia Communications, Corp.*, 2003 WL 22316543 at *30 (Bankr. S.D.N.Y. 2003), citing again to *Integrated Resources.* In *Integrated Resources*, the court further pointed out that courts are

"loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." 147 B.R. at 656.

The Tenth Circuit has applied various state law business judgment rules. In *F.D.I.C. v. Schuchmann,* 235 F.3d 1217, 1228 (10th Cir. 2000), applying New Mexico law, the court held that "if in the course of management, directors arrive at a decision, within the corporation's powers (inter vires) [sic] and their authority, for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interests of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss." In *Carson v. Lunch Multimedia Corp*, 123 F. Supp. 2d 1254, 1260 (D. Kan. 2000), Judge Lungstrum noted the lack of Kansas precedent on the business judgment rule but recognized that Kansas courts frequently look to Delaware law for decisions on these points, citing as his authority the Kansas cases of *Sampson v. Hunt*, 233 Kan. 572, 585, 665 P.2d 743 (1983) and *Arnaud v. Stockgrowers State Bank of Ashland*, 268 Kan. 163, 165, 992 P.2d 216 (1999). In *Sampson*, the Kansas Supreme Court held that "courts will generally not interfere on behalf of a dissatisfied stockholder with the discretion of the directors on questions of corporate management, policy or business." 233 Kan. at 585. *Arnaud* recognized the court's deference to Delaware cases on corporate law points because the Kansas Corporation Code is modeled on the Delaware Corporation Law. 268 Kan. at 165.

Applying the *Integrated Resources* factors to the facts in this case, the Court concludes that the decision to compensate Goertzen in the proposed manner is in fact a business decision. The three board members serving as a compensation committee appear to be disinterested. Goertzen,

although a board member, had no vote. There is no evidence suggesting that the Board acted in other than due care. The Court notes in this context the steady consultation and presence of one board member in Topeka and the frequent visits to Topeka by another for the same purpose. Similarly, there is no suggestion the Board acted in other than good faith. Nor can the Court find that the Board abused its discretion or wasted the assets.

In connection with the abuse of discretion issue, the Court has considered the reasonableness of the salary proposal. In doing so, the Court considers the evidence bearing on comparative salaries for similarly situated executives. Computer engineers make a median salary of $78,000. No one disputes Goertzen's qualifications in that regard. Chief executives are paid commensurate with their companies' performance and according to the companies' ability. Here, the company can, with some economy, afford to pay Goertzen $6,000. He devotes all of his time to managing, developing, communicating with customers, etc. He was paid far more in prior times (without administrative responsibilities) and, even when this case was filed, was nominally employed at $120,000 a year. He has received no pay for many months. He is a founder of the company and has many customer contacts, not to mention institutional memory that is valuable in either the reorganization or liquidation mode. Even the Petitioning Creditors' expert concedes his value in an ongoing enterprise, but merely questions whether he should be paid more than $3,000 in the company's current state.

The proposed pay amounts to $36 per hour. Were Goertzen to leave and the estate needed to hire a replacement estate professional, the Court highly doubts that a suitable one could be found at an hourly rate of $36, given that the Court routinely considers fee applications from non-lawyer estate professionals who charge anywhere from $100 to $300 an hour. Even a small ship needs a

captain to man the rudder. Even if Goertzen is not accounted the best captain by some of the creditors, the Board has deemed him the most appropriate one for this time and he does have many attributes that make him a suitable executive officer for this company. It seems unlikely at best that this company will function well, or even at all, without Goertzen. The salary proposed is appropriate. The Court concludes that the decision is reasonable and therefore not an abuse of the Board's discretion.

As to the § 503(c) employee retention limitations, the Court finds them inapplicable in this situation. Section 503(c) as added by BAPCPA in 2005 restricts payment of retention bonuses or severance payments to insiders of debtor when the proposed payments are to be paid as administrative expenses. There is no question here that Goertzen is a statutory insider within the definition of § 101(31).[5] The question is whether the proposed $6,000 monthly salary to be paid to Goertzen is in the form of a retention payment subjecting debtor to the limits and requirements in § 503(c)(1). As noted in *In re Nellson Nutraceutical, Inc.,* 369 B.R. 787, 802 (Bankr. D. Del. 2007), any payment to an employee, including regular wages, has at least a partial purpose of retaining the employee. If the court does not apply some materiality standard, all payments to insiders would be subject to § 503(c)(1). The *Nellson Nutraceutical* court read § 503(c)(1) to mean a transfer to an insider for the *primary* purpose of inducing the person to remain with the debtor's business. Other courts have looked to whether a bonus plan overall has a retentive effective rather than an incentivizing effect. If the plan or payment motivates the insider to produce and increase

---

[5] An insider includes a director or officer of the debtor. Goertzen is both.

the value of the estate, § 503(c)(1) does not apply.[6]

The evidence as presented to the Court in this case does not fit within the language or intent of § 503(c)(1). Here, Goertzen had foregone his salary for a period of time prepetition due to cash flow difficulties of the company; the company nonetheless was legally obligated to pay Goertzen's wages that he earned prepetition. *See* KAN. STAT. ANN. § 44-314 (2008 Supp.). The resumption of payment of Goertzen's salary post-petition, albeit at a lower rate, remains a contractual obligation for services performed regardless of the retention issue. The only "retentive" effect of making these salary payments is that Goertzen may be dissuaded from terminating his employment due to nonpayment of his salary and refusing to work for free. The Court cannot conclude that accepting a reduction in salary for one's services – wages to which one is legally entitled – is an "inducement" to remain with the company. Nor does the resumption of Goertzen's reduced salary necessarily operate as an incentive for Goertzen to continue to provide his services. What is apparent from Goertzen's testimony is that he has a long history with QuVis and is deeply dedicated to this business venture and wishes to remain involved in its future. The Court concludes that the proposed $6,000 monthly salary is exactly that – compensation for services to be performed. It is not a retention payment and § 503(c)(1) is inapplicable. Nor is the Court persuaded that § 501(c)(3), which excepts from administrative allowances transfers outside the ordinary course that are not justified by the case's circumstances, applies. Salary payments are in the ordinary course transfers.

Conclusion

The Court therefore GRANTS the motion on the following basis. The Court ratifies the

---

[6] *See Dana Corp.,* 358 B.R. 567, 571, 584 (Bankr. S.D.N.Y. 2006); *In re Global Home Products, LLC,* 369 B.R. 778, 785-86 (Bankr. D. Del. 2007).

Board's decision to pay Goertzen $6,000 per month commencing August 1, 2009. This arrangement is approved for 9 months commencing that date through May 1, 2010 to allow for the confirmation process to be completed. This arrangement at all times remains subject to further order or modification whether by agreement of the parties or by the Court upon appropriate motion. Should a secured creditor or other party bring a motion concerning adequate protection of its interest in the company's assets, this order may be further modified. If the company cannot pay Goertzen during any month (due to cash flow), he should not receive the money. If the case is dismissed sooner, or should Goertzen's services be terminated, his right to receive compensation under this order will expire.

     IT IS SO ORDERED.

# # #