UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: | ) |
| | ) |
| QUVIS, Inc. | ) Case No. 09-10706 |
| | ) |
| Debtor | ) Chapter 11 |
| | ) |

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Seacoast Capital Partners II, L.P. ("Seacoast") files this Brief in Support of Approval of the Disclosure Statement (the "Disclosure Statement") filed by QuVIS, Inc (Doc# 159-2). and respectfully states as follows:

### Introduction

1. Seacoast has filed a proof of claim in the amount of $5,387,042 in this case on account of a note issued by QuVIS, Inc. (the "Debtor"). The note giving rise to Seacoast's claim is one of many notes issued under a First Amended and Restated Convertible Loan and Security Agreement, dated June 30, 2003 (the "Note Agreement"). A true and correct copy of the Note Agreement is attached as Exhibit 1 to the Disclosure Statement.

2. Seacoast believes that it is one of the largest note holders of the Debtor's notes (each such holder, a "Noteholder") issued under the Note Agreement. The Debtor has attached a list of its Noteholders, marked as Exhibit 5, to its Disclosure Statement.

3. As a party in interest in this case, Seacoast requests that the Court consider its perspectives in evaluating the merits of the two pending objections to the Debtor's disclosure statement (the "Disclosure Statement," Docket No. 158). These objections have been filed by

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 1

the counsel for the Official Committee of Unsecured Creditors (the "Committee Objection," Docket No. 196) and a group of persons or entities listed as Douglas A. Friesen, M.D., Marilyn R. Friesen Greenbush, Ph.D., Douglas C. Cusick, J. Greg Kite, and the Wichita Investment Group, LLC[1] (the "WIG Group Objection," Docket No. 195 and along with the Committee Objection, the "Pending Objections").

## Classification Issues Presented by the Pending Objections

4. The Pending Objections assert that the Debtor's Disclosure Statement should not be approved because the Disclosure Statement inappropriately placed all holders of notes issued pursuant to the Note Agreement in the same class of secured claims. The Pending Objections suggest it is necessary for QuVIS to bifurcate the Noteholders' claims into secured and unsecured classes and/or place each Noteholder in a separate class with separate payment priorities based on the timing of their filed UCC-1 financing statements.

5. Specifically, the Committee Objection asserts:

> The D.S. (p. 31-32) provides that 'secured creditors" consist of the "approximately $43 million in claims [of] Note Holders." The D.S. appears to state that all such claims will be deemed fully secured. However, the Liquidation Analysis gives a total value of the debtor's assets at $604,728.45 (not valuing intellectual property). Of this amount, $266,728.45 is given as the value of the accounts receivable, which is not "secured" to the Note Holders. The D.S. fails to explain or value the secured claim of the Note Holders pursuant to 11 U.S.C. §506(a)(1). Further, the D.S. fails to explain that a significant portion of the Note Holders' claim will be (or should be) included in the unsecured class. Also, the D.S. fails to explain how all Noteholders should be considered "secured" when only some Noteholders have filed U.C.C.-1 statements to perfect the supposed security interested held by the "Noteholders." Finally, the D.S. fails to discuss or disclose any possible re-characterization of the Noteholders as equity instead of debt.

---

[1] This entity does not appear to be a creditor of QuVIS, and Seacoast reserves the right to challenge its standing to be heard.

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 2

6. Additionally, the WIG Group Objection appears to assert that a "first in time, first in right" rule applies among the Noteholders, which requires an alteration of the Plan's classification of Noteholder claims. Specifically, the WIG Group Objection states:

> While there may have been an original UCC financing statement that covered all noteholders, any such statement lapsed; thereafter, individual noteholders, including J. Greg Kite and the Baugher Revocable Living Trust, filed UCC financing statements only as to their secured positions. The Plan should classify Secured Noteholders in order of priority, and in separate classes, both for purposes of Plan A and Plan B.

7. Although Seacoast believes that Pending Objections' concerns are only appropriate for consideration in connection with plan confirmation, Seacoast wishes to share its perspective on these issues. This will hopefully avoid any erroneous pre-emptive striking of the Debtor's plan of reorganization and disclosure statement based on incorrect legal perceptions.

### QuVIS is not required to separately classify Noteholder Claims into Secured and Unsecured Classes Under the Note Agreement

8. The Committee Objection suggests that Noteholders will have a substantial deficiency claim and questions why that deficiency will or will not be included in the "unsecured class." However, the Bankruptcy Code allows claims that are "substantially similar" to be placed in the same class. *See* 11 U.S.C. § 1122. Certainly the Noteholders' claims, all of which arise under the same Note Agreement, may be included in the same class because they are "substantially similar." Furthermore it is doubtful that an "unsecured creditor" (having no security interest whatsoever) could be included in the same class as the Noteholder class, as their rights are not "substantially similar" in a strict legal sense.[2]

---

[2] That is not to say that Noteholders and Non-Noteholders do not share common interests as creditors, they most certainly do in many respects However any suggestion that all Noteholders cannot be classified in a single class is plainly in error under the "substantially similar" classification standard.

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 3

## It is Unnecessary Under the Note Agreement for Each and Every Noteholder to File their Own UCC-1

9. Committee counsel questions: "how all Noteholders should be considered 'secured' when only some Noteholders have filed U.C.C.-1 statements to perfect the supposed security interested held by the "Noteholders?" For the record, Seacoast filed a U.C.C.-1, as have many if not most of the Noteholders. But the question as to what classification status applies to those who did not file UCC-1s may require a determination at plan confirmation.

10. Seacoast's view is that the Article 9 of the UCC does not require that each Noteholder be listed as a secured party on the UCC-1; rather it is sufficient that so long as even one Noteholder filed a UCC-1, such filing provides constructive notice of the terms of the Note Agreement, and pledges contained therein. This result is dictated to a large degree by the terms of the Note Agreement.

11. Inspection of the Note Agreement confirms that the Debtor granted a security interest in collateral, not for a particular Noteholder, but for all Noteholders. The Note Agreement basically defines "Lenders" to mean each person who executed the Note Agreement as a lender. The Note Agreement defines a "Lien" to include a "security interest" and includes "the filing of . . .any financing statement."

12. In the lien granting clause found in Section 6.01 of the Note Agreement, QuVIS granted a security interest to the "Lenders" (plural). Additionally, in Section 6.05, QuVIS appoints Lenders (plural) as its attorney in fact to do any act that QuVIS is obligated to do (such as file financing statements for the Lenders). As attorney in fact, each Lender thus has an agency capacity to file UCC-1s on behalf of all.

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 4

13. Notably in Section 6.01 (b), QuVIS was directed to make UCC-1 Filings, and each and every one of the Lenders (plural) has been authorized make such filings on QuVIS's behalf. Section 6.01(b) provides:

> "In order to perfect such security interest, Borrower shall: make such filings and take such other actions as may be required under the Uniform Commercial Code of the State of Kansas or other jurisdiction. Borrower authorizes each Lender to perform every act which such Lender considers necessary to protect and preserve the Collateral and Lenders' interest therein and, in that regard, Borrower agrees to execute such documents and to take whatever other action is reasonably requested by Lenders to perfect and continue the security interest granted hereby."

14. It should also be noted that the Note Agreement provides in Section 10.02 that "remedies" are exercised by "Lenders" (plural). As agreed in Section 10.02 (a)(iv), all amounts received upon exercise of remedies shall be applied by Lenders "pro rata" toward payment of their respective Note balances.

15. In sum, under the Note Agreement QuVIS authorized each Noteholder to perform every act necessary to protect and preserve "the Collateral and Lenders' [plural] interest therein." By taking actions such as UCC-1 filings, a Lender (singular) has done so not only for itself, but all Lenders (plural).

16. Because each Noteholder necessarily has taken action on behalf of all Noteholders at the time that it filed its financing statement, the financing statements filed with the Kansas Secretary of State were sufficient to provide notice of, and perfect each Noteholder's security interest in, the notes issued in connection with the Note Agreement. The Uniform Commercial Code, which has been adopted by Kansas, has adopted a system of "notice filing." Kan. Stat. Ann. § 84-9-502, cmt. 2. A filed financing statement "indicates merely that a person may have a security interest in the collateral indicated. Further inquiry from the parties

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

**Page 5**

009091.0157\549462.04

Case 09-10706    Doc# 200    Filed 01/12/10    Page 5 of 14

concerned will be necessary to disclose the complete state of affairs." *Id.* The financing statements filed by many of the Noteholders, including Seacoast, include a collateral description that provides sufficient notice to affected parties that it may be necessary to perform further inquiry, which would disclose the above referenced terms and provisions of the Note Agreement.

17. Furthermore, although the Pending Objections may argue that these financing statements cannot be effective for all Noteholders because the statements fail to list the names of all secured parties, Kansas' Commercial Code does not impose any such requirement. Kansas provides that a financing statement may be effective if it provides the name of the secured party "or a representative of the secured party." Kan. Stat. Ann. § 9-502(a)(2).

18. A secured party filing a financing statement on behalf of a secured party does not need to indicate the financing statement is being filed in a representative capacity – "failure to indicate the representative capacity of a secured party or representative … does not affect the sufficiency of a financing statement." Kan. Stat. Ann. § 9-503(d). Thus, the filing of financing statements filed by any Noteholder, which necessarily is done pursuant to the attorney in fact powers recognized in the Note Agreement, is sufficient to perfect the security interests of all Noteholders. This is true even notwithstanding the absence of any indication of the filing being made in a representative capacity. *See e.g. In re Amron Techs., Inc.*, 2007 Bankr. LEXIS 1028 at *8-9 (Bankr. M.D. Ga. 2007) ("The court further notes that some multi-lender transactions are structured in such a way that only one lender need file a financing statement. … By contractual agreement among the lenders, one lender is designated as agent for all the lenders. The agent

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 6

then has authority to sign the financing statement in a representative capacity for all the lenders.").[3]

## **It would be foolish for any Noteholder to release its UCC-1 in exchange for the payoff of that single Noteholder under the Note Agreement**

19. With this background in mind, the following hypothetical will serve to explain why the filing by even a single Noteholder provides constructive notice of all debt secured the Collateral. Assume a hypothetical Noteholder, John Doe, holds $300,000 principal amounts of Notes, representing 1% of the approximately $30 million principal amount issued. Further assume that of all the Noteholders, only John Doe filed a UCC-1, listing only his name as the secured party.

20. Next assume that QuVIS defaults, and John Doe conducts an UCC Article 9 public sale of the Collateral. Assume that John Doe believes the Collateral to be worth $3 million, but at the public sale, a bidder makes a $600,000 cash bid for the collateral, and no one else bids.

21. In this situation, must John Doe release his UCC-1, and sell the Collateral in exchange for a $600,000 bid? At first, one might think so, since $600,000 would retire his seeming $300,000 claim in full. That outcome would leave the rest of the Noteholders out in the cold, as they could not realize the $3 million in value. Courts have sought to mitigate this problem by inferring an "inten[t] to act collectively in the event of the borrower's default" when interpreting loan documents. *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 321 (2007).

---

[3] It is the attorney in fact/agency power held by each Noteholder that distinguishes the QuVIS Note Agreement from the agreement described in the *Amron Technologies* opinion which failed to provide an agency status.

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 7

22. In view of the sharing provision found in Section 10.02 (a)(iv), this Court may infer that John Doe most certainly can and should reject such $600,000 bid, and credit bid not only his $300,000 Note amount, but all other debts due by QuVIS under the Note Agreement, at least until the credit bid approaches the assumed $3 million value of the Collateral.

23. This is because if John Doe were to accept the $600,000 bid, his pro rata share would be a mere 2 cents on the dollar ($600,000 divided by $30,000,000). By rejecting such bid, and credit bidding up to the perceived fair market value of the Collateral (assumed to be $3,000,000), John Doe thus preserves for himself and all Noteholders a recovery of 10 cents on the dollar ($3,000,000 divided by $30,000,000).

24. The Note Agreement should not be construed in a manner that results in a particular Noteholder being limited to only the indebtedness that Noteholder holds in enforcing lien rights under the Note Agreement. However such construction is the logical consequence of the positions taken by those who say "every man for himself" and that only those Noteholders who filed UCC-1s may be in the secured Noteholder class. Because the Pending Objections are premised upon such flawed reasoning, they should be overruled.

### Perfection of Security Interests in Patents

25. Both the Committee Objection counsel and the WIG Group Objection question the validity of the QuVIS "Plan B" provision which defines a "Qualified Bidder" to be "any Noteholder who has filed a public notice of its security interest in all or substantially all of QuVIS's assets, either by means of a UCC financing statement made with the Kansas secretary of state, or by means of having recorded the security interest with the United States Patent and Trademark Office." While these objections are not fully developed, perhaps they take the

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

**Page 8**

009091.0157\549462.04

Case 09-10706   Doc# 200   Filed 01/12/10   Page 8 of 14

position that a security interest filing with respect to a patent, made only with the United States Patent and Trademark Office, is insufficient to have a right to credit bid under Section 363(k) of the Bankruptcy Code.

26. If the Court were to determine that only parties who independently "perfected" their security interests have valid liens for purposes of exercising Section 363(k) credit bid rights, then the question becomes: how does a party adequately "perfect" an interest in patents for purposes of entitlement to the exercise of Section 363(k) credit bid rights? Seacoast's view is that with respect to patents, it is plausible that perfection for purposes of the exercise of Section 363(k) credit bid rights may be accomplished by two methods: (i) a UCC-1 filing with the Secretary of State or (ii) a filing with the United State Patent and Trademark Office (the "USPTO").

27. Filing a security interest with the USPTO is a plausible method of perfecting a security interest in patents. 35 U.S.C. § 261 provides:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States. A certificate of acknowledgment under the hand and official seal of a person authorized to administer oaths within the United States, or, in a foreign country, of a diplomatic or consular officer of the United States or an officer authorized to administer oaths whose authority is proved by a certificate of a diplomatic or consular officer of the United States, or apostille of an official designated by a foreign country which, by treaty or convention, accords like effect to apostilles of designated officials in the United States, shall be prima facie evidence of the execution of an assignment, grant or conveyance of a patent or application for patent. An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 9

28.     This statute was construed by the Supreme Court in *Hendrie v. Sayles*, 98 U.S. 546 (1879), in which it noted a bona fide purchaser defense is most likely available to a subsequent purchaser or mortgagee against any interest in a patent that is not recorded at the USPTO.  Most importantly, the Court noted that the application of the bona fide purchaser defense is a matter of federal law.  Thus perfection of a security interest by means of a filing with the USPTO appears to be a plausible method of perfection.[4]

29.     Thus based upon 35 U.S.C. § 261, it appears plausible that a Chapter 11 plan, which excludes a Noteholder who has filed notice of a security interest in the Debtor's patents with the USPTO from exercising credit bid rights, might fail the "fair and equitable" standard codified at Section 1129(b)(2) of the Bankruptcy Code.   Unless some party in interest has binding authority to the contrary, Seacoast is of the view that the Plan B definition of "Qualified Bidder" should be maintained.[5]   None of this however requires amendment to the current Disclosure Statement, and such issues should be carried to confirmation hearings.

---

[4] The *City Bank and Trust Company v. Otto Fabric, Inc.*, 83 B.R. 780 (D. Kan 1998) opinion is not to the contrary.  *City Bank* concerned a creditor seeking to protect its security interest against a trustee in bankruptcy. The creditor had perfected the security interest only by filing a financing statement with the secretary of state. The Bankruptcy Court held that 35 U.S.C. § 261 controls the method of perfecting a security interest in patents and, therefore, a federal filing, i.e., recording the security interest in the USPTO, is required.  However on appeal, the District Court reversed the Order of the Bankruptcy Court and held that a federal filing with the USPTO is not required to perfect a security interest in patents against a trustee in bankruptcy. The decision was based on the District Court's interpretation of the federal statute, which states that: an assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage. The District Court, in reaching its holding, emphasized that the language of the federal statute explicitly provides for protection against subsequent purchasers or mortgagees, but appears to leave open the area of protection against lien creditors. The District Court concluded that if Congress intended to preempt the entire field of filing, it would have done so explicitly in the federal statute.   It is important to properly construe the holding of *City Bank and Trust Company v. Otto Fabric, Inc.*   The case does not hold that a creditor is unable to "perfect" a lien valid against assigns (including lien creditors) by means of a filing with the USPTO.   Rather the District Court's ruling is that the absence of a USPTO filing is not fatal to perfection, so long as the creditor has filed with the Kansas Secretary of State.

[5] Seacoast has not filed with the USPTO, rather Seacoast filed its UCC-1 with the Kansas Secretary of State.

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

                                                                                                Page 10

## Disclosure of Consequences of the Court's Adoption of a Strict "First in Time, First in Right Rule"

30. The WIG Group Objection suggests that one or more of its members (specifically Greg Kite and the Baugher Trust) will take the position that a "first in time, first in right" applies, and that Kite and the Baugher Trust thus deserve a separate classification under the Plan.

31. However because the collateral sharing provisions referenced above, application of the "first in time, first in right" rule among parties to the Note Agreement is nonsensical. As each Noteholder (Lender) acts as agent for all with respect to UCC filings and must ratably share recoveries, the "first in time, first in right" principle simply does not control priority rights among the Noteholders who are parties to the Note Agreement.[6]

32. If however, the Court were to hold that Kite and the Baugher Trust are correct, and that they have "first in time, first in right" priority senior to the rest of the Noteholders, based upon their UCC-1 filing dates, then Seacoast wishes the Court to be aware of its future intentions so there is no misunderstanding of the significant of such a ruling.

33. According to Exhibit 5 to the Disclosure Statement, which is a listing of the Noteholders as of 10/20/09, Kite is shown to be owed approximately $117,000, and the Baugher Trust is also shown to be owed about $117,000. Seacoast is shown to be owed approximately $5.4 million.

34. If the Court concludes that a "first in time, first in right" rule requires a reclassification of Plan A and Plan B, most likely neither plan will go forward, and eventually

---

[6] Recently the Bankruptcy Court for the Southern District of Texas was required to police creditors who sought to dodge contractual obligations among themselves. See *In re ION Media Networks Inc.*, -- B.R. --, 2009 WL 4047995 (Bankr. S.D.N.Y., Nov. 24, 2009) observed: "[P]lainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled.")

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 11

the stay will be lifted for lack of equity in the collateral. If Kite and Baugher then conduct a foreclosure sale (again assuming they filed first in time), Seacoast will pay off their approximately $235,000 of claims with cash, and then credit bid its Note up to $5.4 million. It is doubtful that anyone else will bid more than $5.4 million, so the remaining Noteholders and creditors would receive nothing.

35. This is not stated with the intent to threaten. It simply shows the consequences of interpreting the Note Agreement to allow each Noteholder to act strictly in its own self-interest, instead of collectively. The WIG Group Objection's "first in time" interpretation is contrary to Seacoast's understanding of the Note Agreement. But if the Court concludes Seacoast is incorrect, by denying approval of the Disclosure Statement based upon the "first in time, first in right" principle, Seacoast intends to act in its self-interest as well. Thus Noteholders who filed UCC-1s after Seacoast will be required to payoff Seacoast at $5.4 million, or Seacoast will most likely own the collateral. That scenario leaves nothing for anyone else, including wage claims or general unsecured creditors.

## Disclosure of the WIG Group's "offer" may be required to provide fair disclosure of plan alternatives

36. Seacoast and the WIG Group may be in agreement on one narrow point; namely both perceive the Disclosure Statement is deficient because it is silent with respect to WIG Group's "wishes to acquire the company assets." See paragraph 11 of the WIG Group objection. Seacoast understands that on August 28, 2009, the WIG Group offered to purchase the Debtor's assets for $114,962.54. Seacoast is of the view that such "offer" should be disclosed, as well as the fact, assuming the entire $114,962.54 were distributed ratably to the Noteholders, the

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 12

dividend to Noteholders would be less than 0.3%. General unsecured claims would receive nothing under this WIG Group proposal. Disclosure of this dismal offer should help creditors understand the alternatives to the QuVIS plan.

**Conclusion**

WHEREFORE, SEACOAST respectfully requests and prays that this Court approve the Disclosure Statement, overrule the Pending Objections, and grant such other relief as the Court deems just and appropriate.

Dated: January 12, 2010

    Respectfully submitted,

    FLEESON, GOOING, COULSON & KITCH, L.L.C.

    By: /s/ Thomas J. Lasater
        Thomas J. Lasater, Reg. No. 11440
        P.O. Box 997
        Wichita, Kansas 67201
        Telephone: (316) 267-7361
        Email: tlasater@fleeson.com

    and

    J. Maxwell ("Max") Tucker
    Patton Boggs LLP
    2001 Ross Avenue, Suite 3000
    Dallas, Texas 75201
    Telephone: (214) 758-1500
    Email: mtucker@pattonboggs.com

    ATTORNEYS FOR SEACOAST CAPITAL PARTNERS II, L.P.

# CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of January, 2010 I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send a notice of electronic filing to the Office of the U.S. Trustee and to all parties receiving electronic notice, and that I mailed copies of the same to:

Edward J. Nazar
Nicholas R. Grillot
Redmond & Nazar, L.L.P.
245 N. Waco, Suite 402
Wichita, KS 67202-1117

J. Michael Morris
Klenda, Mitchell, Austerman & Zuercher, L.L.C.
301 N. Main, Suite 1600
Wichita, KS 67202-4888

William B. Sorensen, Jr.
Morris, Laing, Evans, Brock & Kennedy, Chartered
Old Town Square
300 N. Mead, Suite 200
Wichita, KS 67202-2745

/s/ Thomas J. Lasater

**BRIEF OF SEACOAST CAPITAL PARTNERS II, L.P. IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT**

Page 14