UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| QUVIS, Inc. | ) | Case No. 09-10706 |
| | ) | |
| Debtor | ) | Chapter 11 |
| | ) | |

**SEACOAST RESPONSE TO DEBTOR'S MOTION TO DETERMINE THE SECURED STATUS OF NOTEHOLDERS FOR PURPOSES OF PLAN CLASSIFICATION AND OTHERWISE, AND SEACOAST'S REPLY TO THE RESPONSE FILED BY COMMITTEE COUNSEL**

Seacoast Capital Partners II, L.P. ("Seacoast") files this Response to the Seacoast Motion to Determine the Secured Status of Noteholders for Purposes of Plan Classification and Otherwise (the "Motion") (Doc# 212), and its reply to the Response filed by Committee counsel (Document #224),. and respectfully states as follows:

## Introduction

Seacoast has filed a proof of claim in the amount of $5,387,042 in this case on account of a note issued by QuVIS, Inc. (the "Debtor"). The note giving rise to Seacoast's claim is one of many notes issued under a First Amended and Restated Convertible Loan and Security Agreement, dated June 30, 2003 (the "Note Agreement"). A true and correct copy of the Note Agreement is attached as Exhibit 1 to the Disclosure Statement.

Seacoast believes that it is one of the largest note holders of the Debtor's notes (each such holder, a "Noteholder") issued under the Note Agreement. The Debtor has attached a list of its Noteholders, marked as Exhibit 2 to the Motion.

Seacoast is generally in agreement with the Debtor's factual assertions stated in the Motion, including that Exhibit 1 is a true and correct copy of the Note Agreement, Exhibit 2 appears to be an accurate list of Noteholders, and Exhibit 3 appears to correctly match the sequence of UCC Financing Statements filed by the Noteholders listed. As shown on Exhibit 3, Seacoast filed a UCC Financing Statement on June 14, 2007.

**QuVIS is not required to separately classify Noteholder Claims into Secured and Unsecured Classes Under the Note Agreement**

The fundamental issue presented by the Motion, is whether the Debtor's Plan properly places all Noteholders in the same class. The Bankruptcy Code allows claims that are "substantially similar" to be placed in the same class. See 11 U.S.C. § 1122. Certainly the Noteholders' claims, all of which arise under the same Note Agreement, should be included in the same class because they are "substantially similar."

It has been suggested that the Debtor's Class Two consisting of all Noteholders be divided between those Noteholders who have filed UCC Financing Statement (the "haves"), and those who have not (the "have nots"). However as observed in *In re MCorp. Financial, Inc.*, 137 B.R. 219, 226 (Bankr. S.D. Tex. 1992): "There is no reason to fragment classifications and uselessly increase their number where there is no substantial differentiation in the nature of the claims." As argued below, by reason of the terms of Note Agreement, there is no substantial difference in the rights of the "haves" versus the "have nots."

**It is Unnecessary Under the Note Agreement for Each and Every Noteholder to File their Own UCC-1**

Neither Article 9 of the UCC, nor the Note Agreement requires that each Noteholder be listed as a secured party on the UCC-1 filing; rather it is sufficient that so long as even one

Noteholder filed a UCC-1, such filing provides constructive notice of the terms of the Note Agreement, and pledges contained therein. This result is dictated to a large degree by the terms of the Note Agreement.

Inspection of the Note Agreement confirms that the Debtor granted a security interest in collateral, not for a particular Noteholder, but for all Noteholders. The Note Agreement defines "Lenders" to mean "each person who has executed this [Note] Agreement on the signature pages hereto, collectively, or any successor or substitute Lender as shown on Schedule 1 hereto, as modified from time to time." The persons that have executed the Note Agreement (or their successors) are believed to correspond to the Debtor's list of Noteholders attached as Exhibit 2 to its Motion.

The Note Agreement defines a "Lien" to include a "security interest" and includes "the filing of . . .any financing statement." In the lien granting clause found in Section 6.01 of the Note Agreement, QuVIS granted a security interest to the "Lenders" (plural). Additionally, in Section 6.05, QuVIS appoints Lenders (plural) as its "attorney in fact" to do any act that QuVIS is obligated to do (such as file financing statements for the Lenders).

Notably in Section 6.01 (b), QuVIS was authorized and directed to make UCC-1 Filings. Furthermore each and every one of the Lenders (plural) has been authorized make such filings on QuVIS's behalf. Section 6.01(b) provides:

> "In order to perfect such security interest, Borrower shall: make such filings and take such other actions as may be required under the Uniform Commercial Code of the State of Kansas or other jurisdiction. Borrower authorizes each Lender to perform every act which such Lender considers necessary to protect and preserve the Collateral and Lenders' interest therein and, in that regard, Borrower agrees to execute such documents and to take whatever other action is reasonably requested by Lenders to perfect and continue the security interest granted hereby."

In sum, under the Note Agreement, QuVIS is authorized to make UCC-1 filings on behalf of all Noteholders. Further QuVIS authorized each Noteholder to perform every act necessary to protect and preserve "the Collateral and Lenders' [plural] interest therein." By taking actions such as UCC-1 filings, a Lender (singular) has done so not only for itself, but acting in the place of the QuVIS Borrower.[1]

This structure is consistent with the official comments to the UCC, which provide that a debtor (or any other party) may file a UCC-1 financing statement. The UCC provides that a financing statement cannot be filed unless it is authorized by the debtor - it is the authorization that matters, the identity of the filer is immaterial.[2] Because QuVIS authorized the filing of a financing statement upon agreeing to be bound under the terms of a security agreement (see also

---

[1] In paragraph 15 of Seacoast's prior Brief (Document #200), Seacoast argued:

"In sum, under the Note Agreement QuVIS authorized each Noteholder to perform every act necessary to protect and preserve 'the Collateral and Lenders' [plural] interest therein.' By taking actions such as UCC-1 filings, a Lender (singular) has done so not only for itself, but all Lenders (plural)."

To be clear Seacoast does not contend that each Noteholder appointed each other Noteholder its agent. Rather Seacoast contends (i) the Note Agreement authorizes the Borrower to make UCC-1 filings to perfect the Lenders (plural) security interest, (ii) the Borrower has granted each Noteholder the Borrower's authority to file the UCC-1s, and (iii) such authority is a power to file UCC-1 for the entire group of Noteholders. The Note Agreement may not be fairly construed to mean the Borrower is authorized to make a UCC-1 filing on behalf of only a single Noteholder (to the exclusion of the others), nor should a Noteholder exercising the "attorney in fact" powers under Section 6.05 be construed as filing a UCC-1 only on its own behalf.

[2] Comment 2 to UCC 9-509 (Kan. Stat. 84-9-509) further demonstrates why it is immaterial whether QuVIS as Borrower (or a Lender on behalf of the Borrower) has filed the UCC-1s. This section collects in one place most of the rules determining whether a record may be filed. Section 9- 510 explains the extent to which a filed record is effective. Under these sections, the identity of the person who effects a filing is immaterial. The filing scheme contemplated by this Part does not contemplate that the identity of a "filer" will be a part of the searchable records. This is consistent with, and a necessary aspect of, eliminating signatures or other evidence of authorization from the system. (Note that the 1972 amendments to this Article eliminated the requirement that a financing statement contain the signature of the secured party.) As long as the appropriate person authorizes the filing, or, in the case of a termination statement, the debtor is entitled to the termination, it is insignificant whether the secured party or another person files any given record. The question of authorization is one for the court, not the filing office. However, a filing office may choose to employ authentication procedures in connection with electronic communications, e.g., to verify the identity of a filer who seeks to charge the filing fee.

UCC 9-509(b)), QuVIS, by executing the Note Agreement, authorized the filing of a UCC-1 to perfect the note agreement. Pursuant to such authority, QuVIS (or any Noteholder on behalf of QuVIS) could file the financing statement. As shown on Exhibit 3, approximately forty-seven of the Noteholders have exercised such authority to file financing statements.

Because each Noteholder who filed UCC-1s has exercised as attorney in fact QuVIS' authority to make such filings (and with QuVIS authorized to file on behalf of all Noteholders, the financing statements filed with the Kansas Secretary of State are sufficient to provide notice of, and perfect all Noteholder's security interest in, the notes issued in connection with the Note Agreement. The Uniform Commercial Code, which has been adopted by Kansas, has adopted a system of "notice filing." Kan. Stat. Ann. § 84-9-502, cmt. 2. A filed financing statement "indicates merely that a person may have a security interest in the collateral indicated. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs." *Id.* The financing statements attached as Exhibit 3 include a collateral description that provides sufficient notice to affected parties that it may be necessary to perform further inquiry, which would disclose the above referenced terms and provisions of the Note Agreement.

Furthermore, the argument that these financing statements cannot be effective for all Noteholders because the statements fail to list the names of all secured parties is without merit. Kansas' Commercial Code does not impose any such requirement. Kansas provides that a financing statement may be effective if it provides the name of the secured party "or a representative of the secured party." Kan. Stat. Ann. § 9-502(a)(2).

A financing statement does not need to indicate the financing statement is being filed in a representative capacity – "failure to indicate the representative capacity of a secured party or

representative … does not affect the sufficiency of a financing statement." Kan. Stat. Ann. § 9-503(d). Thus, the filing of financing statements filed by any Noteholder, which necessarily is done pursuant to the Debtor's attorney in fact powers recognized in the Note Agreement, is sufficient to perfect the security interests of all Noteholders. This is true even notwithstanding the absence of any indication of the filing being made in a representative capacity. *See e.g. In re Amron Techs., Inc.*, 2007 Bankr. LEXIS 1028 at *8-9 (Bankr. M.D. Ga. 2007) ("The court further notes that some multi-lender transactions are structured in such a way that only one lender need file a financing statement. … By contractual agreement among the lenders, one lender is designated as agent for all the lenders. The agent then has authority to sign the financing statement in a representative capacity for all the lenders.").[3]

**It would be foolish for any Noteholder to release its UCC-1 in exchange for the payoff of that single Noteholder under the Note Agreement**

With this background in mind, the following hypothetical will serve to explain why the filing by even a single Noteholder provides constructive notice of all debt secured by the Collateral. Assume the Debtor issued $30 million principal amount of Notes under the Note Agreement. Also assume a hypothetical Noteholder, John Doe, holds $300,000 principal amounts of Notes, representing 1% of the $30 million of Notes issued. Further assume that only John Doe filed a UCC-1, listing only his name as the secured party.

Next assume that QuVIS defaults, and John Doe conducts an UCC Article 9 public sale of the Collateral. Assume that John Doe believes the Collateral to be worth $3 million, but at the public sale, a bidder makes a $600,000 cash bid for the collateral, and no one else bids.

[3] It is the attorney in fact/agency power held by each Noteholder that distinguishes the QuVIS Note Agreement from the agreement described in the *Amron Technologies* opinion which failed to provide an agency status.

In this situation, must John Doe release his UCC-1, and sell the Collateral in exchange for a $600,000 bid? At first, one might think so, since $600,000 would retire his $300,000 Note claim in full. That outcome would leave the rest of the Noteholders out in the cold, as they could not realize the $3 million in value.

Courts have sought to mitigate this problem by inferring an "inten[t] to act collectively in the event of the borrower's default" when interpreting loan documents. *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 321 (2007).

In view of the collateral sharing provision found in Section 10.02 (a)(iv), this Court may infer that John Doe most certainly can and should reject such $600,000 bid, and credit bid not only his $300,000 Note amount, but all other debts due by QuVIS under the Note Agreement, at least until the credit bid approaches the assumed $3 million value of the Collateral.

This is because if John Doe were to accept the $600,000 bid, his pro rata share would be a mere 2 cents on the dollar (the $600,000 bid divided by $30,000,000). By allowing John Doe to reject such bid, and to credit bid up to the perceived fair market value of the Collateral (assumed to be $3,000,000), John Doe acting reasonably would preserve for himself and all Noteholders a recovery of 10 cents on the dollar ($3,000,000 divided by $30,000,000).

The above hypothetical further demonstrates why the Note Agreement should not be construed in a manner that results in a particular Noteholder being limited to only the indebtedness that Noteholder holds in enforcing lien rights under the Note Agreement.

**Consequences of Selecting Classification Method 2, which divides the Noteholders between the "haves" (those who filed UCC-1s) and the "have nots" (those who didn't)**

While Seacoast believes the above to be correct statement of applicable law, if the Court were to hold that **only** Noteholders listed on the UCC Report attached as Exhibit 3 may be

classified as having a secured status, it appears to Seacoast that such ruling would have the following impact on the Debtor's Plan A.

Under Plan A (which currently adopts Classification Method One), 30% of the Reorganized QuVIS's common equity (described herein as the "Class B Common Equity")[4] is to be allocated to holders of pre-petition claims as follows: 90% of the Class B Common Equity will be ratably issued to the Noteholders, and 10% of the Class B Common Equity goes to general unsecured creditors. In otherwords, Noteholders and all remaining general unsecured creditors get 100% of the Class B Common Stock, with 90% allocated to the Noteholders and 10% to the remaining general unsecured creditors.

According to page 23 of the Debtor's Disclosure Statement, the Debtor has classified approximately $40,000,000 of Noteholder claims in Class 2, and approximately $5,000,000 of general unsecured claims placed in Class 3. Assuming that none of the Noteholders had filed UCC-1s, and that consequently all Noteholders and general unsecured claims had to be placed in the same class and treated the same, then the result would be that Noteholders receive approximately 89% (40,000,000/45,000,000) of the Class B common stock (instead of the 90% of the Class B currently offered to the Noteholders, and the remaining general creditors would receive 11% (5,000,000/45,000,000) of the Class B Common stock. Obviously, the $5,000,000 assumed amount is subject to adjustment once the claims are allowed. The point is the Noteholders and general unsecured claim treatment already receive very similar treatment under Plan A, which has adopted the Classification Method One.

---

[4] Under Plan A, the remaining 70% of the common equity (called herein the "Class A Common Stock") will be sold to Class 2 Noteholders who elect (but are not required) to purchase Class A Stock. Plan A requires at least $600,000 be raised from the sale of such stock. The proceeds of the Class A Common Stock can be used to pay priority wage and administrative claims and to allow the Debtor working capital to consummate the Plan.

If the Court rules that Classification Method Two applies, Plan A could be amended to reallocate a portion of the 90% of Class B common equity currently allocable strictly to Noteholders, to an expanded Class 3 (which would consist of general unsecured creditors and those Noteholders not listed on UCC Report attached as Exhibit 3).[5] So even if the Court were to make a distinction between the "haves" and "have nots" by finding Classification Method Two is required; such finding does not render the basic concepts behind the Plan to be unfeasible.

Nevertheless from a cost of administration perspective, Classification Method Two will be more cumbersome and expensive to administer than Classification Method One. Under Classification Method One, 90% of Class B Common Stock can be ratably allocated to the Noteholders listed on Exhibit 2 based upon the debt amounts listed thereon. There is no need under Classification Method One for the Court to precisely calculate each item of interest and fees due under the Note Agreement, since all Noteholder's share of the Class B Common would proportionate to their Note holdings.

However if the Court requires Classification Method Two, some of the Noteholders would be moved into the Class 3 of general unsecured creditors. In this event, administrative costs will increase. The parties and the Court will be required to make complex interest calculations under the Note Agreement, so that the ratable sharing by the "have not" Noteholders and the trade vendors can be determined.

---

[5] Finally it should be noted that if Classification Method One is approved, all Noteholders would also qualify as "Qualified Bidders" for purposes of the auction proposed in the alternative Plan B. If Classification Method Two is approved, only those approximately forty-seven Noteholders listed on Exhibit 3 would be Qualified Bidders.

**The Noteholders bargained away the "First in Time, First in Right Rule" among themselves**

The WIG Group Objection to the Disclosure Statement suggested that one or more of its members (specifically Greg Kite and the Baugher Trust) will take the position that a "first in time, first in right" applies, and that Kite and the Baugher Trust thus deserve a separate classification under the Plan. This is described in the Motion as Classification Method Three.

However the Note Agreement provides in Section 10.02 that "remedies" are exercised by "Lenders" (plural). As provided in Section 10.02 (a)(iv), all amounts received upon exercise of remedies shall be applied by Lenders "pro rata" toward payment of their respective Note balances. Because the collateral sharing provisions referenced above, application of the "first in time, first in right" rule among parties to the Note Agreement is nonsensical. As each Noteholder (Lender) acts as agent for all with respect to UCC filings and must ratably share recoveries received from the Collateral, the "first in time, first in right" principle simply does not control priority rights among the Noteholders who are parties to the Note Agreement.[6]

**The Parole Evidence Rule negates the need for the March 16, 2010 evidentiary hearing**

While the Court has scheduled an evidentiary hearing for March 16, 2010, such hearing should not be required. No party can in good faith dispute that the document attached as Exhibit 1 to the Motion is a true and correct copy of the Note Agreement. No party can contest in good faith the filing data collected on Exhibit 3. If any party contests the accuracy of the Noteholder

---

[6] Recently the Bankruptcy Court for the Southern District of New York was required to police creditors who sought to dodge contractual obligations among themselves. See *In re ION Media Networks Inc*., -- B.R. --, 2009 WL 4047995 (Bankr. S.D.N.Y., Nov. 24, 2009) observed: "[P]lainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled.")

list attached as Exhibit 2, presumedly they will provide evidence that a particular note has been assigned.

However the Plan classification controversy can be determined by the Court's construction of the express terms found within the "four corners" of the Note Agreement. None of those terms is ambiguous. The parole evidence rule prohibits the consideration of oral testimony to modify, supplement, or alter the express terms of the Note Agreement, and such rule eliminates the need for an evidentiary hearing. Seacoast objects to admission of any parole evidence offered to explain the written terms of the Note Agreement.

**Seacoast's Reply to the Committee Counsel's Objection**

On February 9, 2010, counsel for the Creditors Committee filed a "Response" (see Document # 224) to the Motion purportedly on behalf of the Committee. However Counsel did not share this Response with the Committee prior to filing. Eben Moulton, Seacoast' designated member on the Committee, was not provided with an opportunity to review or vote on the Response before it was filed. Seacoast also understands the member of the Committee having the largest claim (BlackOak) was not provided with an opportunity to review or vote to approve the filing of the Response. As the members of the Committee having the two largest claims have not approved the filing of the Response, it cannot be truthfully said it represents the Committee's views. When counsel says in the Response that the "Committee believes" or the "Committee agrees" to an assertion of fact or law, Seacoast disclaims having made or approved such assertions. Seacoast is of the view that until the Committee actually approves such assertions as evidenced by a properly constituted vote of the Committee, taken after a properly

called meeting, in which a quorum of the Committee participated, such assertions do not reflect the Committee's views..

Turning to the merits, the Committee counsel evades taking a position on which of the four classification methods described in the Debtor's Motion is the correct method to classify the Noteholders. The Committee counsel apparently has concluded the "perfected" Noteholders consist of the forty-six Noteholders who filed UCC-1s listed in Exhibit 3, and has also concluded that whatever a Noteholder receives must be shared pro-rata with all Noteholders (apparently even those who are unperfected). See Committee counsel's Response at paragraphs 5 and paragraph 9.

Thus Committee counsel does not appear to accept Classification Method Three (the first in time, first in right method), since counsel recognizes there is a duty among the Noteholders to share. Counsel appears to recognize that such duty to share is independent from the "first in time" based priority rights arising under the Kansas UCC.[7]

Nor can Committee counsel's response be interpreted as accepting Classification Method Two. While Committee counsel initially would limit entrance to the secured class to those filing a UCC-1 (as listed on Debtor's Exhibit 3), counsel recognizes a duty of those listed on Exhibit 3 to share collateral recoveries with those Noteholders not listed on Exhibit 3).[8]

---

[7] Contrary to Committee counsel's assertion in paragraph 7, the fact that 46 Noteholders elected to exercise the Borrower's power of attorney given to each Noteholder does not prove a Noteholder's "understanding" of the Note Agreement.. As Seacoast has argued earlier herein, the filing of a UCC financing statement by even a single Noteholder is sufficient to place a "hypothetical lien creditor" on constructive notice of the terms of the Note Agreement, the aggregate debts due the Noteholders, and the collateral that collectively secures such aggregate debt. UCC-1 filings made by more than one Noteholder, <u>while redundant</u>, are permitted.

[8] As to Method Four, application of the trustee's avoiding powers might operate to remove the last twenty-two Noteholder names listed on the Debtor's Exhibit 3. However such avoidance exercise would still leave approximately twenty-four Noteholders perfected. As noted above, it does not appear Committee counsel disputes

By recognizing that the Noteholders have a duty to share recoveries, there should be no serious dispute by Committee counsel that the claims of all the Noteholders are "substantially similar" claims for purposes of Section 1122 of the Bankruptcy Code. By reason of the sharing provision, no purpose is served by attempting to fragment the Noteholder class into the "haves" and "have notes." The Court should grant the Debtor's Motion, and conclude the Debtor's Classification Method One is correct.

Two other points made by Committee counsel merit a response. The Committee counsel insists on this Court conducting an unnecessary and expensive hearing to determine the value the Debtor's intellectual property collateral before the Plan can be voted upon by creditors. This is simply not the law.

Under the Bankruptcy Code, there is no need for the Court to determine the value of the QuVIS collateral, unless and until a class of secured creditors has rejected the Plan, and the Debtor then attempts to "cram down" the class under Section 1129(b) of the Bankruptcy Code. The Bankruptcy Code was carefully structured to avoid judicial valuations unless absolutely necessary.

The judicial task presented by the Motion before the Court, is whether the Plan has properly classified creditors. The exhibits attached to the Debtor's Motion confirm that Noteholders have a secured status under applicable state law, and that their rights are "substantially similar" by reason of the collateral sharing provisions. The Court should grant the Motion, and allow the Noteholders as a class to vote to accept or reject the Plan. If the

---

that those twenty four would still have a duty to share recoveries with Noteholders who either (i) did not file at all, or (ii) filed within 90 days of the involuntary petition date.

Noteholders as a class accept the Plan, there will be no need for the Court to make a judicial valuation of the collateral.[9]

Bankruptcy Courts have recognized that it not the function of the judiciary to value collateral just so the parties can receive an advisory opinion. See e.g. *In re Turnbow*, 121 B.R. 11 (Bankr. S.D. Tex. 1990) (court would not make advisory decision on value of collateral); *In re Richardson*, 97 B.R. 161 (Bankr. W.D. N.Y. 1989) (bankruptcy court would not issue advisory opinion as to value of creditor's collateral, based on considerations of ripeness and judicial economy); *In re Mesa Business Park*, 127 B.R. 144 (Bankr. W.D. Tex. 1991) (debtor could not obtain valuation of property subject to liens for sake of valuation alone). See also *In re Seip*, 116 B.R. 709 (Bankr. D. Neb. 1990) (amount of secured claim is to be determined by value of collateral on date in close proximity to confirmation of plan). The Court should decline the Committee counsel's invitation to provide an advisory opinion.

Other courts have observed the limited benefit of judicial valuations of collateral. For example, see *In re Demakes Enterprises, Inc.*, 145 B.R. 362, 364 (Bankr. Mass. 1992), in which the Bankruptcy Court notes:

> The Bankruptcy Code directs the Court to determine a property's value "in light of the purpose of the valuation and of the proposed disposition or use of the property...." 11 U.S.C. § 506(a). Not surprisingly, a systematic method for valuing collateral has not evolved, due to Congress' intention that valuations be made on a case by case basis. S.Rep. No. 989, 95th Cong., 2d Sess. 54, U.S. Code Cong. & Admin. News pp. 5787, 5840 (1978) ( "Courts will have to determine value on a case by case basis, taking into account the facts of each case and the competing interests in the case"). See D.G. Carlson, Secured Creditors

[9] If the Noteholder class accepts, but the separate unsecured class were to reject, the Plan could still be confirmed without a judicial valuation of the collateral. The statutory test found in Section 1129(b) of the Bankruptcy Code requires a judicial determination whether the class junior to the general unsecured creditors (meaning in this context, the stockholders) not receive or retain anything under the Plan on account of their equity interests. Determination of this issue does not require a judicial valuation of the collateral.

> and the Eely Character of Bankruptcy Valuations, 41 Am.U.L.Rev. 63, 64 (1991) ("Not surprisingly, bankruptcy courts have indeed gratified the wishes of Congress by producing an extremely diverse and contradictory set of valuation theories.") This mandate to make new decisions regarding valuations with each case is further complicated when one realizes that the "value" ascribed to collateral is little more than a "shadow," J.F. Queenan, Jr., Standards for Valuation of Security Interests in Chapter 11, 92 Commercial L.J. 18 (1987), or an estimated prediction of the price the property would bring at a future auction. D.G. Carlson, Unsecured Claims Under Bankruptcy Code Sections 506(a) and 1111(b): Second Looks at Judicial Valuations of Collateral, 6 Bankr.Dev.J. 253, 263 (1989). The latter commentator noted, "[u]nless the collateral is highly fungible and stable in price, valuations are inherently uncertain...."

See also *Virginia Nat'l Bank v. Jones (In re Jones)*, 5 B.R. 736, 738 (Bankr.E.D.Va.1980) ("Verily, it is preferable for the parties, reasonably and realistically, to agree upon such matters as the secured portion of a debt. True value is an elusive Pimpernel. The parties' discretion may be as good as the Court's.").

Another reason that a judicial valuation of the collateral is a waste of time and money at this juncture, is that the Noteholder class may elect to make a Section 1111(b) election. In such event, the Noteholders' claims could not legally be bifurcated into secured and unsecured components, but rather the Noteholders as a group would hold a secured claim for the entire allowed claim amount (believed to be approximately $40 million).

Finally, in paragraph 14 of its Response, the Committee counsel states the Committee has "reserved" other issues, such as "recharacterization" pending discovery. The meaning of this "reservation" is unclear. Seacoast objects to any *sub rosa* attempt to interject a "recharacterization" issue into the March 16, 2010 hearing on the Motion.. Any attempt by Committee counsel to conduct a "trial by ambush" should not be countenanced. If Committee counsel plans to make such a "recharacterization" attack, he needs to properly plead facts and

law in support of such a claim, and garner approval from sufficient members of the Committee to take such extraordinary relief.

**Conclusion**

WHEREFORE, SEACOAST respectfully requests and prays that this Court determine that Classification Method One applies, grant the Motion, and grant such other relief as the Court deems just and appropriate.

Dated: February 11, 2010

Respectfully submitted,

FLEESON, GOOING, COULSON & KITCH, L.L.C.

By: /s/ Thomas J. Lasater
Thomas J. Lasater, Reg. No. 11440
P.O. Box 997
Wichita, Kansas 67201
Telephone: (316) 267-7361
Email: tlasater@fleeson.com

and

J. Maxwell ("Max") Tucker
Patton Boggs LLP
2001 Ross Avenue, Suite 3000
Dallas, Texas 75201
Telephone: (214) 758-1500
Email: mtucker@pattonboggs.com

ATTORNEYS FOR SEACOAST CAPITAL PARTNERS II, L.P.

**CERTIFICATE OF SERVICE**

I hereby certify that on this11th day of February, 2010February, 2010, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send a notice of electronic filing to the Office of the U.S. Trustee and to all parties receiving electronic notice.

/s/ Thomas J. Lasater