**SO ORDERED.**

**SIGNED this 01 day of June, 2010.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| QuVIS, INC. | ) | **Case No. 09-10706** |
| | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**ORDER ON DEBTOR'S MOTION TO DETERMINE**
**SECURED STATUS OF NOTEHOLDERS**

Debtor's motion to determine the secured status of various Noteholders[1] came on for

evidentiary hearing on March 17, 2010.[2] The Court received documentary evidence regarding that

_____

[1] Dkt. 212.

[2] Debtor appeared by counsel Nicholas R. Grillot. J. Michael Morris appeared for the
Unsecured Creditors' Committee ("Committee"). J. Maxwell Tucker and Thomas J. Lasater
appeared for Seacoast Capital Partners ("Seacoast"). F. Patrick Riordan and Michael R. Munson
appeared for JFM Limited Partnership I ("JFM"). William B. Sorensen appeared for the

-1-

certain First Amended and Restated Convertible Loan and Security Agreement ("Loan Agreement" or "Security Agreement") and UCC filings under which various individuals and entities ("Noteholders") loaned money to debtor and took a security interest in most of debtor's assets.[3] At the conclusion of the hearing, the Court permitted additional time for the parties to file legal memoranda regarding the issues presented. The Court has now received the post-trial legal memoranda and having reviewed the same, together with the evidentiary record, is prepared to rule.[4]

<u>Jurisdiction</u>

This is a contested matter that is core and over which this Court has subject matter jurisdiction.[5]

<u>Factual Background</u>

This chapter 11 case was commenced as an involuntary bankruptcy by petitioning creditors, Douglas A. Friesen, Marilyn R. Friesen Greenbush, and Douglas A. Cusick, on March 20, 2009.[6] The debtor consented to an order for relief being entered on May 18, 2009. Debtor filed its Disclosure Statement and Plan on November 6, 2009.[7] In its plan, debtor proposed that all Noteholders under the Loan Agreement be placed in the same class and treated identically. Several

---

Petitioning Creditors and Wichita Investment Group, LLC ("WIG").

[3] The Court received into evidence Exhibits 1-5 by stipulation of the parties, Exhibit 6 and 8, and a limited portion of Exhibit 7.

[4] *See* Dkt. 287 (Creditor Seacoast Capital Partners); Dkt. 295 (Debtor); Dkt. 296 (Creditor JFM Limited Partnership I); Dkt. 297 (Petitioning Creditors and Wichita Investment Group, LLC); Dkt. 299 (Unsecured Creditors' Committee).

[5] 28 U.S.C. § 1334(b) and § 157(b)(1) and (b)(2)(B), (K) and (O).

[6] Each of the petitioning creditors are Noteholders under the Loan Agreement.

[7] Dkt. 157 and 158.

responses or objections were filed to debtor's disclosure statement, including debtor's proposed classification of the Noteholders.[8]  On January 14, 2010 the Court held a hearing on the adequacy of debtor's disclosure statement and determined that it was inadequate.[9]  The Court concluded that a determination of the secured status of Noteholders under the Loan Agreement would affect the classification of these creditors under debtor's plan and was necessary prior to approving any amended disclosure statement or plan filed by debtor or other parties.  The Court therefore directed that a motion to determine the Noteholders' secured status under 11 U.S.C. § 506 be filed to bring the issue before the Court and allowed a brief period of discovery on the same.  On January 28, 2010, debtor filed the motion to determine secured status of noteholders for the purpose of plan classification and otherwise ("Motion").[10]  Numerous responses to the Motion were filed and it was set for evidentiary hearing on March 17, 2010.[11]

The Court convened a status conference on the Motion on March 9, 2010 and directed counsel to prepare and submit a pretrial order.  The agreed pretrial order was entered by the Court on March 15, 2010.[12]  It contained the following stipulations of fact:[13]

3.      . . . the Debtor issued secured promissory notes to several creditors (each a

---

[8]  Dkt. 195 (Petitioning Creditors, J. Greg Kite and Wichita Investment Group, LLC), Dkt. 196 (Unsecured Creditors' Committee), and Dkt. 200 (Seacoast Capital Partners).

[9]  Dkt. 203 and 210.

[10]  Dkt. 212.

[11]  See Dkt. 236 (Petitioning Creditors and Wichita Investment Group, LLC), Dkt. 235 (Creditor Seacoast Capital Partners), Dkt. 234 (Creditor JFM Limited Partnership I), Dkt 224 (Unsecured Creditors' Committee), and Dkt. 223 (Creditor George O. Haggard Jr.).

[12]  Dkt. 266.

[13]  Dkt. 266 at 3-4.

-3-

"Noteholder") pursuant to a First Amended and Restated Convertible Loan and Security Agreement, dated June 30, 2003 (the "Security Agreement").

4.      Under the Security Agreement, individuals or entities were allowed to loan the Debtor money in exchange for a security interest in the following of the Debtor's assets:

> ' . . . the Borrower ("Debtor") hereby pledges, and grants to the Lenders a security interest in all of the right, title and interest of the Borrower in and to all of the property, assets, interests and undertakings of the Borrower, whether now owned or hereafter acquired, existing or arising, real, person [sic] or mixed, tangible or intangible, of every kind and description, wherever located, together with all renewals thereof, substitutions therefor and proceeds thereof and all interest, dividends, income and revenue therefrom, ***excluding all factored accounts receivable whether now existing or in the future,*** but otherwise including all accounts, chattel paper, all contracts, all deposit accounts, all equipment, all fixtures, all goods, all instruments, all inventory, all cash of the Borrower, all patents, trademarks, trade names, copyrights and other intellectual property or intellectual property rights of a secured party under the Uniform Commercial Code of the State of Kansas as it may be amended from time to time.'

5.      In paragraph Article VI, Section 6.01(b) of the Security Agreement, the Debtor was required to take the steps necessary to perfect the Noteholder's security interest. Pursuant to this obligation, on March 14, 2002, the Debtor filed a financing statement with the Kansas Secretary of State Office for all Noteholders who had taken a security interest at that time. As additional loans were made by different individuals or entities, new Noteholders were added to the original financing statement by the filing of a UCC-2.

6.      By operation of K.S.A. § 84-9-515, the March 14, 2002 financing statement lapsed on March 14, 2007. No continuation statement was filed by the Debtor.

At trial, the parties introduced into evidence the Loan Agreement,[14] a record of the various lapsed

UCC financing statements filed in connection with the Loan Agreement,[15] the current filed UCC

---

[14] Ex. 1.

[15] Ex. 5.

financing statements,[16] and other documents. Kenbe Goertzen, chief executive officer of debtor, testified to the circumstances surrounding the loans to QuVis under the Loan Agreement.[17] He is a computer engineer and founded QuVis in 1994 and funded it during the development stages through late 1995. At that time, QuVis hired a chief operating officer to raise capital and had a stock offering sale in late 1996 or early 1997.[18] During the period 1998-2001, additional sales of stock were made to some of the previous equity holders. It is not readily apparent how much money was raised through investor equity sales. By 2001, a small group of the investors wanted more security for their equity investment. This led to the first secured note which Goertzen said was approximately $2.9 million. A second secured note followed in 2002 in the amount of $1.5 million. QuVis granted a security interest in its intellectual property and all of its assets, except receivables. Goertzen testified that in June 2003, the current Loan Agreement was entered into. He believes that the 2001 and 2002 notes were rolled into the 2003 Loan Agreement. For each of the parties who loaned money to QuVis under the 2003 Loan Agreement, QuVis executed a note.[19] The Loan Agreement is open-ended in the sense that not all of the parties loaned funds to QuVis at the same

---

[16] Ex. 4.

[17] QuVis develops and sells software and hardware that compresses and processes video data for various digital video applications in the medical, film, and military industries. The readers of this Order are directed to this Court's previous Order entered November 23, 2009 allowing a post-petition salary to Mr. Goertzen, for a description of QuVis and the background of its debt structure. *See* Dkt. 177.

[18] Goertzen testified that Becky Lester was the individual hired and was the person primarily responsible for raising capital. By the 2001-2002 time frame, Goertzen was not directly involved in raising money but was primarily involved in the technology development aspects of QuVis. Lester remained at QuVis until 2007 or 2008.

[19] The form of the secured note executed by QuVis is attached as an exhibit to the Loan Agreement. *See* Ex. 1.

time.  Goertzen testified that when a new loan was made, the lender was added as a secured party with the filing of a UCC-2.[20]   The parties offered no other extrinsic evidence to aid in the interpretation or construction of the Loan Agreement.  The Loan Agreement specifies that Kansas law shall govern interpretation of the Loan Agreement.[21]

<u>Analysis</u>

This Motion requires the Court to interpret the First Amended and Restated Convertible Loan and Security Agreement ("Loan Agreement") dated June 30, 2003 and entered into by the Debtor and approximately 70 parties ("Noteholders") who loaned money to QuVis in exchange for a security interest in QuVis's assets.  The obligations matured on June 30, 2006.[22]   According to Exhibit 2, Debtor owed 73 Noteholders total principal and accrued interest as of June 30, 2008 in the approximate amount of $38.7 million dollars.  The UCC-1 financing statement filed by debtor for all Noteholders on March 14, 2002, as it was authorized and obligated to do under the Loan Agreement, lapsed on March 14, 2007 by operation of Kansas law.[23]   Thereafter, at various times between June 7, 2007 and February 5, 2009, some, but not all, of the Noteholders proceeded individually to file new financing statements.[24]  The primary issue is whether the new UCC-1 filing by the individual Noteholders perfected not only their individual security interests but also the

---

[20]  *See* Ex. 5.   The UCC suggests that an amendment that adds a secured party is effective from the date of filing the financing statement. *See* KAN. STAT. ANN. § 84-9-512(c) and (d).

[21]  Ex. 1, Section 12.09.

[22]  Ex. 1, p. 3.

[23]  *See* KAN. STAT. ANN. § 84-9-515(a) (2009 Supp.).   When the financing statement lapsed, the Noteholders became unperfected. *See* § 84-9-515(c).

[24]  Ex. 3.

security interests of those Noteholders who failed to file a new financing statement and who were not named as secured parties on the new financing statements. If each separate filing operated to perfect all the Noteholders' security interests, all of the Noteholders have allowed secured claims that may be placed in a single plan class for voting purposes. If the separate filings only operated for the separate filers' benefit, some of the Noteholders are secured, while others are unsecured. Their claims should be treated in at least two separate classes. Once this question is resolved, the Court must also determine whether the perfected Noteholders should be paid pro-rata or whether the Noteholders should be paid in order of their UCC filing (*i.e.* first to file having priority).

The debtor's plan places all the Noteholders in a single class and treats them as pro-rata secured creditors. The evidence demonstrates that the Noteholders were, in reality, investors who sought a more-secure position in the company than that which usually attends an equity interest. The Loan Agreement represents an effort to accommodate that desire by allowing individual Noteholders to have a security interest in the assets of he company (except its receivables), but providing that the notes could be converted to equity on the Noteholders' request. So long as the notes were not converted, the Noteholders remained secured creditors. The Loan Agreement provides for the debtor to file financing statements to perfect each Noteholders' interest and, in turn, authorizes the Noteholders to file such statements if the debtor does not. Debtor filed statements on behalf of all the secured Noteholders, but allowed them to lapse. Certain Noteholders have now filed their own financing statements. Some of the Noteholders claim they filed them on behalf of all the Noteholders; others assert they have a priority in the secured assets based on the time of their

-7-

UCC-1 filings.[25]

## I. Does the Loan Agreement Unambiguously Authorize a Single Noteholder to Perfect for All Noteholders?

The Court begins its analysis by reviewing and applying principles of contract law for interpreting the Loan Agreement. Several of those legal principles are summarized in *Heyen v. Hartnett*, with the overriding rule expressed as follows:

> The fundamental rule in construing the effect of a written instruments is that the intent and purpose of the parties be determined from an examination of the entire instrument or from its four-corners. The language used anywhere in the instrument should be taken into consideration and construed in harmony with other provisions.[26]

The Court first considers whether the Loan Agreement is ambiguous. Ambiguity is present when the language in the document is susceptible to two or more meanings or is of doubtful or conflicting meaning.[27] If the Loan Agreement is ambiguous, the Court may apply rules of construction and consider extrinsic evidence to ascertain the parties' intent.[28] The law favors reasonable

---

[25] Debtor and Seacoast are in the camp that all Noteholders were perfected by one Noteholder filing. The Committee, WIG and JFM are in the camp that only the creditor Noteholder listed on the filed UCC-1 is perfected.

[26] 235 Kan. 117, 122, 679 P.2d 1152 (1984).

[27] *Waste Connections of Kansas, Inc. v. Ritchie Corp.,* __ Kan. App. 2d __, 228 P.3d 429, 438 (2010); *Simon v. National Farmers Organization, Inc.,* 250 Kan. 676, 680 (829 P.2d 884 (1992)

[28] *See Anderson v. Dillard's Inc.,* 283 Kan. 432, 436, 153 P.3d 550 (2007) (If there is no ambiguity, there is no need to resort to the rules of construction since the court can determine the intent of the parties from the plain language of the contract); *Pioneer Ridge Nursing Facility Operations, L.L.C. v. Ermey,* 41 Kan. App. 2d 414, 203 P.3d 4 (2009) (When a written agreement is ambiguous, facts and circumstances existing before and connected with the signing of such contract are competent to clarify the intent and purpose of the agreement.); *Central Natural Resources, Inc. v. Davis Operating Co.,* 288 Kan. 234, 201 P.3d 680 (2009) (If ambiguous, circumstances existing prior to and contemporaneously with instrument's execution may clarify the intent and purpose of the contract, but may not be used to vary and nullify its clear and positive provisions.).

-8-

interpretations of contracts, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.[29]

The starting point for the Court is that part of the Loan Agreement that speaks to the security interest granted to the lenders, Article VI.[30]  It is this part of the Loan Agreement that the Debtor contends empowers any single Noteholder to perfect the security interest in the Debtor's assets on behalf of all Noteholders, without identifying any of the other Noteholders as a secured party. Section 6.05 with the heading "Appointment of Lenders as Attorney-in-Fact" states:

> Borrower [Debtor] appoints Lenders [Noteholders], *and each of them individually*, as *Borrower's attorney-in-fact* to do any act which Borrower is obligated by this Agreement to do, and to exercise the rights that Borrower may exercise under this Agreement, to use the Collateral as Borrower might use it and to protect and preserve *Lenders' rights under this Agreement and in the Collateral.* . . . No Lender shall have any liability whatsoever to the Borrower, any other Lender or any third party for any action taken or rights exercised pursuant to this section.[31]

Section 6.01(b) provides:

> In order to perfect such security interest, Borrower [Debtor] shall: make such filings and take such other actions as may be required under the Uniform Commercial Code of the State of Kansas or other jurisdiction.  *Borrower authorizes **each Lender** [Noteholder] to perform every act which **such Lender** considers necessary to protect and preserve the Collateral and **Lenders' interest therein*** and, in that regard, Borrower agrees to execute such documents and to take whatever other action is reasonably requested by Lenders to perfect and continue the security interest granted hereby.[32]

Overlaying these specific provisions is the definition of "Lenders" in Article I and an interpretative

---

[29]  *Waste Connections of Kansas, Inc., supra* at 436.

[30]  In Section 6.01(a), Debtor clearly and unequivocally granted a security interest in its assets to the Noteholders.  Subsequent provisions in Article VI speak to the perfecting of that security interest.

[31]  Ex. 1, p. 9 [Emphasis added].

[32]  Ex. 1, p. 8 [Emphasis added].

-9-

provision in section 12.10. "Lenders" is defined as "each person who has executed this [Loan] Agreement on the signature pages hereto, collectively, or any successor or substitute Lender . . ."[33] Section 12.10 provides, in pertinent part: "Unless the context clearly indicates, words used in the singular include the plural, words in the plural include the singular . . ."[34] The Court finds that this interpretative term affects the reading of the definition of "lenders." It provides that singular references can be read as plural and vice versa. While the definitional clause states that "lenders" means "each [lender] . . . , collectively," this does not, absent context, render the word "lenders" a collective, or plural, reference wherever it is used in the Loan Agreement. Indeed, as defined, "lenders" alternatively includes "or any successor or substitute [singular] Lender."[35]

Section 6.01(a) grants "Lenders" a security interest in the company's assets. In the context of the Loan Agreement and section 6.01(a), it is a collective or plural use of the word "lenders." In contrast, section 6.01(b) authorizes "each Lender" to do what is necessary for "such Lender" to preserve the collateral "and Lenders' interest therein." This language authorizes direct action by a single lender to perfect, as does the UCC itself.[36] Notably, section 6.05 appoints each lender as an attorney in fact to do what the borrower is supposed to do to protect the collateral or perfect the security interest.[37] Seacoast and Debtor argue that, taken together, these clauses mean that the debtor was to file and maintain current financing statements that perfected all of the lenders' security

---

[33] Ex. 1, p. 3.

[34] Ex. 1, p. 21.

[35] Ex. 1, p. 3.

[36] *See* KAN. STAT. ANN. § 84-9-509 (2009 Supp.) and Official UCC Comments thereto.

[37] Section 6.05 states, "Borrower appoints Lenders, *and each of them individually,* as Borrower's attorney-in-fact . . ."

-10-

interests and that it appointed the lenders individually as its attorneys in fact to maintain the collective financing statement current. Even though they were individually appointed, the actions they took were done on behalf of the lender body.

The Court disagrees and finds that there is no express authority in the Loan Agreement for the lenders to file for one another. Nothing in section 6.05 appoints lenders individually as attorneys in fact *for other lenders*. The individual lenders are appointed attorneys in fact *for the Debtor*. Under Kansas law, a power of attorney is a written instrument by which one person, as principal, appoints another as agent and confers upon such agent the authority to act in the place of the principal for the purposes set forth in the instrument.[38] Like other written instruments, there is no room for construction if the power of attorney is not ambiguous or uncertain and whose meaning is perfectly plain.[39] Here, section 6.05 enables each Noteholder (as agent of the Borrower) to perfect its security interest vis-a-vis the Debtor, should the Debtor fail to perform its obligation to make the requisite filings to perfect the security interest. Section 6.05 is the authorization from the Debtor for a Noteholder to file a financing statement as contemplated by KAN. STAT. ANN. § 84-9-509(a) and (b). There is no mention of acting on behalf of or exercising rights as an agent for or representative of all lenders or Noteholders as it pertains to filing a financing statement. Moreover, § 6.01(c)(iii) does not contemplate a single financing statement on behalf of all Noteholders. QuVis warrants to the Lenders that the Loan Agreement is effective to create a valid lien and "upon the

---

[38] *Geren v. Geren,* 29 Kan. App. 2d 565, 569, 29 P.3d 448 (2001), quoting *Muller v. Bank of America,* 28 Kan. App. 2d 136, 139, 12 P.3d 899 (2000) (A power of attorney is to be strictly construed).

[39] *See Bank IV, Olathe v. Capital Federal Saving & Loan Ass'n,* 250 Kan. 541, 549, 828 P.2d 355 (1992).

-11-

filing of the *appropriate financing statements* [plural], a perfected Lien in favor of the Lenders on the Collateral . . ." This language suggests that multiple financing statements would be filed to perfect the Noteholders' security interest rather than a single filing to perfect for all.

In only a few instances, does the Loan Agreement delineate the Noteholders' duties and obligations to one another or authorizes fewer than all Noteholders to exercise rights for all Noteholders. There are Noteholder actions that can be taken by all of them unanimously, by a majority of them, or by any one of them separately. For instance, section 10.01(a) gives Noteholders with a majority of the principal balance of the notes the right to waive debtor's default.[40] The Noteholder majority may also waive the debtor's covenants under section 9.01. But in section 12.02, modification of the Loan Agreement can only be effected by consent of "each Lender or an authorized representative of each Lender." Section 10.2 provides that the Noteholders (as a group) share in recoveries pro rata. Section 10.3 recognizes that the Noteholders can exercise remedies and enforce the Loan Agreement "collectively or individually." And as it relates to the financing statement specifically, section 5.04 authorizes "each Lender" to file a UCC-3 termination statement upon payment of the notes "held by the Lender."[41] These provisions suggest that the parties to the Loan Agreement understood the difference between authorizing collective as opposed to individual actions and that the parties knew how to plainly authorize action by fewer than all of the Noteholders. Section 6.05 speaks to separate action by a Noteholder and does not authorize a single Noteholder to act as an agent or representative of all Noteholders. Its last sentence provides " no

---

[40] Any such waiver under this section must be in writing. Under section 10.01(a)(v) and (viii), the debtor's bankruptcy and debtor's permitting the financing statement to lapse constitute events of default.

[41] *See* KAN. STAT. ANN. § 84-9-513(c).

Lender shall have any liability whatsoever to . . . any other Lender . . . for any action taken or rights exercised pursuant to this section." This exculpatory language is entirely consistent with Noteholders acting alone and cuts against concluding that one Noteholder is authorized to act as an attorney in fact for another Noteholder.

Several relevant provisions of the Kansas UCC support the Court's interpretation of Article VI of the Loan Agreement. First and foremost, KAN. STAT. ANN. § 84-9-502(a) specifies the information required on a financing statement for it to be sufficient: the name of the debtor, the name of the secured party or a representative of the secured party, and the collateral. More than one secured party may be shown on the financing statement.[42] A "representative of the secured party" need not indicate its representative capacity on the financing statement.[43] None of the Noteholders who filed new UCC-1s identified multiple secured parties on the financing statement. Each of them named only themselves as the secured party. Thus, the question becomes whether any provision in Article Nine operated to make the named Noteholder a "representative" of all Noteholders.

Although Article Nine does not require a secured party's representative to disclose its representative capacity on the financing statement, the alleged representative must be able to demonstrate some source of its authority to be deemed the "representative of the secured party." The Debtor and Seacoast argue that the § 6.05 of the Loan Agreement is the source of that authority. As previously noted, however, neither the debtor's appointment of the Noteholders as attorneys-in-fact in § 6.05 nor any other language in the Loan Agreement unequivocally makes any single Noteholder the representative, agent, or attorney-in-fact for all of the Noteholders. The parties point

---

[42] KAN. STAT. ANN. § 84-9-503(e).

[43] KAN. STAT. ANN. § 84-9-503(d).

-13-

to no separate agreement such as an intercreditor agreement or loan participation agreement that would authorize one creditor to act as an agent or representative of all of the Noteholders.[44]  The Court concludes that each filing Noteholder had only the power to act separately as a secured party, and not as a representative of all Noteholders.  In the absence of multiple secured parties being named on the new financing statements, the Court concludes per § 84-9-502(a) that the filed financing statements perfect only the security interests of those Noteholders named a secured party thereon.[45]  Those Noteholders who did not file financing statements and who were not named as secured parties on any of the new UCC-1s filed after the lapse, are not perfected.

KAN. STAT. ANN. § 84-9-509 was added to Article Nine in 2000 and amended in 2002 and 2004.  It addresses who may file a "record" in a secured transaction.  The financing statement itself need not explain the party's authority to file the financing statement.  As the comments to § 84-9-509 explain:

> This section collects in one place most of the rules determining whether a record may be filed. . . . Under these sections, the identity of the person who effects a filing is immaterial.  The filing scheme contemplated by this Part does not contemplate that the identity of a "filer" will be part of the searchable records.  *This is consistent with, and a necessary aspect of, eliminating signatures or other evidence of authorization*

---

[44]  *See In re Amron Technologies, Inc.,* 2007 WL 917236 at *3 (Bankr. M.D. Ga. Mar. 22, 2007).

[45]  The failure to name the other Noteholders as secured parties presents a similar type of "floating secured parties" problem identified in *In re EA Fretz Co.,* 565 F.2d 366 (5th Cir. 1978).  In that case, the financing statement identified corporation X as the secured party.  But the security agreement also secured loans made in the future to debtor by corporation X or any of its future divisions and affiliates.  Later loans made by wholly owned subsidiaries of corporation X were unperfected because the subsidiaries were not listed as secured parties.  While this case might be decided differently today with the addition of a "representative of the secured party" in § 84-9-502, the relationship among the corporate lenders was insufficient for the parent to perfect for the subsidiaries.  The current case is even farther removed than *EA Fretz* where there was no relationship between or among the Noteholders.

-14-

*from the system. . . .*As long as the appropriate person authorizes the filing, or, in the case of a termination statement, the debtor is entitled to the termination, it is insignificant whether the secured party or another person files any given record. *The question of authorization is one for the court, not the filing office.*[46]

Records filed in the filing office do not require signatures for their effectiveness. Subsection (a)(1) substitutes for the debtor's signature on a financing statement the requirement that the debtor authorize in an authenticated record the filing . . . Of course, a filed financing statement is ineffective to perfect a security interest if the filing is not authorized. See Section 9-510(a). *Law other than this Article, including the law with respect to ratification of past acts, generally determines whether a person has the requisite authority to file a record under this section. . . .*[47]

The Official UCC Comments further explain that a debtor gives *ipso facto* authorization for a secured party to file a financing statement by executing a security agreement.[48] But subsections (a), (b), and (c) of § 84-9-509 address a *debtor's* authorization of a person (including a secured party) to file an initial financing statement and certain amendments. Section 84-9-509(d) empowers a *secured party* to authorize "a person" [*i.e.* another secured party] to file certain financing statement *amendments*.[49] But as the Official Comments make clear, there must still be some express grant of that authority. Apart from the Loan Agreement, which the Court previously concluded does not provide this authority, the parties have identified no other source giving authorization for a

---

[46] KAN. STAT. ANN. § 84-9-509 (2009 Supp.), OFFICIAL UCC COMMENT 2 (Emphasis added).

[47] KAN. STAT. ANN. § 84-9-509, OFFICIAL UCC COMMENT 3 (Emphasis added).

[48] *See* KAN. STAT. ANN. § 84-9-509(b), OFFICIAL UCC COMMENT 4. As stated by treatise author Barkley Clark, "[a]s a practical matter, the secured party will get the debtor's express authorization for filing in the security agreement." Barkley Clark and Barbara Clark, 1 The Law of Secured Transactions under the Uniform Commercial Code ¶ 2.09[7][a] (Rev. ed. Nov. 2009). This is precisely what §§ 6.01 and 6.05 of the Loan Agreement effected.

[49] Amendments excluded from the reach of subsection (d) are amendments that add collateral or amendments that add a debtor. For these amendments, the debtor must give the authorization. *See* § 84-9-509(a)(1) and (b). Amendments which add a secured party to the financing statement must be authorized by the secured party of record under subsection (d).

-15-

Noteholder to file on behalf of all Noteholders.

In addition, the new filing made by the Noteholders here was not an amendment of an existing UCC-1. The Noteholders filed "new" UCC-1s.[50] A secured party (Noteholder) under an existing UCC-1 could have authorized an *amendment* to add a secured party under § 84-9-509(d), but could not have authorized an initial financing statement.[51] An initial financing statement must be authorized by the debtor. The Court observes that none of the new financing statements filed by the Noteholders after the lapse of the March 14, 2002 financing statement, identify any secured party other than the filing Noteholder. Nor is there any indication on the financing statement that the named secured party represents other unnamed and unidentified secured parties. And there is no reference in the new financing statements to identify the "secured party" by linkage to the Loan Agreement. No one reviewing these new financing statements in the Secretary of State's records would have an inkling that the secured parties identified therein are all related Noteholders under the Loan Agreement. If the parties truly intended that a single Noteholder was authorized to file for all Noteholders, any one of them could have filed amendments to the first UCC-1 filed on June 7, 2007 by secured party, J. Greg Kite (# 95498557) to name the other Noteholders.[52] They did not.

The Court also considers whether a Noteholder had ostensible or apparent authority to act as the agent of all Noteholders. An apparent agent is one who, with or without authority, reasonably appears to third persons to be authorized to act as the agent of another.[53] To determine whether an

---

[50] *See* Ex. 4 and § 84-9-515(c) for effect of a lapse of a filed financing statement.

[51] *See* § 84-9-509(e), Official UCC Comment 7 and § 84-9-510(b).

[52] *See* Ex. 4.

[53] *National Bank of Andover v. Kansas Bankers Sur. Co.,* ___ Kan. ___, 225 P. 3d 707, 723 (2010).

apparent agency exists, the courts look to intentional acts or words of the principal to a third party and if those acts or words reasonably induced the third party to believe that an agency relationship existed.[54] A principal's words or conduct may be overt and explicit to confer authority or the mere relationship between the agent and principal or the title conferred upon the agent by the principal may be sufficient to confer authority.[55] The evidentiary record here is devoid of any conduct or words by *any* of the Noteholders that one of them could perfect the security interest in debtor's assets for all of the Noteholders. None of the Noteholders announced to or informed debtor (or any other third party) that one of the Noteholders was authorized to perfect the security interest on behalf of all and who that agent Noteholder was. There was no relationship or affiliation among the Noteholders that would lead debtor or any other third party to believe that the Noteholders delegated to one Noteholder the authority to act for all with respect to perfecting the Noteholders' security interest.[56] Nor did the Noteholders engage in any conduct that would lead third parties to believe that a single Noteholder's action in filing a UCC-1 was effective for all.[57] To the contrary, here the Noteholders by their action in filing additional UCC-1s, after the first Noteholder Kite filed a UCC-

---

[54] *Town Center Shopping Center, LLC v. Premier Mortgage Funding, Inc.,* 37 Kan. App. 2d 1, 6, 148 P.3d 565 (2006)

[55] *Bucher & Willis Consulting Engineers v. Smith,* 7 Kan. App. 2d 467, 470, 643 P.2d 1156 (1982).

[56] *Cf. Town Center Shopping Center, LLC, supra* where a branch manager signed lease and lease was returned to landlord with a cover letter identifying the signer as a branch manager for the tenant. *See also, Bucher & Willis Consulting Engineers, supra* where an attorney, by virtue of attorney-client relationship alone, is clothed with apparent authority to bind the client for services connected with the representation.

[57] *See National Bank of Andover, supra* where bank employee was allowed to honor several overdrafts over a three year period thus giving customers the appearance that the employee possessed overdraft honoring authority.

-17-

1, suggest that no one Noteholder had apparent authority to perfect or file a financing statement for all Noteholders.  Moreover, the Noteholders each received separate notes from the debtor.  In sum, the Court finds no circumstances exist that would lead a third party to reasonably believe that any one Noteholder had apparent authority to act for all.[58]

The Court therefore concludes that the Loan Agreement and Article VI is unambiguous in that it can be reasonably and naturally read in a way that does little violence to any of its terms and gives effect to all of them.  It is not capable of multiple meanings, although it is less than precise in its treatment of the secured creditors and their rights vis-a-vis one another.  In the absence of an expression provision in the Agreement that authorizes individual Noteholders to act for the collective in filing financing statements, the individual filings perfect only the liens of the particular filing Noteholders, subject to any meritorious Chapter 5 avoidance actions.

## II.      Even if the Loan Agreement is Ambiguous, Extrinsic Evidence Supports the Court's Interpretation

Even if the Court were to conclude that this Loan Agreement is ambiguous and to apply rules of construction, the Court notes that the later-filed UCC-1s were, on their face, each filed individually and not on behalf of the Noteholder group.  The 2002 UCC-1 filed by the debtor named every Noteholder as a "secured party" and whenever a new investor loaned money to QuVis, the debtor amended it to name the new secured party.  The new UCC-1s represent opportunistic efforts on the part of the various filing Noteholders to establish a rank of priority among themselves.

---

[58] The party relying on an alleged agency relationship has the burden of establishing its existence by clear and satisfactory evidence. *Town Center Shopping Center,* 37 Kan. App. 2d at 6.

-18-

Nothing in the Loan Agreement nor the Kansas Uniform Commercial Code precludes that.[59]

Nevertheless, it remains clear to the Court that the Noteholders themselves believed that they were not all perfected by the filing of a new UCC-1 by one Noteholder. Otherwise, there would have been no reason for individual Noteholders to subsequently file their own UCC-1 financing statement after the first Noteholder (Kite) filed a new UCC-1.[60]

While it might be easier to propose and confirm a plan that deems all of the lenders perfected as of the date of the first separate filing, the Court cannot allow the parties' post facto desired interpretation of the Loan Agreement to trump its unambiguous meaning. The Loan Agreement expresses the parties' intention that lenders be individually permitted to file UCC-1s. Nowhere does it state that such filings are on behalf of all the lenders.

### III. Payment of Noteholders – Pro Rata vs. First-to-File

Having determined that only those Noteholders who filed UCC-1s after the lapse of the 2002 financing statement are perfected, the Court next considers whether such Noteholders are entitled to payment pro-rata or in the order in which they filed their financing statement. KAN. STAT. ANN. § 84-9-322(a)(1) states the general priority rule between two competing perfected security interests in the same collateral and is governed by the first to file or perfect. The UCC also recognizes that a party with priority may subordinate its claim or interest to a party that would

---

[59] Under KAN. STAT. ANN. § 84-9-509(a) and (b), a *debtor* may authorize a secured party (Noteholder) to file a UCC-1.

[60] *See Cline v. Angle,* 216 Kan. 328, 333-34, 532 P.2d 1093 (1975) (Where parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight in determining the meaning to be attributed to the provisions in question.)

-19-

otherwise have a junior priority.[61] The issue here is whether the Loan Agreement alters the first to file priority scheme.

Article X of the Loan Agreement addresses default and the rights and remedies upon a default. The Debtor's allowing the March 2002 financing statement to lapse and not file a continuation statement is in itself an event of default under § 10.01(a)(viii). So, too, is the filing of bankruptcy.[62] The Debtor, Seacoast and the Committee rely upon § 10.02(a)(iv) of the Loan Agreement to advocate that amounts received by the Noteholders under a chapter 11 plan are shared pro rata. WIG and JFM argue that the first-to-file rule applies.

Section 10.02(a)(iv) provides:

> All amounts received *by the Lenders* upon the exercise of *its* [sic] remedies hereunder shall be applied *by Lenders*, pro rata based on the outstanding principal amount of Notes issued under this Agreement.

The Court cannot reconcile the use of "its" in § 10.02(a)(iv) with the rest of the provision which appears to signify the Noteholders acting collectively to exercise "their" remedies upon an event of default. The Loan Agreement undoubtedly contemplated that the Debtor would file a financing statement to perfect the Noteholders' security interests collectively as QuVis in fact did on March 14, 2002.[63] When that financing statement lapsed, the Noteholders were left to fend for themselves to preserve and perfect their security interest in the assets of QuVis. The Loan Agreement and the

---

[61] *See* KAN. STAT. ANN. § 84-9-339. The statute makes clear, however, that the party with priority must agree to the subordination and be a party to any such subordination agreement.

[62] § 10.01(a)(v).

[63] Exhibit 1, § 6.01(b).

Case 09-10706   Doc# 333   Filed 06/01/10   Page 20 of 24

UCC both permitted the Noteholders to take those steps.[64]  Nothing in the Loan Agreement,
however, purports to alter the first-to-file priority scheme of KAN. STAT. ANN. § 84-9-322(a)(1).  If
the 2002 financing statement had not lapsed, all of the Noteholders (perfected under the same
financing statement) would have enjoyed the same priority.  It makes sense, in that instance, that the
Noteholders collective enforcement of their security interest would result in a pro-rata recovery.

But when the Noteholders as a group became unperfected and only some of them exercised
their right to perfect, they are no longer similarly situated nor are they acting collectively to enforce
their rights or remedies under the Loan Agreement.  Indeed, the Court is not convinced that
Noteholders have "exercise[d] . . . remedies [under the Loan Agreement]" to trigger § 10.02(a)(iv).
Those remedies under the Loan Agreement include acceleration of the notes[65] and the exercise of
rights as "secured parties."[66]   In short, the Court believes that the pro-rata sharing provision of §
10.02(a)(iv) can only be applied when the Noteholders are similarly situated and acting collectively.
This is simply not the case under the existing circumstances.

Moreover, § 10.03 recognizes the ability of the Noteholders to exercise their remedies
collectively or individually.  It provides:

> Lenders, *collectively or individually*, shall be entitled to enforce payment and
> performance of all obligations of the Borrower hereunder or under the Notes and to
> exercise all rights and powers hereunder or under the Notes, or under any Law and
> the pursuit of any remedy available to Lenders against the Borrower shall not
> prejudice or in any manner affect a Lender's rights to realize upon or enforce any
> other remedy or security now or hereafter available to it in such order and in such
> manner as such Lender may determine in its sole discretion.  No such right or

---

[64]  *See* Exhibit 1, § 6.01(b) and § 6.05; KAN. STAT. ANN. § 84-9-509(a)(1) and (b).

[65]  Section 10.02(a)(I).

[66]  Section 10.02(a)(ii).  The secured parties' remedies include, possession or sale of the
collateral.

remedy shall be exclusive, but each shall be cumulative and shall be in addition to every other remedy provided herein or in any other agreement or by Law and each such remedy may be exercised concurrently or independently. Nothing in this Agreement shall be construed as prohibiting the Lenders, collectively or individually, from seeking a deficiency judgment against the Borrower.

Obviously, a Noteholder acting individually would not be entitled to recover an amount more than the principal balance (and accrued interest) of its separate note. The Court therefore concludes that § 10.02(a)(iv) merely ensures that where Noteholders are similarly situated and acting collectively, each individual Noteholder will receive amounts in proportion to their note, thereby precluding one Noteholder from a greater or earlier recovery at the expense of a similarly situated Noteholder. A pro rata sharing does this. But where some Noteholders are perfected secured creditors and some are not, § 10.02(a)(iv) cannot be applied.

The Court therefore concludes that the Loan Agreement did not abrogate the first to file rule under the circumstances existing here and that payments to the Noteholders who filed new UCC-1s should be made in the order in which each Noteholder filed a financing statement.

## IV.    The June 1, 2005 Subordination Agreement

Creditor JFM suggests that the subordination agreement entered into between Seacoast and two other Noteholders, Owen Leonard and Vernon Nelson, is parol evidence of Seacoast's belief that its security interest and note was separate and distinct from the other Noteholders and therefore, one Noteholder's filing did not perfect for all.[67] Creditor WIG cites to the subordination agreement

---

[67] *See* Dkt. 296, p. 4. The Court observes that in its examination of the Kansas Secretary of State's Uniform Commercial Code records showing the original financing statement filed March 14, 2002, the last UCC-2 amendment to add secured parties occurred on May 27, 2005. The Court can find no UCC-2 filing showing that Seacoast was ever added as a secured party to this financing statement and it thus appears that Seacoast was never perfected in the 2002 financing statement. *See* Exhibit 5.

as parol evidence of Seacoast's intent to alter the first-to-file priority rule.[68]  Having concluded that

the Loan Agreement is unambiguous, the Court does not resort to parol evidence to interpret it.

Even if the Court considered parol evidence, it is not convinced that the subordination agreement

by itself sheds much light on the parties' intent with respect to either issue.

The Court first observes that the subordination agreement was entered into by only three of

the Noteholders – Seacoast, Leonard and Nelson, and it is dated June 1, 2005 – *prior to the lapse*

of the March 14, 2002 financing statement.[69]  The Court questions the evidentiary value of a pre-

existing subordination agreement when analyzing the effect of UCC-1s filed up to two years after

the 2002 financing statement lapsed and all of the Noteholders became unperfected, a situation not

contemplated when the subordination agreement was executed.  Moreover, the subordination

agreement does not affect Seacoast's priority vis-a-vis the other Noteholders who did not consent

to subordination of their interest to Seacoast.  Finally, after the lapse of the 2002 financing statement

on March 14, 2007, Seacoast filed a new UCC-1 on June 14, 2007 while Vernon Nelson filed his

UCC-1 on January 13, 2009 and Owen Leonard filed his UCC-1 on  January 16, 2009.[70]  It would

thus appear that Seacoast is ahead of Nelson and Leonard by virtue of its UCC-1 filing.  The Court

considers the subordination agreement to be of little value in construing the Loan Agreement.

Conclusion

The Court concludes that each Noteholder who filed a UCC-1 after the lapse of the March

14, 2002 financing statement, holds a perfected secured interest as of the date of the UCC-1 filing,

---

[68]  *See* Dkt. 297, pp. 8-9.

[69]  Exhibit 6.  On its face, the subordination agreement indicates that it was entered into
as an inducement for Seacoast to enter into the Loan Agreement and become a Noteholder.

[70]  Exhibit 3 and 4.

with an interest in the collateral in an amount equal to its claim, up to the value of the collateral remaining after application of the collateral to lenders of senior priority. Some Noteholders' security interests may be subject to avoidance by the debtor-in-possession in the exercise of its Chapter 5 avoiding powers. The potential consequences of this are several. The lien of any Noteholder who filed a UCC-1 during the 90-day preference period, December 20, 2008 to March 20, 2009, may, in the absence of applicable defenses, be avoidable by Debtor as having been preferentially perfected under 11 U.S.C. § 547. Noteholders who failed to file a UCC-1 after the lapse of the 2002 financing statement hold unperfected security interests that may be avoidable under 11 U.S.C. § 544(a)(1). Some effort at valuing the collateral may be necessary in order to allow the Noteholders' secured claims under 11 U.S.C. § 506(a).

Accordingly, the disclosure statement and plan do not adequately describe the relationship of the Noteholders to the debtor. The disclosure statement is therefore inadequate and cannot be approved. Debtor is granted 10 days in which to amend its disclosure statement consistent with this Court's determination of the Noteholders' secured status.

# # #

-24-